UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CATHERINE GORDON, JAMES SCHAFFER, TERESA
THOMPSON, PAMELA MIKA, JENNIFER PFENTNER and
DIANA GALDON, on behalf of themselves and all other employees
similarly situated,

Plaintiffs,

v.

KALEIDA HEALTH, et al.,

Defendants.

**Civil Action No.
08-CV-00378-WMS**

### DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR RULE 23 CLASS CERTIFICATION OF NEW YORK LABOR LAW CLAIMS

NIXON PEABODY LLP
40 Fountain Plaza, Suite 500
Buffalo, New York 14202
Tel:  (716) 853-8100

COBURN & GREENBAUM  PLLC
1710 Rhode Island Avenue, NW
Washington, DC  20036
Tel: (202) 657-5003

*Attorneys for Kaleida Health Defendants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... iv-ix

PRELIMINARY STATEMENT ....................................................................................... 1

FACTUAL BACKGROUND ............................................................................................ 6

    Defendants' Operations and Corporate Structure ...................................................... 6

    Defendants' Facilities and Organizational Structure ................................................. 6

    Types of Health Care Services Provided at the Various Facilities ........................... 7

    Separate Human Resources Organizations ............................................................... 9

    Defendants' Workforce ............................................................................................. 9

    Defendants' Timekeeping Systems and Policies ..................................................... 11

    Defendants' Timekeeping Standards Policy ............................................................ 11

    Communications/Training on Defendants' Timekeeping Policies ........................... 14

    Defendants' Payroll Data Demonstrates that their Policy and Practice is to Pay
    Employees for All Time Worked .............................................................................. 15

PROCEDURAL BACKGROUND ................................................................................... 16

ARGUMENT .................................................................................................................. 16

POINT I

    CLASS CERTIFICATION SHOULD BE DENIED BECAUSE THE NAMED
    PLAINTIFFS HAVE FAILED TO MEET THE REQUIREMENTS OF RULE 23(a) .......... 17

        A.    PLAINTIFFS HAVE FAILED TO ESTABLISH COMMONALITY AND
               TYPICALITY ................................................................................................ 18

               1.    Plaintiffs Have Failed to Establish Commonality and Typicality With
                      Respect to the Proposed Meal Break Class ...................................... 19

                      a.    Factual Disparities ................................................................ 25

|  | i. | Differences Among Putative Plaintiffs' Work Environments | .25 |

i. Differences Among Putative Plaintiffs' Work Environments .25

ii. Differences in Overtime Worked ................................................ 26

iii. Differences in Shifts .................................................................. 27

iv. Unionization and Collective Bargaining Agreement Differences ................................................................................... 27

v. Differences in Weekly Schedules/Overtime Thresholds ......... 28

vi. Differences in Scheduling of Lunch Breaks ............................. 28

vii. Differences in How Missed Meals are Reported ..................... 30

viii. Differences in Number of Canceled Deductions ..................... 31

ix. Differences in Self-Reported Number of Missed Breaks ........ 32

b. Factual and Legal Issues to Be Raised by Defendants .......................... 34

i. Whether putative class members reported and were paid for work performed during unpaid meal breaks ............................. 34

ii. Whether defendants knew or had reason to know of work performed during unpaid meal breaks ...................................... 35

iii. Whether meal breaks were spent predominantly for the benefit of the employer .......................................................................... 42

iv. The *De Minimis* Defense ........................................................... 43

v. LMRA preemption is an individualized defense ..................... 44

vi. The application of the professional exemption under the NYLL is an individualized week-by-week inquiry ............................... 45

2. Plaintiffs Have Failed to Establish Commonality and Typicality With Respect to the Proposed Rounding Class ........................................................................ 46

POINT II

CLASS CERTIFICATION SHOULD BE DENIED BECAUSE THE NAMED PLAINTIFFS HAVE FAILED TO MEET THE REQUIREMENTS OF RULE 23(b) .......... 52

A. CLASS CERTIFICATION UNDER RULE 23(b) SHOULD BE DENIED ................ 52

1.    Individualized Damages and Evidentiary Issues Predominate ...........................52

      a.    Meal Break Class .........................................................................54

      b.    Rounding Class .........................................................................55

2.    Manageability/Superiority ........................................................56

CONCLUSION ....................................................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Altier v. Worley Catastrophe Response, LLC*,
   2011 WL 3205229 (E.D. La. July 26, 2011) ..................................................................53

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ............................................................................................ 18, 53

*Anderson v. Mt. Clemens Pottery Co.*,
   328 U.S. 680 (1946) ............................................................................................43

*Armour & Co. v. Wantock*,
   323 U.S. 126 (1944) ............................................................................................42

*Basco v. Wal-Mart Stores, Inc.*,
   216 F. Supp. 2d 592 (E.D. La. 2002) ...................................................................55

*Beasley v. Hillcrest Med. Ctr.*,
   78 Fed. Appx. 67 (10th Cir. 2003) ................................................................ 42, 43

*Berger v. Cleveland Clinic Found.*,
   2007 U.S. Dist. LEXIS 76593 (N.D. Ohio Sept. 29, 2007) ................................22

*Blackwell v. SkyWest Airlines*,
   245 F.R.D. 453 (S.D. Cal. 2007) .........................................................................55

*Burch v. Qwest Commc'ns Int'l, Inc.*,
   677 F. Supp. 2d 1101 (D. Minn. 2009) ...............................................................42

*Camesi v. Univ. of Pittsburgh Med. Ctr.*,
   2011 U.S. Dist. LEXIS 146067 (W.D. Pa. Dec. 20, 2011) ....................... 21, 36, 44

*Camilotes v. Resurrection Health Care Corp.*,
   2012 U.S. Dist. LEXIS 143583 (N.D. Ill. Oct. 4, 2012) ............................... passim

*Caridad v. Metro-North Commuter R.R.*,
   191 F.3d 283 (2d Cir. 1999), *cert. denied*, 529 U.S. 1107 (2000) .......................17

*Cason v. Vibra Healthcare*,
   2011 WL 1659381 (E.D. Mich. May 3, 2011) .....................................................20

*Colozzi v. St. Joseph's Hosp. Health Ctr.*,
   275 F.R.D. 75 (N.D.N.Y 2011) ...........................................................................58

*Coopers & Lybrand v. Livesay,*
    437 U.S. 463 (1978) ....................................................................................................18

*Cornn v. UPS,*
    2005 U.S. Dist. LEXIS 30419 (N.D. Cal. Aug. 26, 2005) ...................................................56

*Cruz v. Dollar Tree Stores, Inc.,*
    2011 WL 2682967 (N.D. Cal. July 8, 2011).......................................................................58

*De Asencio v. Tyson Foods, Inc.,*
    500 F. 3d 361 (3d Cir. 2007) ........................................................................................43

*Diaz v. Electronics Boutique of Am., Inc.,*
    2005 U.S. Dist. LEXIS 30382 (W.D.N.Y. Oct. 13, 2005)..................................................19

*Dorman v. DHL Express (USA), Inc.,*
    2010 WL 446071 (W.D. Wisc. Feb. 3, 2010) .................................................................53

*England v. Advance Stores Co.,*
    263 F.R.D. 423 (W.D. Ky. 2009)..................................................................................54

*Espinoza v. 953 Assocs. LLC,*
    280 F.R.D. 113 (S.D.N.Y. 2011) ..................................................................................24

*Fengler v. Crouse Health Found., Inc.,*
    595 F. Supp. 2d 189 (N.D.N.Y. 2009) ..........................................................................20

*Flores v. Anjost Corp.,*
    284 F.R.D. 112 (S.D.N.Y. 2012) ..................................................................................24

*Frye v. Baptist Mem. Hosp., Inc.,*
    2012 U.S. App. LEXIS 17791 (6th Cir. Aug. 21, 2012) ............................................ 16, 20

*Frye v. Baptist Memorial Hospital, Inc.,*
    2010 U.S. Dist. LEXIS 101996 (W.D. Tenn. Sept. 27, 2010)...........................................21

*Gen. Tel. Co. of the Southwest v. Falcon,*
    457 U.S. 147 (1982) ................................................................................................ 17, 18

*Gonzalez v. Millard Mall Serv., Inc.,*
    281 F.R.D. 455 (S.D. Cal. 2012)..................................................................................24

*Groussman v. Motorola, Inc.,*
    2011 WL 5554030 (N.D. Ill. Nov. 15, 2011) .................................................................19

*Hamelin v. St. Luke's Healthcare,*
    274 F.R.D. 385 (N.D.N.Y 2011).................................................................................58

*Hawkins v. Securitas Sec. Servs. USA, Inc.,*
    280 F.R.D. 388 (N.D. Ill. 2011) ..................................................................53

*Helm v. Alderwoods Group, Inc.,*
    2009 U.S. Dist. LEXIS 123527 (N.D. Cal. Dec. 29, 2009) ........................55

*Hertz v. Woodbury Cnty.,*
    566 F.3d 775 (8th Cir. 2009) .....................................................................39

*Hinterberger v. Catholic Health System, Inc.,*
    No. 08-cv-380 (W.D.N.Y Nov. 28, 2012) .............................................. 40, 41

*Hnot v. Willis Group Holdings Ltd.,*
    228 F.R.D. 476 (S.D.N.Y. 2005) ................................................................17

*Hollander v. American Cyanamid Co.,*
    172 F.3d 192 (2d Cir. 1999), *cert. denied*, 528 U.S. 965 (1999) ...............47

*Hughes v. WinCo Foods,*
    2012 U.S. Dist. LEXIS 2469 (C.D. Cal. Jan. 4, 2012) ......................... 24, 34

*In re Initial Pub. Offering Sec. Litig.,*
    471 F.3d 24 (2d Cir. 2006).................................................................... 17, 47

*In re Visa Check/MasterMoney Antitrust Litig.,*
    280 F.3d 124 (2d Cir. 2001), *cert. denied sub nom.*, *Visa U.S.A., Inc. v. Wal-Mart Stores,*
    *Inc.*, 536 U.S. 917 (2002)...........................................................................47

*Koike v. Starbucks Corp.,*
    378 Fed. Appx. 659 (9th Cir. 2010).............................................................37

*Kuebel v. Black & Decker Inc.,*
    643 F.3d 352 (2d Cir. 2011) .................................................................. 22, 36

*Kuznyetsov v. West Penn Allegheny Health Sys.,*
    2011 U.S. Dist. LEXIS 146056 (W.D. Pa. Dec. 20, 2011) .................... 20, 36

*Ledbetter v. Pruitt Corp.,*
    2007 WL 496451 (M.D. Ga. Feb. 12, 2007) ..............................................20

*Lewis v. Keiser Sch., Inc.,*
    2012 U.S. Dist. LEXIS 147150 (S.D. Fla. Oct. 12, 2012) ..........................35

*Lindow v. United States,*
    738 F. 2d 1057 (9th Cir. 1984).....................................................................43

*Mateo v. V.F. Corp.,*
    2009 U.S. Dist. LEXIS 105921 (N.D. Cal. Oct. 27, 2009) ..........................54

vi

*Moore v. PaineWebber, Inc.*,
  306 F.3d 1247 (2d Cir. 2002) ....................................................................53

*Morris v. Affinity Health Plan, Inc.*,
  859 F. Supp. 2d 611 (S.D.N.Y. 2012) .......................................................24

*Myers v. Crouse Health Sys., Inc.*,
  274 F.R.D. 404 (N.D.N.Y 2011)................................................................58

*Myers v. Hertz Corp.*,
  624 F.3d 537 (2d Cir. 2010) .............................................................18, 46, 53, 54

*Pabst v. Okla. Gas. & Elec. Co.*,
  228 F.3d 1128 (10th Cir. 2000)..................................................................42

*Pecere v. Empire Blue Cross & Blue Shield*,
  194 F.R.D. 66 (E.D.N.Y. 2000) .................................................................18

*Penk v. Or. St. Bd. of Higher Educ.*,
  816 F.2d 458 (9th Cir. 1987), *cert. denied*, 484 U.S. 853 (1987).......................47

*Pforr v. Food Lion, Inc.*,
  851 F.2d 106 (4th Cir. 1988) .....................................................................35

*Pryor v. Aerotek Scientific LLC*,
  278 F.R.D. 516 (C.D. Cal. 2011) ........................................................... 41, 55

*Ramos v. SimplexGrinnell LP*,
  796 F. Supp. 2d 346 (E.D.N.Y. 2011) .......................................................24

*Reed v. County of Orange*,
  266 F.R.D. 446 (C.D. Cal. 2010) ..............................................................35

*Reich v. S. New Eng. Telecomms. Corp.*,
  121 F.3d 58 (2d Cir. 1997).........................................................................42

*Robinson v. Metro-North Commuter R.R. Co.*,
  267 F.3d 147 (2d Cir. 2001) ......................................................................19

*Romero v. H.B. Auto. Group, Inc.*,
  2012 U.S. Dist. LEXIS 61151 (S.D.N.Y. May 1, 2012) ............................24

*Russo v. BellSouth Telecomms., Inc.*,
  2009 U.S. Dist. LEXIS 20552 (N.D. Ga. Feb. 10, 2009) .............................3

*Salon Fad v. L'Oreal USA, Inc.*,
  2011 WL 4089902 (S.D.N.Y. Sept. 14, 2011) ..........................................18

*Sheehan v. Purolator, Inc.*,
   839 F.2d 99 (2d Cir. 1988), *cert. denied*, 488 U.S. 891 (1988) ..........................................47

*Sweet v. Pfizer*,
   232 F.R.D. 360 (C.D. Cal. 2005) ..........................................57

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
   546 F.3d 196 (2d Cir. 2008) ..........................................17

*Valentino v. Carter-Wallace, Inc.*,
   97 F.3d 1227 (9th Cir. 1996) ..........................................57

*Vang v. Kohler Co.*,
   2012 WL 2917788 (E.D. Wis. July 17, 2012)..........................................40

*Vang v. Kohler Co.*,
   2012 WL 3689501 (7th Cir. Aug. 28, 2012) ..........................................41

*Vega v. T-Mobile USA, Inc.*,
   564 F.3d 1256 (11th Cir. 2009) ..........................................57

*Wal-Mart Stores, Inc. v. Dukes*.
   131 S. Ct. 2541 (2011) ..........................................passim

*White v. Wash. Gas*,
   2005 U.S. Dist. LEXIS 3461 (D. Md. Mar. 4, 2005)..........................................22

*White v. Western Beef Props., Inc.*,
   2011 U.S. Dist. LEXIS 141696 (E.D.N.Y. Dec. 9, 2011)..........................................45

*Wong v. AT&T Mobility Servs. LLC*,
   2011 U.S. Dist. LEXIS 125988 (C.D. Cal. Oct. 20, 2011) ..........................................34

*Wood v. Mid-America Mgmt. Corp.*,
   192 Fed. Appx. 378 (6th Cir. 2006)..........................................22

*York v. Starbucks Corp.*,
   2011 U.S. Dist. LEXIS 155682 (C.D. Cal. Nov. 23, 2011) ..........................................37

*Youngblood v. Family Dollar Stores, Inc.*,
   2011 WL 4597555 (S.D.N.Y. Oct. 4, 2011) ..........................................24

*Zivali v. AT&T Mobility, LLC*,
   784 F. Supp. 2d 456 (S.D.N.Y. 2011) ..........................................44

## FEDERAL STATUTES

Internal Revenue Code § 501(c)(3) ..........................................6

STATE STATUTES

New York Labor Law ("NYLL")....................................................................................passim

N.Y. Lab. Law § 190(7) (McKinney 2012)...........................................................................45

RULES

Fed. R. Civ. P. 23(a)....................................................................................................passim

Fed. R. Civ. P. 23(a)(2)....................................................................................................18

Fed. R. Civ. P. 23(a)(3)....................................................................................................19

Fed. R. Civ. P. 23(b).................................................................................................17, 52

Fed. R. Civ. P. 23(b)(3)...............................................................................................passim

Fed. R. Civ. P. 23(b)(3)(D)................................................................................................57

REGULATIONS

29 C.F.R. § 785.11.........................................................................................................35

29 C.F.R. § 785.12.........................................................................................................35

29 C.F.R. § 785.47.........................................................................................................43

29 C.F.R. § 785.48(b)................................................................................................47, 50

12 N.Y.C.R.R. § 142-3.12(c)(2) (2012)..............................................................................45

OTHER AUTHORITIES

5 James Wm. Moore et al., *Moore's Federal Practice*, § 23.46[2][e][i] (3d ed. 2012)..........................53

U.S. Department of Labor Opinion Letter,
   2008 DOLWH LEXIS 12 (May 15, 2008).......................................................................48

U.S. Dep't of Labor, Wage & Hour Division Fact Sheet #53,
   The Health Care Industry and Hours Worked (Rev. July 2009) .....................................20

## PRELIMINARY STATEMENT

Defendants, Kaleida Health, et al. ("defendants" or "Kaleida"), submit this Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification Pursuant to Fed. R. Civ. P. 23(b)(3) ("Rule 23") (Dk. No. 409) ("Pl. Br."). The instant case is the antithesis of a class action given the many different factual and legal issues implicated by plaintiffs' claims which require highly individualized, fact-intensive, employee-by-employee, meal break-by-meal break, shift-by-shift, supervisor-by-supervisor, week-by-week inquiries. Thus, it is clear why plaintiffs have not submitted a proposed trial plan demonstrating how the claims of the putative class, if any, could possibly be tried on a representative basis, let alone how the interests of judicial economy would be served by class certification. Accordingly, for all the reasons set forth below, plaintiffs' motion is fundamentally flawed and should be denied in its entirety with prejudice.

Plaintiffs' motion seeks certification of two separate classes for claims under the New York Labor Law ("NYLL"):

- Meal Break Deduction Class – "all current and former hourly employees of Kaleida from May 22, 2002 to the present whose pay was subject to an automatic deduction for meal breaks even when the employees were not afforded a bona fide meal period of at least 30 minutes because their meal breaks were missed or interrupted to perform work-related duties and who were not paid for all their compensable work time due to Kaleida's policy of only paying for missed or interrupted meal breaks reported by employees." ("Meal Break Class") (Pl. Br. 5) (footnote omitted); and

- Rounding Class – "all current and former hourly employees of Kaleida from May 22, 2002 to the present whose pay was subject to Kaleida's rounding policy resulting in systemic under-compensation of employees."[1] ("Rounding Class") (Pl. Br. 5).[2]

---

[1] Although alleged in their Complaint, plaintiffs appear to have abandoned their attempts at class certification of claims under the NYLL for off-the-clock preliminary and postliminary work and training time. Plaintiffs make no motion with respect to their training time claims, and only seek certification of a Rounding Class, which, as discussed below, has not been heretofore asserted.

[2] Defendants also moving by separate motion to strike that portion of Plaintiffs' Motion for Rule 23 Class Certification that relates to the rounding claim because that claim was not included in the Amended Complaint.

The instant motion is pressed from an identical mold fashioned by this plaintiffs' law firm against dozens of other not-for-profit hospitals across the country, and suffers from crucial factual and legal defects: 1) it completely fails to identify a company policy that affected putative class members in a common manner; and 2) it fails to address the applicable legal standard set forth in the Supreme Court's recent watershed case, *Wal-Mart Stores, Inc. v. Dukes*. 131 S. Ct. 2541 (2011).

> As the Court enunciated in *Dukes*:

> What matters to class certification… is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

*Id.* at 2551 (emphasis in original). Class actions are procedural devices intended to allow courts to achieve judicial economy by adjudicating, on behalf of many, the same issue. If, despite the similarity of issues among putative class members, the evidence bearing on the issues will not result in a uniform answer, class actions cannot achieve judicial economy without abridging or modifying the rights of the parties. *See id.*

Plaintiffs have utterly failed to demonstrate that the proposed class—consisting of over 18,000 current and former nonexempt employees working in over 448 different departments in over 27 separate locations, and holding over 388 currently active job titles (ranging from different patient care titles to groundskeeper positions to accounting positions)—meets the elements of commonality and typicality as a matter of law. Despite being afforded over four years to conduct discovery in this case, plaintiffs do not put forth a single fact, let alone produce any shred of evidence, that timekeeping violations occurred in approximately 18 of defendants' locations or over 375 departments. The only representative evidence concerning these thousands of employees demonstrates that defendants'

timekeeping practices were decentralized, well-communicated to and understood by the workforce, and implemented lawfully.

Plaintiffs' proffered evidence fails to establish the existence of an unlawful organization-wide policy that required or permitted nonexempt employees to work off-the-clock.  Indeed, all of plaintiffs' affiants, save one, worked in patient care positions and constitute only a small fraction of defendants' current and former employees during the relevant time period.  Plaintiffs' motion shows that this case is little more than a trivial number of highly individualized complaints, not a case that should be adjudicated on a class basis.  Plaintiffs' allegations, even if accepted as true for purposes of this motion, are best characterized as rare exceptions in enforcement of defendants' strict timekeeping policies in isolated departments and only permit an inference that "some employees have misunderstood. . . policies, or that their supervisors failed to enforce these policies."  *Russo v. BellSouth Telecomms., Inc.*, 2009 U.S. Dist. LEXIS 20552, at *28 (N.D. Ga. Feb. 10, 2009); *see also Dukes*, 131 S. Ct. at 2556 ("[A] few anecdotes selected from literally millions of employment decisions prove nothing at all."). Such a paltry evidentiary record cannot justify certification of a class across defendants' vast operations or the oppressive cost and burden associated with such an outcome.

By contrast, the declarations of plaintiffs' own co-workers submitted with this opposition provide compelling proof that defendants' lawful timekeeping policies and procedures are well communicated and enforced, eviscerating any allegation of an organization-wide policy or plan violating the NYLL.  In fact, in 2007 alone (the year prior to the filing of the instant lawsuit), defendants paid a total of 554,204 overtime hours.  The same year, defendants paid employees for a total of 46,353 reported missed meal breaks.  The overtime and missed meal breaks recorded and paid to the putative class is but one of many obvious indications that defendants implemented a robust set of policies to ensure that non-exempt employees are paid for all time worked.  Moreover, plaintiffs do not

appear to assert that they reported time for which they were not paid, a fact that further undermines plaintiffs' theory of an unlawful timekeeping system.

Plaintiffs also fail to set forth any viable plan or coherent basis for such claims to be tried and adjudicated based on representative testimony. Plaintiffs simply cannot carry their burden of establishing the required elements of Fed. R. Civ. P. 23 with respect to their two proposed subclasses. In *Dukes*, the Supreme Court reshaped the landscape of Rule 23 jurisprudence, holding that "Rule 23 does not set forth a mere pleading standard" and that "certification is proper only if the trial court is satisfied, after a *rigorous analysis*, that the prerequisites of Rule 23(a) have been satisfied." *Dukes*, 131 S. Ct. at 2551 (emphasis added) (internal quotation marks omitted).[3]

Here, plaintiffs have failed to establish that their proposed Meal Break Class meets the commonality and typicality requirements of Rule 23(a), nor can they. First, plaintiffs appear to recognize that they cannot point to the meal break deduction, and accompanying exception reporting, as an alleged unlawful policy because every court that has ever addressed the issue has found that such a deduction practice is lawful. Therefore, plaintiffs attempt to circumvent this obvious impediment to their class claims by relying instead on the exact theory of class liability expressly struck down in *Dukes*. Plaintiffs appear to contend that defendants' delegation of discretion to managers and supervisors to implement its meal break policies, resulting in an alleged "hodgepodge" of manager- and department-specific practices, is somehow the common unlawful policy. In so doing, however, they flatly ignore the Supreme Court's observation that "[o]n its face, of course, that is just the opposite of a

---

[3] In their Motion, plaintiffs rely almost exclusively on the brief decisions of one judge in class action litigation filed by this plaintiffs' firm against three Syracuse-area hospitals. (Pl Br. 21). Not surprisingly, plaintiffs completely ignore the Supreme Court's intervening decision in *Dukes*, issued in June 2011, which explicitly sets forth the standard for adjudicating employment class actions under Fed. R. Civ. P. 23, and under which the cases relied upon by plaintiffs would never have been certified as class claims.

uniform employment practice that would provide the commonality needed for a class action; it is a policy against having uniform employment practices." *Dukes*, 131 S. Ct. at 2554. "It is also a very common and presumptively reasonable way of doing business—one that we have said should itself raise no inference of [unlawful] conduct." *Id.* (internal quotation marks omitted).

Second, manifest factual disparities abound across this proposed class, including varying job duties, work environments, procedures for recording time, overtime worked, shifts, union status, weekly schedules, scheduling of meal breaks, methods for reporting meal breaks, number of paid meal breaks, and the number of self-reported missed or interrupted meal breaks. This vastly heterogeneous group of putative class members shares little in common and does not meet the commonality and typicality elements as a matter of law.

Third, a multiplicity of legal and factual issues implicated by adjudication of the underlying claims further militates against class certification, including whether defendants had knowledge of time allegedly worked, whether meal periods were spent predominantly for the benefit of the employer, application of the *de minimis* defense which renders certain work non-compensable, whether employees reported and were paid for meal breaks, whether plaintiffs' NYLL claims are preempted by the Labor Management Relations Act ("LMRA"), and the application of the professional exemption to the NYLL and the New York Minimum Wage Orders. Since plaintiffs have failed to establish the elements of Rule 23(a), they have also fallen far short of the more-demanding predominance and superiority requirements of Rule 23(b)(3).

Likewise, plaintiffs have failed to show that their proposed Rounding Class meets the commonality and typicality requirements of Rule 23(a). They have failed to meet the predominance requirement of Rule 23(b)(3) with respect to the proposed Rounding Class as well, nor can they. Overwhelming factual disparities exist across this putative class, including different job duties, working

environments, supervisors, methods for recording time, weekly schedules, and amounts of time worked.  In addition, myriad legal issues and defenses must be adjudicated on an individualized basis, including the effect of rounding practices as applied to each putative class member, whether each putative class member performed compensable work during the rounding period, whether defendants had knowledge of time allegedly worked, application of the *de minimis* defense, and application of the professional exemption to the NYLL and the New York Minimum Wage Orders.

The plaintiffs—one former employee and five current employees of defendants—attempt to impose upon defendants the tremendous cost and burden of defending against their claims on an organization-wide basis premised on a mere handful of declarations and interrogatory responses attesting to highly-individualized and department-specific allegations of "off-the-clock" work.  For the reasons set forth herein, plaintiffs' attempt should be rejected and the motion should be dismissed in its entirety, with prejudice.

## FACTUAL BACKGROUND

### Defendants' Operations and Corporate Structure

Kaleida is a New York State licensed corporation that qualifies as a charitable organization exempt from taxation pursuant to Section 501(c)(3) of the Internal Revenue Code of 1986.  (Foster Decl.[4] ¶¶ 3-4).  Kaleida was formed in 1998 as an affiliation of existing healthcare entities.  (*Id.* at ¶ 5).  Kaleida and its affiliates comprise the largest health care system in Western New York.  (*Id.* at ¶ 6).

### Defendants' Facilities and Organizational Structure

The following facilities have been affiliated with Kaleida during some or all of the period since 2002:

---

[4] References to "Foster Decl." are to the Declaration of Ellie Foster, former Director of Labor Relations for Kaleida Health, signed on December 4, 2012.

a. <u>Hospitals (acute care facilities)</u>:  Buffalo General Medical Center, DeGraff Memorial Hospital, Millard Fillmore Gates Circle Hospital, Millard Fillmore Suburban Hospital,  and Women & Children's Hospital of Buffalo;

b. <u>Primary and Specialty Care</u>:  Gates Vascular Institute, Amherst General, Amherst Health Center, Hertel Elmwood Internal Medicine at North Buffalo Medical Park, Hodge Pediatrics, North Buffalo Medical Park, Parents and Children Together at Towne Garden Plaza, Pediatric Dental Center, Stanley Makowski Early Childhood Center #99, Towne Garden Pediatrics at Towne Garden Plaza, WCHOB Outpatient Clinics, WCHOB Pediatric Specialties Center, WCHOB Physician Specialties Growney Memorial Medical Arts Building, and WCHOB Women's Health Center;

c. <u>Ambulatory Surgery</u>:  Millard Fillmore Surgery Center;

d. <u>Outpatient Rehabilitation</u>:  Buffalo Therapy Services – Buffalo General Medical Center, Buffalo Therapy Services – Williamsville, DeGraff Memorial Hospital Wellness Center, Family Planning Center, Robert Warner Rehabilitation Center at Buffalo Therapy Services – Williamsville, and WCHOB Preschool Programs;

e. <u>Home Care (provided by the Visiting Nurse Association of Western New York)</u>:  VNA/VNA Home Care Services of Erie County, Allegany County, Chautauqua County, Genesee County, and Niagara County;

f. <u>Long Term Care and Subacute</u>:  DeGraff Memorial Hospital, Amherst Adult Day Services at Amherst Center for Senior Services, and HighPointe on Michigan;

g. <u>Laboratory Services</u>:  Laboratory Patient Service Centers at Buffalo General Medical Center, DeGraff Memorial Hospital, Millard Fillmore Suburban Hospital, Amherst, Clarence, Division Street, Hamburg, Lockport, River Road, Williamsville (2 locations), Flint Road, and WCHOB Pediatric Specialties Center; and

h. <u>School-based Health Centers</u>:  Bennett High School, Buffalo Elementary School of Technology #6, Build Academy #91, Dr. Lydia Wright School of Excellence #89, Dr. Martin Luther King Multicultural Institute #39, Herman Badillo Bilingual Academy, #76, Hillery Park @ Triangle Academy, Stanley Makowski Early Childhood Center #99, and Westminster School.  (*Id.* at ¶ 7).

Each hospital has its own Vice President/President.  (*Id.* at ¶ 8).

## **Types of Health Care Services Provided at the Various Facilities**

The nature and types of health services provided at each of the different Kaleida facilities is quite diverse.  (*Id.* at ¶ 9).  For example, general health services, such as those below, are provided at the various hospitals:

- Ambulatory Surgery – Multi Specialty
- Clinic Part Time Services
- Clinical Laboratory Service
- CT Scanner
- Emergency Department
- Outpatient Health Fairs
- Intensive Care
- Maternity
- Nuclear Medicine – Diagnostic
- Pharmaceutical Service
- Outpatient Primary Medical Care
- Radiology – Diagnostic
- Outpatient Occupational Therapy
- Speech Language Pathology Therapy (*Id.*)

However, in addition to the core services listed above, the types of additional services provided at the four currently operating Kaleida hospitals vary between each facility. (*Id.* at ¶ 10). For example, adult cardiac catheterization and cardiac surgery are done only at Buffalo General Medical Center. (*Id.* at ¶ 11). Pediatric cardiac services are provided only at Women & Children's Hospital of Buffalo. (*Id.*) Family planning, psychiatric, and home peritoneal dialysis training and support services are provided at Buffalo General Medical Center, but not at the other hospitals. (*Id.* at ¶ 12). AIDS Center, Burn Program, outpatient dental, epilepsy, neonatal care, pediatric, pediatric heart transplant, and kidney transplant services are provided at Women & Children's Hospital of Buffalo, but not at the other hospitals. (*Id.* at ¶ 13). Respiratory care, outpatient audiology, certified mental health, and outpatient chemical dependence rehabilitation services are provided at Buffalo General Medical Center and Women & Children's Hospital of Buffalo, but not at the other hospitals. (*Id.* at ¶ 14). Lithotripsy services are provided at Millard Fillmore Suburban Hospital, but not at the other hospitals. (*Id.* at ¶ 15). Physical medical rehabilitation services are provided at Buffalo General Medical Center and DeGraff Memorial Hospital, but not at the other hospitals. (*Id.* at ¶ 16).

Kaleida operates several school-based extension clinics offering services such as primary medical care, nursing, immunology, psychology, and venereal disease prevention. (*Id.* at ¶ 17).

Laboratory services are provided at DeGraff Memorial Hospital, Buffalo General Medical Center, Millard Fillmore Suburban Hospital, and other Laboratory Patient Service Centers throughout the Buffalo area.  (*Id.* at ¶ 18).  Long term care is provided at DeGraff Memorial Hospital, Amherst Adult Day Services, and HighPointe on Michigan.  (*Id.* at ¶ 19).  The Millard Fillmore Surgery Center provides ambulatory surgery services.  (*Id.* at ¶ 20).

### Separate Human Resources Organizations

Buffalo General Hospital and Millard Fillmore Suburban Hospital have their own Human Resources Managers, who each manage a staff of site-specific Senior Generalists and Administrative Assistants.  (*Id.* at ¶ 21).  At defendants' other locations, Senior Generalists serve as Human Resources "point people" for their specific sites.  (*Id.* at ¶ 22).  Their job duties include interpreting, implementing, and enforcing Human Resources policies and practices at their sites.  (*Id.*)  The highest ranking site-specific Human Resources employee reports to the Senior Director of Human Resources.  (*Id.* at ¶ 23).  As of November 2012, there is one Senior Director.  (*Id.*)  Prior to 2012, there were two.  (*Id.*)

### Defendants' Workforce

The defendants employ approximately 8,550 non-exempt employees at over 27 locations in the Western New York area.  (*Id.* at ¶ 24).  Plaintiffs' proposed class of all non-exempt employees of the defendants since 2002 consists of approximately 18,700 individuals.  (*Id.*)  Non-exempt employees at the defendants' facilities currently hold 388 separate job titles, each with its own separate duties, and work in over 448 departments across the system.  (*Id.*)  Employee positions range from Groundskeeper to Billing Collection Analyst to various types of Registered Nurses.  (*Id.* at ¶ 24, Exh. A).  Even two employees working as RNs may have vastly different duties, work demands, and work environments.  (*Id.* at ¶ 24).  For example, certain RNs work in acute-care hospitals in fast-

paced settings such as the Emergency Department, while other RNs work in clinic settings where they see patients for scheduled visits, similar to a doctor's office. (*Id.*)  In addition, many non-exempt employees' job duties (including, but not limited to, billers, accounting clerks, housekeepers, secretaries, maintenance workers, payroll clerks, switchboard operators, buyers, and computer operators) are not directly related to patient care at all. (*Id.*)

Approximately 84 percent of defendants' employees are represented by unions. (*Id.* at ¶ 25). Their terms and conditions of employment, including wages, work hours, and breaks, are governed by different collective bargaining agreements with various unions. (*Id.*)  The defendants' unionized employees are or were members of 9 different unions and subject to 12 different bargaining agreements. (*Id.* at ¶ 26).  16 percent of defendants' workforce is not represented by a union. (*Id.* at ¶ 27).  Defendants' non-union hourly employees include, among others, pharmacists, social workers, research associates, and security personnel. (*Id.*)

The various defendants pay overtime at different thresholds, most of which are governed by union contract. (*Id.* at ¶ 28).  There are 13 different overtime thresholds including 9 that calculate overtime on a daily basis. (*Id.*)  The following are specific examples of the differing overtime thresholds found in collective bargaining agreements:

- **2005-2008 Agreement between Buffalo General Hospital and International Union of Operating Engineers, AFL-CIO**:  "An employee should be paid at the rate of time and one-half his regular straight time hourly rate for all hours worked in excess of thirty-seven and one-half (37 1/2 ) in any one (1) work week."

- **2008-2011 Agreement between Women & Children's Hospital of Buffalo and 1199 SEIU United Healthcare Workers East**:  "All work performed by a Registered Nurse in excess of forty (40) hours in a work week (excluding daily overtime hours) will be compensated at 1.5 times the employee's regular hourly salary for employees working eight (8) and ten (10) hour shifts." (*Id.*)

Employees regularly scheduled hours vary. (*Id.* at ¶ 29).  Employees are regularly scheduled to work different weekly hours, including 18.75, 20, 36, 37.5, 38, 39, and 40 hours per week. (*Id.*)

- 10 -

## Defendants' Timekeeping Systems and Policies

Defendants implemented the Kronos timekeeping system at various locations on a rolling basis beginning in March, 2003, with the last facility being added in June, 2004.  (*Id*. at ¶ 30).  Defendants contracted with Kronos to provide a computer software system used to record the hours worked by employees at various entities throughout the system.  (*Id*.)  Prior to the implementation of Kronos, the various facilities used different timekeeping systems.  (*Id*.)

Non-exempt employees record their time in a variety of ways.  (*Id*. at ¶ 31).  Prior to the implementation of Kronos in 2003 and 2004, employees recorded their time using manual timesheets, time clocks, by telephone, and by badge swipe, depending on the timekeeping system used in their respective department and facility.  (*Id*.)  After the implementation of Kronos in 2003 and 2004, employees recorded their time in Kronos by telephone, badge swipe, and/or exception logs.  (*Id*.)  Timekeepers, primarily department managers and supervisors, review and approve employees' time as reported in Kronos.  (*Id*. at ¶ 32).  This recorded time is then transferred to the payroll system for pay calculation.  (*Id*.)

## Defendants' Timekeeping Standards Policy

In April, 2003, the defendants implemented a Timekeeping Standards Policy.  (*Id*. at ¶ 33, Exh. B).  The policy requires that each employee accurately report his or her time worked using the time reporting mechanism utilized at the employee's worksite.  (*Id*.)  Supervisors and managers who supervise non-exempt staff are responsible for the administration of this policy.  (*Id*.)

The Timekeeping Standards Policy is distributed to all employees.  (*Id*. at ¶ 34).  Supervisors and managers are responsible for instructing their employees on the correct procedures for time recording, and counseling employees who are not in compliance with the defendants' policies and procedures regarding timekeeping and payroll.  (*Id*.)  Each supervisor or manager is also responsible

for the timekeeper duties of his or her unit or department, which include reviewing, auditing, and approving the time records for all the non-exempt associates who report to him or her.  (*Id.*) Employees have the opportunity to make corrections or changes to their recorded time.  (*Id.*)  If a timecard must be corrected or an audit is needed on a time record in the time and attendance system, the manager or supervisor makes the change and must provide an explanation to the employee regarding any changes made prior to the payday.  (*Id.*)  It is expected that the manager or designee will correct any hours not recorded or recorded incorrectly before submitting the time to payroll.  (*Id.*)

The scheduling of meal periods is at the discretion of the manager or supervisor.  (*Id.* at ¶ 35). Some departments have assigned meal periods which remain the same each day; others require employees to stagger their meal periods to ensure coverage; still others have no schedule at all.  (*Id.*) The reporting of work performed during meal periods is also at the discretion of the manager or supervisor.  (*Id.* at ¶ 36).  Some departments use exception logs, while others use "no lunch" slips and verbal reports.  (*Id.* at ¶ 36, Exh. C).

Clock-in instructions and the defendants' Timekeeping Standards Policy are distributed to all associates as part of their department-specific orientation process.  (*Id.* at ¶ 37, Exh. D).  Managers and supervisors provide instructions in writing to all employees as to the appropriate methods to use when clocking in and out and the applicable codes.  (*Id.* at ¶ 37).  Supervisors and managers must attest that they have provided this information to all of their assigned employees as part of the annual performance review process.  (*Id.*)  In those instances when an employee floats or temporarily transfers to a different unit or department, the supervisor or manager of that unit or department must provide instructions to the employee as to the unit or department's practice(s) of clocking in and out. (*Id.*)  Instructions of how to clock in and out are also posted in each department.  (*Id.*)

Non-exempt employees are responsible for recording all hours for which they are eligible to be compensated.  (*Id.* at ¶ 38).  It is each employee's responsibility to correctly enter all time using the mechanism defined for his/her particular site and/or department.  (*Id.*)

All hourly employees must clock in and out at the beginning and end of their shift through the use of the Telephonic Timekeeping phone system or by swiping a badge, according to the procedures of the respective time and attendance system in place in their facility and department.  (*Id.* at ¶ 39).  When an employee clocks in or out up to 7 minutes before or 7 minutes after the start or end of his or her shift, the time is rounded to the shift start or end time.  (*Id.*)  Clock-ins after the 7 minute time frame are rounded to the nearest quarter hour.  (*Id.*)

Defendants' policies provide that a 30-minute unpaid meal period be provided to all non-exempt employees working any shift longer than 6 hours, which is not counted as time worked, subject to exception reporting.  (*Id.* at ¶ 40).  Timekeepers are instructed to maintain a process by which employees can report when they do not receive a full meal period.  (*Id.*)  Timekeepers are provided with complete discretion to select the appropriate reporting process for work performed during meals periods based on the specific needs and working environment of their department or unit.  (*Id.*)  They are responsible for cancelling the meal period deductions in the Kronos system based on such employee reports.  (*Id.*)

Employees are not required to clock out (or swipe) for contractual lunch, dinner, and work breaks when they remain on their site premises.  (*Id.* at ¶ 41).  However, employees are required to clock out (or swipe) for lunch and dinner breaks if they leave their site premises, as well as TAC back (or swipe) in when they return.  (*Id.*)

For defendants' unionized employees, the terms and conditions of employment are governed by collective bargaining agreements negotiated by a union on their behalf.  (*Id.* at ¶ 42).  In the event

that a portion of the Timekeeping Standards Policy conflicts with a collective bargaining agreement, the terms of the collective bargaining agreement will dictate the terms and conditions of employment for those employees who are covered by that agreement.  (*Id.*)

Kaleida Health must provide services 24 hours a day, 7 days a week in many departments. (*Id.* at ¶ 43).  Work schedules must be arranged to provide the appropriate level of service at all times within federal and state laws regulating hours of work.  (*Id.*)  To accomplish this, the defendants must set employee work schedules as needed.  (*Id.*)

Some full time employees regularly work a seven and one-half (7.5) hour shift, exclusive of unpaid meal periods.  (*Id.* at ¶ 44).  Others work eight hours, while still others work nine and one-half (9.5), eleven and one-half (11.5), and twelve and one-half (12.5) hour shifts.  (*Id.*)  The work week begins on Sunday at 12:01 a.m. and ends the following Sunday at 12:00 a.m.  (*Id.*)  Supervisors and managers are tasked with determining and discussing with the necessary work schedule with their employees.  (*Id.*)

All non-exempt employees must record their hours of work through the appropriate time and attendance system and procedure.  (*Id.* at ¶ 45).  Employees are prohibited from recording the time of another employee.  (*Id.*)  An employee's inaccurate recording of time can result in disciplinary action up to and including termination.  (*Id.*)

### Communication/Training on Defendants' Timekeeping Policies

Employees are instructed to record all time worked, including during meal periods, and that they are to be paid for such time.  (*Id.* at ¶ 46).  The defendants' timekeeping policies described above are accessible to every employee.  (*Id.*)  The Kronos Training Manual is also available to all employees and is updated as needed.  (*Id.*)  Policies and training materials are disseminated on a regular basis and through various means, including Kaleidascope, a computer intranet to which all

employees have access, in hard copy via request to the Human Resources Department, and through
periodic notifications.  (*Id.*)

      To ensure that these policies are fully adhered to, employees—managers and non-managers
alike—are subject to a wide variety of update training as to these policies.  (*Id.* at ¶ 47).  All new
employees are instructed, during the defendants' system-wide orientation, on the policies pertaining
to timekeeping and meal breaks.  (*Id.*)  In addition, employees are required to attend a department-
specific orientation at which they cover the timekeeping policies and practices applicable to their
particular departments and supervisors.  (*Id.* at ¶ 48).  Employees are provided with reminders of the
timekeeping and meal break procedures through periodic e-mails, at staff meetings, and via a variety
of other methods.  (*Id.*); (Roney Decl., Exh. B:  Leaderstorf Decl. ¶ 7 ("During departmental
meetings, I will periodically reinforce the importance of Kaleida's policies concerning proper
timekeeping."); Mader Decl. ¶ 7 ("I regularly instruct employees to check their Kronos time records
to make sure they are correct.  I also post signs in various areas of the department reminding
employees to make sure their time is accurate.")).

      Defendants train timekeepers to maintain a process by which employees can report when
they do not get a full meal period.  (*Id.* at ¶ 49).  The timekeeper is also trained on how to cancel the
automatic meal deduction in the Kronos system, under the Cancel Meal Deductions section.  (*Id.* at ¶
49, Exh. E).

**Defendants' Payroll Data Demonstrates that their Policy and
Practice is to Pay Employees for All Time Worked**

      The defendants do not have a written or unwritten policy to deny employees overtime pay.
(*Id.* at ¶ 50).  In fact, in 2007, the defendants paid a total of 554,204 overtime hours.  (*Id.* at ¶ 50, Exh.
F).  The defendants do not have a written or unwritten policy to deny employees pay for time worked

during meal breaks.  (*Id.* at ¶ 50).  In fact, in 2007, the defendants paid employees for a total of 46,353 meal breaks.  (*Id.* at ¶ 51, Exh. G).

## PROCEDURAL BACKGROUND

Plaintiffs initiated this action by filing a Complaint on May 22, 2008.  (Dk. No. 1).  The Complaint, which was styled as a collective and class action, alleges that defendants failed to pay plaintiffs for all time worked in violation of the Fair Labor Standards Act ("FLSA"), the New York Labor Law, the Employee Retirement Income Security Act, the Racketeering Influenced Corrupt Organizations Act, and New York common law.  (*Id.*)  Specifically, plaintiffs' Complaint alleges that defendants failed to compensate plaintiffs for time worked during meal periods, preliminary and postliminary work, and training time.  (*Id.*)  In the face of a motion to dismiss, plaintiffs voluntarily dismissed from this action all claims except those under the FLSA and NYLL.  (Dk. No. 112).

On May 28, 2008, plaintiffs moved for conditional certification of a collective action consisting of non-exempt employees who were subjected to the alleged unlawful meal break policy under Section 216(b) of the FLSA.[5]  (Dk. No. 9).  On October 13, 2009, the Court conditionally certified a narrower collective action consisting of Registered Nurses ("RNs"), Licensed Practical Nurses ("LPNs"), and Respiratory Therapists who performed patient care duties at defendants' hospitals and skilled nursing facilities.  (Dk. No. 228).  The parties subsequently engaged in written and electronic discovery.  (Roney Decl.[6] ¶ 6).

## ARGUMENT

---

[5] The requirements for Rule 23 class certification are much more stringent than the "modest factual showing" required under the standard for conditional certification and more stringent than the standard applied for final certification of FLSA collective actions. *Frye v. Baptist Mem. Hosp., Inc.*, 2012 U.S. App. LEXIS 17791, at *8 (6th Cir. Aug. 21, 2012).

[6] References to "Roney Decl." are to the Attorney Declaration of Susan C. Roney, executed on December 7, 2012.

Parties requesting class certification must justify the application of a litigation device that is "an exception to the usual rule." *Dukes*, 131 S. Ct. at 2550; *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 155 (1982) ("The class-action device was designed as an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.") (internal quotation marks omitted).  For this reason, litigants seeking to certify a class bear the burden of proving each of the four elements of Federal Rule Civil Procedure 23(a) and at least one requirement of Rule 23(b). *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 202-03 (2d Cir. 2008) ("Today, we dispel any remaining confusion and hold that the preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements."); *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 291 (2d Cir. 1999), *cert. denied*, 529 U.S. 1107 (2000).  Plaintiffs here cannot carry that burden.

## I.  CLASS CERTIFICATION SHOULD BE DENIED BECAUSE THE NAMED PLAINTIFFS HAVE FAILED TO MEET THE REQUIREMENTS OF RULE 23(a)

As the Supreme Court recently observed in *Dukes*, certification under Rule 23(a) imposes a high burden on a plaintiff and should be granted only after a "rigorous analysis" that "will entail some overlap with the merits of the plaintiff's underlying claim." *Dukes*, 131 S. Ct. at 2551; *Hnot v. Willis Group Holdings Ltd.*, 228 F.R.D. 476, 480-81 (S.D.N.Y. 2005) ("District courts must conduct a 'rigorous analysis' of the Rule 23 requirements, which may require the court to probe behind the pleadings.").  The Second Circuit has held that a district court may certify a class only after making determinations and findings regarding the underlying facts that are relevant to the Rule 23 requirements. *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006) (stating that a district court must make a "definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues" and that plaintiffs must provide "enough evidence, by affidavits, documents, or testimony, to . . . [show] that each Rule 23 requirement has been met.").  Thus, the court

- 17 -

may probe beyond the pleadings to determine whether the elements of Rule 23(a) are established. *See Falcon*, 457 U.S. at 160; *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978) ("[C]lass determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.") (internal quotation marks omitted).

Rule 23 prohibits an action from moving forward on a representative basis if plaintiffs cannot demonstrate any one of the four requirements under Rule 23(a). *See Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) (*citing Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)). Specifically, plaintiffs must demonstrate by a preponderance of the evidence that a proposed class action would involve: (1) a sufficient number of individuals; (2) common questions of law or fact common to the class; (3) plaintiffs whose claims are typical of the class members; and (4) a class representative or representatives who will represent the interests of the class adequately. Fed. R. Civ. P. 23(a); *Myers*, 624 F. 3d at 547; *Salon Fad v. L'Oreal USA, Inc.*, 2011 WL 4089902, at *5 (S.D.N.Y. Sept. 14, 2011). Importantly, a "failure to meet any one of Rule 23's requirements destroys the alleged class action." *Pecere v. Empire Blue Cross & Blue Shield*, 194 F.R.D. 66, 69-70 (E.D.N.Y. 2000). Since plaintiffs' anecdotal and statistical evidence utterly fails to establish the existence of a policy or practice that causes common or typical forms of denial of pay for work performed during meal periods and during short periods of time immediately before or after their shift, the instant motion for class certification must be denied.

## A.  PLAINTIFFS HAVE FAILED TO ESTABLISH COMMONALITY AND TYPICALITY

To satisfy the commonality requirement under Rule 23(a), plaintiffs must show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). In *Dukes*, the Supreme Court warned that this "language is easy to misread, since '[a]ny competently crafted class complaint literally raises common 'questions.'" *Dukes*, 131 S. Ct. at 2551. The Supreme Court clarified that

commonality "does not mean merely that [the putative class members] have all suffered a violation of the same provision of law." *Id*. Rather, a "common question" for purposes of Rule 23 is one for which the answer will result in a "classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*.

To satisfy the typicality requirement under Rule 23(a), plaintiffs must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). To be typical, "claims of the class representatives [must] be typical of those of the class, and [occurs] when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Diaz v. Electronics Boutique of Am., Inc.*, 2005 U.S. Dist. LEXIS 30382, at *25 (W.D.N.Y. Oct. 13, 2005) (Elfvin, J.) (quoting *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001)). Courts often consider commonality and typicality in tandem. *Dukes*, 131 S. Ct. at 2551 n.5 (observing that the two "tend to merge"). Here, plaintiffs have utterly failed to meet their burden of establishing commonality and typicality with respect to both their proposed Meal Break and Rounding Classes.

## 1. Plaintiffs Have Failed to Establish Commonality and Typicality With Respect to the Proposed Meal Break Class

Merely stating that the members of the Meal Break Class are those "who were not paid for all their compensable work time due to Kaleida's policy of only paying for missed or interrupted meal breaks reported by employees" is insufficient to establish commonality. (Pl. Br. at 5). Satisfying commonality requires plaintiffs to do much more than "simply point to some questions of fact or law relevant to potential class members…." *Groussman v. Motorola, Inc.*, 2011 WL 5554030, at *3 (N.D. Ill. Nov. 15, 2011). Plaintiffs must show that "class members 'have suffered the same injury,'… [which] does not mean merely that they have all suffered a violation of the same provision of law." *Id*. (quoting *Dukes*, 131 S. Ct. at 2551). Where individualized analyses are required for each class

- 19 -

member, the commonality requirement cannot be satisfied.  *Id.* at *4 (finding that plaintiffs failed to

satisfy the commonality requirement when "the assessment of damages for each Plaintiff and proposed

class member" would "become a massive series of individualized analyses" despite the fact that there

"may be some general overlapping common issues of fact and law").

As a preliminary matter, it should be noted that the practice of an automatic meal period

deduction is not unlawful and cannot provide the "glue" to hold together a class.[7]  It is well settled that

a policy of automatically deducting time for a meal break, subject to the employee's notifying the

employer of having worked the meal break, is a lawful policy.  *See Frye*, 2012 U.S. App. LEXIS

17791, at *12 ("At bottom, Frye's common theory of injury reduces to a critique of Baptist Memorial's

use of an automatic-deduction policy.  But, as we observed, an automatic-deduction policy by itself

comports with the FLSA . . . ."); *Kuznyetsov v. West Penn Allegheny Health Sys.*, 2011 U.S. Dist.

LEXIS 146056, at *13 n.2 (W.D. Pa. Dec. 20, 2011) (collecting authorities); *Cason v. Vibra*

*Healthcare*, 2011 WL 1659381, at *3 (E.D. Mich. May 3, 2011); *Ledbetter v. Pruitt Corp.*, 2007 WL

496451, at *4 (M.D. Ga. Feb. 12, 2007); U.S. Dep't of Labor, Wage & Hour Division Fact Sheet #53,

The Health Care Industry and Hours Worked (Rev. July 2009).  Indeed, plaintiffs' counsel has

conceded as much in other cases.  *Fengler v. Crouse Health Found., Inc.*, 595 F. Supp. 2d 189, 195

(N.D.N.Y. 2009) ("As plaintiffs in this case have acknowledged, the mere existence and

implementation of a policy or practice of making automatic deductions for scheduled meal breaks in

and of itself does not violate the FLSA.").

---

[7] As stated *supra*, it is readily apparent from the number of overtime hours paid by defendants that
there is no rule generally prohibiting overtime.  As an example, in 2007, defendants paid a total of
554,204 overtime hours.  Likewise, there is no rule prohibiting payment for work performed during
meal breaks.  In fact, in 2007, defendants paid employees for a total of 46,353 missed meal breaks.

In an apparent attempt to resurrect their meal period claims in the face of this mounting case law, plaintiffs' proposed definition of the Meal Break Class seeks to contest a "policy of only paying for missed or interrupted meal breaks *reported* by employees." (Pl. Br. at 5) (emphasis added).  That theory differs from the one proposed in 2008 when plaintiffs initially sought to conditionally certify a collective action.  The proposed collective action sought the issuance of notice to "all current and former hourly employees of defendants whose pay was subject to an automatic deduction even when the employees performed compensable work."  (Dk. No. 10, p. 1).[8]

This change in the proposed definition of the Meal Break Class does not avoid the impact of recent case law because the requirement that employees report missed meal breaks exists in all of the automatic meal break deduction policies that have been held to be lawful.  Nor does requiring employees to report time worked undermine the lawfulness of such a deduction practice.  In the district court decision in *Frye v. Baptist Memorial Hospital, Inc.*, 2010 U.S. Dist. LEXIS 101996, at *20-21 (W.D. Tenn. Sept. 27, 2010), which was recently upheld by the Sixth Circuit Court of Appeals, the court held:

> Because the FLSA permits automatic deduction policies, standing alone, this so-called "burden shift" cannot form the basis of an alleged FLSA violation. Therefore, Baptist's requiring its employees to take affirmative action to ensure payment for time worked during meal breaks, by itself, does not support a common theory of statutory violations capable of overcoming the Plaintiffs' otherwise disparate factual and employment settings.

*See also Camesi v. Univ. of Pittsburgh Med. Ctr.*, 2011 U.S. Dist. LEXIS 146067, at *15 (W.D. Pa. Dec. 20, 2011) (observing that this has become "the prevailing view" among the federal courts—that is,

---

[8] Plaintiffs' abandonment of the class definition for the conditionally certified FLSA collective action merits decertification of that collective action as a matter of law.

an employer may reasonably rely on employees reporting time worked during meal periods) (collecting authorities).[9]

Indeed, requiring employees to report missed meal breaks is no greater of a burden than that imposed on any non-exempt employee who performs work for an employer.  Any employee must inform the employer of the time he or she has worked.  Paying only for reported time worked is not a violation unless the employer knows the work is being performed and not reported.  *See Wood v. Mid-America Mgmt. Corp.*, 192 Fed. Appx. 378, 381 (6th Cir. 2006); *White v. Wash. Gas*, 2005 U.S. Dist. LEXIS 3461, at *13-14 (D. Md. Mar. 4, 2005) (dismissing plaintiff's claims for time worked during unpaid meal breaks where employee "never reported those hours on his timesheets, nor did he ever ask to be paid for those hours until this lawsuit…."); *Berger v. Cleveland Clinic Found.*, 2007 U.S. Dist. LEXIS 76593, at *37-38  (N.D. Ohio Sept. 29, 2007) (granting the defendant-hospital's motion for summary judgment, finding that it was "undisputed that Defendant maintained a logbook in which employees were told to mark when they missed their entire meal period," and the failure to pay was "due to Plaintiff's own failure to mark them in the logbook").  Accordingly, plaintiffs cannot simply cite to the alleged policy of only paying for meal breaks reported by employees as an unlawful policy in order to demonstrate commonality.

Rather, plaintiffs must point to a common unlawful implementation of the policy.  In a very recent case that is relevant in all respects, the court in *Camilotes v. Resurrection Health Care Corp.*, 2012 U.S. Dist. LEXIS 143583 (N.D. Ill. Oct. 4, 2012), decertified a collective action and denied a

---

[9] To the extent that the Second Circuit in *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362-63 (2d Cir. 2011), stated that an employer could not shift the burden, that holding is limited to its facts, where the employer had direct knowledge of work being performed and instructed the employee not to report it. The determination of whether such knowledge and directive exists is, of course, highly individualized.

motion for class certification with respect to meal period claims brought by nurses against a health system.  In reaching its decision on those two motions, the court found that:

> Although Plaintiffs argue that Defendants' implementation of the automatic deduction policy caused FLSA violations, Plaintiffs have not demonstrated that Defendants' implementation of the policy was uniform system-wide.  Indeed, the evidence shows the opposite – specifically, that Defendants delegated authority to department managers within each hospital to determine how to implement Defendants' policies, including developing department-specific procedures related to the automatic deduction policy.  In particular, managers implemented policies and practices to address how to schedule meal periods, where employees may take their meal periods, how employees are relieved from duty for their meal periods, whether employees may take assigned cell phones or pagers with them on their meal periods, whether supervisory permission is required to take a meal period, and how employees record time worked.

*Id.* at *33-34 (citations omitted).

Where individual supervisors are given discretion over employment decisions, as in this case, it shows nothing more than "a policy against having uniform employment practices" and is "just the opposite of a uniform employment practice that would provide commonality needed for a class action." *Dukes*, 131 S. Ct. at 2554.  Since plaintiffs have failed to establish a common directive behind the separate, independent decisions of defendants' individual supervisors, the putative class here lacks the necessary "glue" to hold its claims together.  *See id.* at 2545.  Without that glue, the *Dukes* court made clear, "it will be impossible to say that examination of all the class members' claims for relief will produce a common answer . . . ."  *Id.* at 2552.

To the extent plaintiffs attempt to distinguish *Dukes* on the grounds that wage-hour claims, unlike discrimination claims, do not require intent as an element of proof, this is a distinction without a difference. The issue of whether defendants had actual or constructive knowledge of compensable, off-the-clock work in this case is just as decentralized, department-specific, and individualized as the alleged discriminatory personnel decisions at issue in *Dukes*.  In addition, the decisions of supervisors and managers regarding how and whether to enforce defendants' lawful timekeeping policies is the

identical issue found by the Supreme Court in *Dukes* to be antithetical to class adjudication.  Thus,

scores of courts have not hesitated to apply *Dukes* in the wage-hour context.[10]  *See, e.g., Romero v.*

*H.B. Auto. Group, Inc.*, 2012 U.S. Dist. LEXIS 61151, at *50 (S.D.N.Y. May 1, 2012) (applying *Dukes*

in NYLL wage-hour class action and denying class certification where plaintiffs "failed to state a

'common contention' that is 'central to the validity'" of their claims); *Gonzalez v. Millard Mall Serv.,*

*Inc.*, 281 F.R.D. 455, 462 (S.D. Cal. 2012) (applying *Dukes* in California wage-hour class action and

denying class certification where "[m]anagers at each location have discretion in scheduling the

employees' work schedule and meal and rest periods.  Therefore, Plaintiffs have not shown that there

was a common policy that pervaded the entire company…." (citation omitted)); *Hughes v. WinCo*

*Foods*, 2012 U.S. Dist. LEXIS 2469, at *20 (C.D. Cal. Jan. 4, 2012) (applying *Dukes* in California

wage-hour class action and denying class certification where "the only common policy is the one that

gives WinCo managers discretion over the timing and arrangement of the meal periods taken by

employees.").

    As discussed in detail below, plaintiffs have failed to identify a single company policy

requiring off-the-clock work during meal periods that resulted in a common injury to all non-exempt

employees.  Instead, plaintiffs' claims in this case—much like those of the plaintiffs in *Dukes*,

*Camilotes*, *Gonzales*, and *Hughes*—are premised on the individual decisions and the discrete actions of

---

[10] To the extent that plaintiffs cite to a handful of S.D.N.Y. cases certifying Rule 23 classes after *Dukes* in the wage-hour context, these cases are distinguishable from the case at bar.  *Flores v. Anjost Corp.*, 284 F.R.D. 112, 126 (S.D.N.Y. 2012) (in 30(b)(6) deposition, defendants "effectively conceded" that plaintiffs raised common questions about defendants' corporate wage policies); *Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 616 (S.D.N.Y. 2012) (at settlement approval stage, court found Rule 23 commonality requirement met because "plaintiffs alleged a common policy or practice to require plaintiffs to meet quotas but to enforce limits on the number of overtime hours that could be reported"); *Espinoza v. 953 Assocs. LLC,* 280 F.R.D. 113 (S.D.N.Y. 2011) (restaurant minimum wage and overtime case involving class of 150-200 people); *Youngblood v. Family Dollar Stores, Inc.*, 2011 WL 4597555 (S.D.N.Y. Oct. 4, 2011) (misclassification case involving employees in the same position); *Ramos v. SimplexGrinnell LP*, 796 F. Supp. 2d 346 (E.D.N.Y. 2011) (prevailing wage case).

different supervisors that lack the necessary "glue" to hold the claims together.  Given the disparate factual settings and legal questions to be raised by the putative class members, adjudication of the meal period claims of each of the putative class members would require a highly-individualized, fact-intensive, employee-by-employee, meal break-by-meal break, shift-by-shift, supervisor-by-supervisor, and week-by-week analysis.  Adjudication of these issues is squarely antithetical to the rationale and purposes of class actions as a litigation device.

a. <u>Factual Disparities</u>

The members of the putative class work in a wide variety of jobs, departments, and facilities. These jobs vary in their duties and demands on employees, which will necessarily affect the extent to which employees are required to perform work during meal periods, if at all.

i. <u>Differences Among Putative Plaintiffs' Work Environments</u>

The putative class consists of approximately 18,700 current and former employees holding 388 separate job titles, each with their own unique duties, who work or worked in over 448 departments in over 27 locations across Western New York.  As the court in the highly-analogous case of *Camilotes*, 2012 U.S. Dist. LEXIS 143583, at *18, recently and aptly observed, "[t]his consideration is important to the Court's analysis [of whether to certify a class or collective action], because whether and when Plaintiffs took meal period breaks, and the frequency with which they took them, depended in large part upon their particular work environment and their job duties."  These positions range from Groundskeeper to Billing Collection Analyst to various types of RNs.[11]  (Foster Decl. ¶ 24).  Even two employees working as RNs may have vastly different duties, work demands, and work environments. For example, certain RNs work in acute-care hospitals in fast-paced settings such as the Emergency Department, while other RNs work in clinic settings where they see patients for scheduled visits.  (*Id.*).

---

[11] A complete list of job titles is attached to the Foster Declaration as Exhibit A.

- 25 -

In addition, many non-exempt employees' job duties (including, but not limited to, billers, accounting clerks, housekeepers, secretaries, maintenance workers, payroll clerks, switchboard operators, buyers, and computer operators) are not directly related to patient care at all.  (*Id.*)

These widely disparate positions involve widely disparate job duties and work environments. In other words, the work demands on the putative class vary from employee to employee.  As a result, there are differences from one employee to the next in the likelihood of work being required during meal periods, the length of any work-related interruptions, and the nature of the activities performed— all of which impact the determination as to whether a meal period is compensable.  Plaintiffs have completely failed to demonstrate how the meal period claims of this highly diverse group of putative class members (thousands of whom work or worked in positions, departments, and facilities for which plaintiffs have presented no allegations, let alone evidence, of timekeeping violations) are common or typical, much less how they could be tried on a representative basis.

## ii.  Differences in Overtime Worked

As a preliminary matter, defendants do not have a written or unwritten policy to deny employees overtime pay.  The chart attached to the Foster Declaration as Exhibit F shows the number of overtime hours paid by defendants per employee by facility, department, position, and associate. This data not only destroys any inference of a system-wide unlawful policy, it also demonstrates that the overtime worked varies greatly across the putative class, as well as across each facility, department, and job position.  For example, while the employees in the Family Planning Department recorded and were paid for 0.90 hours of overtime per employee in 2007, those in Building Operations recorded and were paid for over 285 hours of overtime per employee during the same period.  (Foster Decl. ¶ 50, Exh. F)  Likewise, employees who held the position of File Clerk were paid for just over 24 hours of overtime per employee in 2007, while those who worked in the position of Carpenter A were paid for

over 380 hours of overtime per employee.  (*Id.*)  Indeed, the overtime hours paid per employee in 2007

varied widely across defendants' facilities—from 45.33 hours per employee at Women & Children's

Hospital of Buffalo to 104.03 hours per employee at Deaconess.  (*Id.*)  This data varied widely even

across the named plaintiffs, as Mika (#4289 in Exh. F – 2007 Overtime Hours Paid by Associate) was

paid for 4.5 hours of overtime during 2007, while Gordon (#2271) was paid for 141.75 hours of

overtime during the same time period.  (*Id.*)  Accordingly, the amount of time an employee works is

highly dependent on his or her job position, department, and facility, and cannot be adjudicated on a

representative basis in any reliable or meaningful manner.

### iii.  Differences in Shifts

The shifts worked by members of the putative class also vary widely.  As a health care provider

with many facilities open 24 hours a day, 7 days a week, Kaleida must adequately staff all shifts (day,

afternoon/evening, overnight).  (Foster Decl. ¶ 43).  Employees working different shifts will necessarily

experience different working environments and different demands which may or may not cause them

to work during meal periods.

### iv.  Unionization and Collective Bargaining Agreement Differences

Some members of the putative class are or were represented by a union, while others are or

were not.  16 percent of defendants' workforce is not unionized.  (Foster Decl. ¶ 27).  Not all of these

non-union employees are salaried; non-union hourly employees include pharmacists, social workers,

research associates, and security personnel.  (*Id.*)  Unionized class members are subject to collective

bargaining agreement provisions regarding meal breaks and overtime, while non-union class members

are not.  (*Id.* at ¶ 25).

Even unionized employees are subject to different written meal break provisions contained in

their respective collective bargaining agreements, including their site agreements.  (*See id.*)  Unionized

employees are also subject to different overtime thresholds, which are set out in their collective

bargaining agreements.  (*Id.* at ¶ 28) (*e.g.,* 1199 SEIU agreement for RNs at Women & Children's

Hospital of Buffalo sets overtime threshold at 40 hours/week, while AFL-CIO agreement for

maintenance employees at Buffalo General Hospital sets overtime threshold at 37.5 hours/week).

These differences necessarily impact whether employees would have cognizable overtime claims even

if they worked off-the-clock and preclude adjudication on a representative, classwide basis.

v. <u>Differences in Weekly Schedules/Overtime Thresholds</u>

Non-exempt employees work a variety of different types of regularly scheduled work weeks,

including 18.75 hours/week, 20 hours/week, 36 hours/week, 37.5 hours/week, 38 hours/week, 39

hours/week, and 40 hours/week.  (Foster Decl. ¶ 29).  The various defendants also pay overtime at 13

different thresholds, many of which are governed by union contract.  (*Id.* at ¶ 28).  Such differences

result in varying claims because they affect whether additional hours or missed meal periods will result

in overtime.

vi. <u>Differences in Scheduling of Lunch Breaks</u>

Defendants afford departmental and unit managers or supervisors discretion to determine the

timing and sequence of the thirty-minute meal break.  (Foster Decl. ¶ 35).  Some departments have

assigned meal periods that remain the same each day; other departments require employees to stagger

their meal periods to ensure coverage; some departments have no set schedule for meal breaks at all.

(*Id.*)  These differences in the scheduling of meal periods will necessarily lead to differences in whether

employees performed any work during their meal periods, a fact which militates against class

certification.  *Camilotes*, 2012 U.S. Dist. LEXIS 143583, at *20 (denying class certification and

granting motion for decertification of collective action where, *inter alia*, "each department within each

Defendant hospital has its own practice regarding whether nurses' meal period breaks are scheduled or

- 28 -

unscheduled, and whether nurses may combine unpaid meal periods with paid rest periods"). For example, if employee meal periods are staggered to ensure adequate coverage, then presumably there would be no need for an employee within that department to perform any work during his or her meal period. A brief survey of the practices of several managers (whose declarations are attached as Exhibit B to the Roney Declaration) demonstrates just how individualized the meal period experiences of each putative class member have been:

<u>Managers</u>

- ***Respiratory Care, Women & Children's Hospital of Buffalo*** – employees decide among themselves how to stagger meal periods (Declaration of Marc Leaderstorf, Respiratory Care Supervisor, Women & Children's Hospital of Buffalo, ¶ 6);

- ***Operating Room/Recovery Room/Surgical Services Float Pool/Central Sterile Processing, Women & Children's Hospital of Buffalo*** – meal breaks are scheduled and extra staff is specifically scheduled to cover the rooms during meals (Declaration of Juliette Mader, Operating Room/Recovery Room/Surgical Services Float Pool/Central Sterile Processing Manager, Women & Children's Hospital of Buffalo, ¶ 6);

- ***Patient Access, Kaleida Health*** – "Each manager deals with meal break scheduling differently. In some sites, employees decide among themselves how the meal breaks will be scheduled, in other sites the managers will schedule the breaks themselves." (Declaration of Michelle Dulski, Corporate Director of Patient Access, Buffalo General Towers/ DeGraff/ Women & Children's Hospital/Millard Fillmore Suburban/Gates Vascular Institute, ¶ 6);

- ***Accounts Receivable, Kaleida Health*** – employees decide when to take their meal breaks, and must inform their supervisor (Declaration of Jo Anne Puccio, Accounts Receivable Supervisor, Kaleida Acute Care Facilities, ¶ 5);

- ***Women's Services, Millard Fillmore Suburban Hospital*** – employees coordinate their meal breaks with the charge nurse on a daily basis (Declaration of Anita Hardy, Women's Services Director/Manager of Labor and Delivery, Childbirth Education, and Prenatal Testing, Millard Fillmore Suburban Hospital, ¶ 7);

- ***Cardiopulmonary and Imaging Services, Millard Fillmore Suburban Hospital*** – respiratory technicians coordinate their meal breaks based on the schedule for the day; the lead radiology technician assigns meal breaks daily to radiology technicians; cardiology technicians take their lunch together at noon  (Declaration of Dawn Taylor, Cardiopulmonary and Imaging Services Director, Millard Fillmore Suburban Hospital, ¶ 8);

- ***Vascular Intervention Suites, Gates Vascular Institute at Buffalo General Hospital*** – employees coordinate lunch breaks with each nursing pod; sometimes, employees are assisted by late start or a circulating nurse who will cover for employees on meal breaks; employees know to contact supervisors Myers or Dychtiar for assistance if they have a problem with coverage so they can take their meal break (Declarations of Patricia Myers and Dragana Dychtiar, Vascular Intervention Suites Nurse Manager and Unit Supervisor, Gates Vascular Institute at Buffalo General Hospital, Myers Decl. ¶ 8; Dychtiar Decl. ¶ 6);

- ***Shipping and Receiving, Buffalo General Hospital*** – the manager schedules meal breaks in intervals to ensure that all employees are not out at the same time (Declaration of John Spampinato, Shipping and Receiving Manager, Buffalo General Hospital, ¶ 5).

Putative class members (whose declarations are attached as Exhibit A to the Roney Declaration) have also submitted sworn testimony indicating that their respective departments had varying practices:

- ***Labor and Delivery RN at Millard Fillmore Suburban Hospital*** – lunches are not typically pre-scheduled; instead they are taken between 11:30 a.m. and 2 p.m and are arranged based on the unit's activity and coverage needs (Stafford Decl. ¶ 4);

- ***Cardiac Sonographer at Millard Fillmore Suburban Hospital*** – most employees take lunch at noon (Haley Decl. ¶ 4).

- ***Staff Nurse at Women & Children's Hospital of Buffalo*** – "There is a great deal of flexibility in the scheduling of meal breaks." (Grochowina Decl. ¶ 4).

These manifest differences necessarily impact the extent to which employees may have to work during meal periods, if at all, and fundamentally preclude the presentation of reliable representative testimony that could be remotely common or accurately extrapolated to the vast putative class.

### vii.  Differences in How Missed Meals are Reported

In their motion papers, plaintiffs repeatedly chastise defendants for "leaving it up to managers and supervisors to use whatever hodgepodge methods they come up with to attempt to capture" time worked during meal periods.  (Pl. Br. 16).  Setting aside the merits of such a contention, an allegation of a "hodgepodge" of manager-specific policies cannot serve as the basis for a class action.  Indeed, the Supreme Court has held that such an alleged practice "is just the opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy *against having*

uniform employment practices." *Dukes*, 131 S. Ct. at 2554 (emphasis in original); see also *Camilotes*,

2012 U.S. Dist. LEXIS 143583, at *22 (denying class certification motion and decertifying collective

action where "Plaintiffs concede[d] Defendants did not have a system-wide policy regarding when

Plaintiffs should cancel the automatic meal period deduction.  Instead, the practices varied from

department to department and fell within the supervisors' discretion." (citations omitted)).

  The managers and supervisors of each unit or department are tasked with the responsibility of

developing a method whereby employees can report time worked during meal periods, and these

methods vary.  (Foster Decl. ¶ 36).  The declarations attached to the Roney Declaration, as well as

those submitted in opposition to plaintiffs' motion for conditional certification (Dk. Nos. 119-7, 119-8),

demonstrate the various methods of reporting such time:

- ***Declaration of Joyce Pompeo, 10 South Cardiac Unit Nurse Manager, Buffalo General Hospital, ¶ 6:*** "If, for some reason, an employee works during his/her scheduled meal break, it is documented in the in the [sic] exception log and he/she is paid for all time worked.  The exception log is kept at the unit's nurses' station." (Roney Decl., Exh. B);

- ***Declaration of Judith Murcko, PICU/EMCO/Cardiology Nurse Manager, Women & Children's Hospital of Buffalo, ¶ 5:*** "[E]mployees are instructed to complete a 'no lunch' slip and give it to me. . . . The departments that I manage do not use Exception Logs for time worked during meal breaks, those are typically used for other purposes in my departments." (Roney Decl., Exh. B);

- ***Declaration of Janet Cousineau, Coffee Shop Supervisor, Millard Fillmore Suburban Hospital, ¶ 6:*** Employees write down their missed meals in an exception log and talk to Cousineau directly because she is usually working with them. (Dk. No. 119-7).

viii. <u>Differences in Number of Canceled Deductions</u>

  Defendants do not have a written or unwritten policy to deny employees pay for time worked

during meal breaks.  The chart attached to the Foster Declaration as Exhibit G shows the number of

meal breaks paid by defendants per employee by facility, department, position, and associate.  This

chart not only eviscerates any inference of an unlawful system-wide policy, it also highlights the wide

variety of experiences that putative class members had with respect to work performed during meal

- 31 -

periods.  For example, Nutritional Service Workers were paid for 2 meal periods per employee in 2007, while Extended Role Nurses were paid for over 75 meal periods per employee during the same time period.  (Foster Decl. ¶ 50, Exh. G).  Certain departments paid for as few as 3 meal periods per employee in 2007 (Intermediate Care), while others paid for over 100 meal periods per employee (Maintenance and Engineering).  (*Id.*)  Similarly, some facilities paid for about 300 missed meal periods (Mattina), while others paid for over 14,500 meal periods (Buffalo General Hospital).  (*Id.*)  This data also varied widely even across the group of named plaintiffs—for example, Pfentner (#2706 in Exh. G – 2007 Canceled Deductions by Associate) was paid for more than three times as many missed meals as Gordon (#1236) or Mika (#2325).  (*Id.*).

Thus, the data reveal that whether members of the putative class performed work during meal periods and were subsequently paid for such time varies greatly based on where employees worked and what position they held.  These variances are directly relevant to the issue of liability because they reflect differences in the putative class members' understanding of, and compliance with, defendants' policies.  The claim of unpaid missed meal periods by an employee who reported, and was paid for, many missed meal periods is substantively different from that of an employee who reported only a few or none.

ix.  Differences in Self-Reported Number of Missed Meal Breaks

Finally, experiences of the putative class members will vary widely with respect to the number of meal periods that they allegedly worked through.  Indeed, the interrogatory responses included with plaintiffs' Rule 23 motion papers reveal a wide variance of allegedly missed meal periods among putative class members:

- ***Ratajczak*** – asserted that she worked through approximately 65 percent of her meal breaks, and worked through part of about 25 percent of her meal breaks (Dk. No. 410-11);
  - Interruptions lasted anywhere from 10 to 25 minutes.

- **Reynolds** – asserted that she worked through approximately 15 percent of her meal breaks, and worked through part of about 85 percent of her meal breaks (Dk. No. 410-11);
  - Interruptions lasted anywhere from 5 to 20 minutes.

- **Schaffer** – asserted that he worked through approximately 15 percent of his meal breaks and worked through part of about 65 percent of his meal breaks (Dk. No. 410-11).

- **Gordon** – asserted that she worked through part of about 100 percent of her meal breaks while at Deaconess Center (Dk. No. 410-7);

- **Fialkiewicz** – asserted that she worked through approximately 2 percent of her meal breaks and worked through part of about 98 percent of her meal breaks (Dk. No. 410-6);
  - Interruptions lasted anywhere from 20 to 25 minutes.

In contrast, putative class members working in various settings have provided sworn testimony indicating that they had no reason to perform work during meal breaks.

- **Tumor Registrar** – never worked through meal periods or was interrupted for more than a minute or two (Dk. No. 119-5 – Aiken Decl. ¶ 4);

- **Laboratory Processor** – never worked through meal periods or was interrupted for more than a minute or two (Dk. No. 119-6 – Moore Decl. ¶ 4);

- **Environmental Services and Mail Clerk** – never worked through meal periods or was interrupted for more than a minute or two (Dk. No. 119-6 – Payne Decl. ¶ 4).

- **Operating Room Staff Nurse** – never had to work through a meal period because there was a great deal of flexibility when scheduling meal breaks.  (Roney Decl. Exh. A – Grochowina Decl. ¶ 4).

The varied work settings, job duties, methods of recording work time, regular shifts, union status, overtime hours worked, weekly schedules, methods of scheduling lunch breaks, methods of reporting work performed during meal periods, number of paid meal breaks, and number of self-reported missed meal periods demonstrate the incredibly individualized nature of the meal period claims across plaintiffs' proposed class.  The meal period experiences of each employee are as unique as their job duties, and vary depending on the employee's department, facility, regular shift, methods of scheduling lunch breaks, and methods of reporting work performed during meal periods.  Courts have not hesitated to deny class certification under similar circumstances based on a lack of commonality

among putative class members. *Wong v. AT&T Mobility Servs. LLC*, 2011 U.S. Dist. LEXIS 125988, at *8, *24 n.16 (C.D. Cal. Oct. 20, 2011) (notwithstanding plaintiffs' attempt to show commonality through defendant's "centralized control," "centralized policies" and "developed standardized processes" across its stores, "[i]t is the uncommon answers to the exemption(s) defense(s) and meal- and rest-break availability that will be 'apt to drive the resolution of the litigation.'"); *Hughes,* 2012 U.S. Dist. LEXIS 2469, at *26-27 (no commonality where managerial decision-making on when employees took meal breaks varied from store to store and department to department).

b.     Factual and Legal Issues to Be Raised by Defendants

In addition to the disparate factual scenarios across plaintiffs' proposed Meal Break Class, there are also numerous factual and legal issues implicated by plaintiffs' underlying claims that will require adjudication on an individualized basis and, therefore, militate against certification of plaintiffs' nebulously proposed class.

i.     Whether putative class members reported and were paid for work performed during unpaid meal breaks

The data attached to the Declaration of Ellie Foster as Exhibit G demonstrates that thousands of class members reported that they performed work during a meal period and were paid for such time. Indeed, in 2007 alone, Kaleida paid for over 46,000 meal breaks for non-exempt employees, averaging out to approximately 12 paid meal breaks per employee.  (Foster Decl. ¶ 51, Exh. G).  Moreover, named plaintiffs Pfentner (#2706 in Exh. G – 2007 Canceled Deductions by Associate), Mika (#2325), Schaffer (#3062), Gordon (#1236), and Galdon (#1125) were each paid for missed meal breaks on multiple occasions in 2007.  (*Id.*)  Galdon, Gordon, Schaffer, and Mika recorded missed lunches in their departments' exception logs in 2007 as well.  (*Id.* at ¶ 36, Exh. C).

In the interrogatory responses and affirmations submitted with plaintiffs' Rule 23 certification motion, the vast majority of putative class members admit to using exception logs to report some

missed meal periods, but claim incredibly that they did not report all of their missed meal periods.

They cite a variety of excuses for not following Kaleida's timekeeping policies—for example, some

putative class members generically allege that "[m]anagement frowned upon requests to be paid for

work performed during meal breaks" yet fail to specifically identify any such members of

management.  (*See, e.g.,* Curry Responses; Drumsta Responses; Duffy Responses).

        In contrast, other putative class members from various departments have submitted sworn

testimony indicating that they reported and were paid for work performed during meal periods without

issue.  (*See, e.g.,* Roney Decl., Exh. A – Haley Decl. ¶ 4; Dk. No. 119-5:  Dodge Decl. ¶ 4; Donoghue-

Orf Decl. ¶ 4; Eger Decl. ¶ 4; Fears Decl. ¶ 4; Heinzmann Decl. ¶ 4; Koch Decl. ¶ 4).  This inconsistent

reporting of work performed during meal periods by only certain individuals—and their excuses for

failing to do so on a regular basis—will necessarily require an individualized inquiry to determine: 1)

whether work was performed during a meal period; 2) whether it was reported; 3) whether it was paid;

and 4) if it was not reported, the reasons why it was not reported.

ii.  <u>Whether defendants knew or had reason to know of work performed during unpaid meal breaks</u>

As an element of their claims, each putative class member must demonstrate that management

either had constructive or actual knowledge that plaintiffs were working during lunch without pay.  29

C.F.R. §§ 785.11-12; *Reed v. County of Orange*, 266 F.R.D. 446, 460 (C.D. Cal. 2010); *Pforr v. Food

Lion, Inc.*, 851 F.2d 106, 109 (4th Cir. 1988).  Without actual or constructive knowledge of time

worked, an employer cannot be held liable for a failure to pay the employee for this time.  *Lewis v.

Keiser Sch., Inc.*, 2012 U.S. Dist. LEXIS 147150, at *6-7 (S.D. Fla. Oct. 12, 2012) ("[Plaintiff] clocked

herself in and out and accounted for her own time.  Under such circumstances, the Court is unwilling to

attribute to Keiser actual or constructive knowledge of work being performed off the clock, when

[Plaintiff]'s own records indicate otherwise.  [Plaintiff] does not argue, or present any evidence

- 35 -

showing, that Keiser forced her to clock out and continue working through lunch. Under such

circumstances, it makes no sense to say that Keiser should have paid [Plaintiff] for drafting and sending

emails at times that she herself indicated she was clocked out or taking lunch.").[12]

By its very nature, defendants need to present individualized evidence as to each putative class

member to rebut the existence of any such knowledge.  *See Camilotes*, 2012 U.S. Dist. LEXIS 143583,

at *38-39 ("[D]etermining whether Defendants had actual knowledge would require, at a minimum,

proof specific to each hospital, and probably to each Plaintiff.  As outlined above, the Plaintiffs worked

in eight different hospitals and in 198 different departments within those hospitals.  Within those

different departments, they also worked different shifts and reported to over 200 different supervisors.

Additionally, the departments differed in terms of how and whether nurses would notify anyone when

they took their meal breaks, with some departments not requiring nurses to notify anyone"); *Camesi*,

2011 U.S. Dist. LEXIS 146067, at *27-28; *Kuznyetsov*, 2011 U.S. Dist. LEXIS 146056, at *25.  Such a

showing will require individual testimony from each class member with respect to each meal period

during which he or she allegedly performed work, as well as the opportunity for each supervisor to

rebut the testimony of each class member, in order for a trier of fact to resolve whether defendants

suffered or permitted plaintiffs to work uncompensated time in violation of the NYLL.  Indeed,

manager declarations that defendants submitted as part of their conditional certification opposition (Dk.

No. 119-7) demonstrate that the extent of manager knowledge (or lack thereof) varied from employee-

to-employee:

---

[12] See also *Kuebel*, 643 F.3d at 362-63 (applying two differing standards of proof required of a plaintiff
claiming unpaid wages, depending on whether the plaintiff contends that the employer has maintained
inaccurate payroll records based on whether the employer knew or should have known of additional
time worked).  Here, based on manager declarations submitted by defendants in their opposition to
conditional certification, the applicable standard could differ from employee-to-employee, as some
managers attested to knowing whether their employees took meal breaks while others said they do not
know unless missed meals are documented in the exception log.

- ***Declaration of Ron Aldinger, Corporate Manager of Security, Women & Children's Hospital of Buffalo/DeGraff/Buffalo General, ¶ 8:*** "[F]or security reasons, it is important that we know exactly where each Officer is at all times during the day.  So, either I or the Supervising Officer will know whether someone is leaving for lunch or missed a lunch to answer an incident call."

- ***Declaration of Paul Boswell, Home Care Infusion Manager, Kaleida/Visiting Nurse Association/Pediatric Maternal Team, ¶ 8:*** "The employees in the various departments that I oversee do not work in one centralized location.  The nature of Homecare necessarily requires employees to work almost entirely offsite.  I simply do not have an opportunity to observe them all throughout the day, and I have no way of knowing whether they missed a meal period unless they record it on the exception log."

- ***Declaration of Cynthia Bova-Bankston, Operating Room Office Administrator, Women and Children's Hospital of Buffalo, ¶ 8:*** "I have anywhere from 30 to 60 operations or procedures per day.  I do not have an opportunity to observe all my employees throughout the day.  The employees do not eat in the work area.  Employees are free to go anywhere they wish during their meal period and many eat their meals in the cafeteria or offsite."

- ***Declaration of Janet Cousineau, Coffee Shop Supervisor, Millard Fillmore Suburban Hospital, ¶ 8:*** "Since I am generally onsite and there are only a few employees, I know when the employees have taken lunch."

- ***Declaration of Sharon Logue, Mother-Baby Unit Nurse Manager, Millard Fillmore Suburban Hospital, ¶ 8:*** "The employees in the Prenatal Department do not work in one centralized location.  There are approximately 24 patients in 20 rooms cared for by the employees in my department.  I do not have an opportunity to observe them all throughout the day, and I have no way of knowing whether they missed a meal period unless they record it on the exception log.  In addition, approximately 30 nurses work the evening shift for which I typically am not present."

These declarations illustrate the individualized nature of the inquiry as to whether defendants had knowledge of work allegedly performed during meal breaks.  Courts routinely decline to find commonality where such individual determinations must be made with respect to the issue of employer knowledge.  *York v. Starbucks Corp.*, 2011 U.S. Dist. LEXIS 155682, at *88 (C.D. Cal. Nov. 23, 2011) (finding no commonality with respect to plaintiffs' off-the-clock claims because "whether an employee worked without pay, the reasons why the employee worked without pay, the reasons why that employee failed to record the time on the Punch Communication Log, and the knowledge that a manager did or did not have regarding the employee's unpaid work can only be answered on the basis of individualized proof"); *Koike v. Starbucks Corp.*, 378 Fed. Appx. 659, 661 (9th Cir. 2010) ("The

district court did not abuse its discretion in finding that individualized factual determinations are required to determine whether class members did in fact engage in off-the-clock work and whether Starbucks had actual or constructive knowledge of off-the-clock work performed.").

Plaintiffs' proposed definition of the Meal Break Class which seeks to contest a "policy of only paying for missed or interrupted meal breaks reported by employees" only serves to highlight the need for individualized inquiries with respect to the issue of knowledge.  Plaintiffs' theory implies that members of the putative class are working more hours than they report to their respective employers. An inquiry into whether or not that happened necessarily requires parsing of the interactions of individual putative class members and their supervisors in order to determine whether each supervisor had knowledge of work performed, but not reported, by employees during meal periods.

Based on interrogatory responses and declarations submitted in support of plaintiffs' motion, plaintiffs now appear to contend that the critical issue of knowledge should simply be imputed to defendants by virtue of the fact that they run hospitals that are typically "busy."  (*See* Cressman Decl., Exhs. J, K) (alleging Plaintiffs' managers were aware of work being performed during meal breaks because they "knew of the demands placed on employees, knew the unit was understaffed, knew how busy employees were in the unit.").  Plaintiffs cite absolutely no authority whatsoever for this novel proposition, nor can they.  In any event, defendants do not dispute that, in providing health care services as not-for-profit charitable institutions, they are well aware that some of their employees are very busy.  What defendants lack, and what plaintiffs ultimately must prove, is actual or constructive knowledge of whether each of the thousands of putative class members working in highly heterogeneous environments across its vast operations has worked during any particular meal break without reporting it.

Defendants acknowledge that certain of their employees will, at times, be required to work during meal breaks.  In fact, this is the very reason why defendants have decentralized and department-specific procedures in place for employees to report such work.  In order to establish their claims, plaintiffs must show more than general knowledge that work is sometimes performed during meal periods; they must show knowledge that work is performed and not recorded, which requires an individualized inquiry.  *Hertz v. Woodbury Cnty.*, 566 F.3d 775, 782 (8th Cir. 2009) ("It would not be reasonable to require that the County weed through non-payroll CAD records to determine whether or not its employees were working beyond their scheduled hours. This is particularly true given the fact that the County has an established procedure for overtime claims that Plaintiffs regularly used.").  Knowledge that employees work during meal periods without reporting it, in violation of defendants' policies, simply cannot be imputed on a classwide basis.

Plaintiffs further contend that defendants possessed knowledge of work performed during meal breaks because they received aggregate survey data from the National Database of Nursing Quality Indicators ("NDNQI") that indicated that RNs missed all or part of meal periods at a higher rate than they were paid for such breaks.  (Pl. Br. 14-15).  That survey information does nothing to establish knowledge of actual work performed by RNs, much less members of the hundreds of other job positions that are a part of the putative class.  In the analogous case of *Camilotes*, the court rejected the employer's possession of NDNQI data as a basis to conclude that knowledge could be determined on a collective or class basis:

> Establishing constructive knowledge also will require an individualized inquiry, despite Plaintiff's contention that a comparison of the [NDNQI] survey results and statistics on the use of the "no lunch punch" procedure establishes this point.  Even assuming, *arguendo*, that Plaintiffs' conclusion that the NDNQI results show that between 60% and 90% of nurses did not have an uninterrupted meal period is correct, there is no indication that the Opt-In Plaintiffs had a comparable experience to the large group of self-selected nurses surveyed by the NDNQI.  Evidence

representative of the specific experiences of Plaintiffs will be necessary to establish the Defendants' constructive knowledge.

2012 U.S. Dist. LEXIS 143583, at *39-40 (citations omitted).  No different result is warranted here.

Further, plaintiffs conveniently omit an important fact when comparing the NDNQI survey information to their calculation of the percentage of time RNs were paid for meal breaks.  The NDNQI survey asked applicants whether they received a meal break during their last shift, while the percentage derived from Kaleida's timekeeping records reflects paid meal breaks over the course of nearly nine years.  (Dk. No. 410-3, Ferris Decl. ¶¶ 8-9, 15).  Thus, the NDNQI data would offer no meaningful comparative information related to the number of paid missed meal periods.  It is both inaccurate and overly simplistic to directly compare a percentage based on one shift to another percentage based on thousands of shifts.

Based on another case plaintiffs' counsel is currently litigating, defendants can anticipate what plaintiffs in the case at bar will argue on reply to support their claim that employer knowledge of time worked is suitable for adjudication on a classwide basis.  In their reply memo of law in further support of class certification in *Hinterberger v. Catholic Health System, Inc.*, No. 08-cv-380 (W.D.N.Y. Nov. 28, 2012), Dk. No. 404, plaintiffs cite to several cases which they claim stand for this proposition.  Several of these cases, however, not only do not stand for this proposition, but actually support the argument set forth by defendants: that the very nature of the claims asserted by plaintiffs necessarily requires an individualized inquiry into the interactions between a particular employee and his/her supervisor on any given shift.

For example, plaintiffs completely misrepresent *Vang v. Kohler Co.*, 2012 WL 2917788 (E.D. Wis. July 17, 2012).  In *Vang*, the district court—in granting plaintiffs' motion for class certification— held that constructive knowledge could be determined on a classwide basis and this issue would predominate over other individualized issues.  Plaintiffs indicate that this decision was "vacated and

remanded on other grounds." *Hinterberger,* Dk. No. 404, p. 12.  Plaintiffs conveniently fail to point

out that these "other grounds" are the very grounds that defendants are relying on in opposition to

plaintiffs' motion for class certification.  On appeal, the Seventh Circuit vacated this decision in light of

the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), holding that

the plaintiffs had failed to demonstrate commonality under Rule 23(a) (much less the more demanding

predominance inquiry of Rule 23(b)(3)):

> The allegation in this suit…appears to be that particular superiors regularly
> departed from the policy established by Kohler's top brass.  Under Wal-Mart and
> Bolden such variable circumstances do not present a common question.
>
> On remand the district court may think it prudent to take evidence to determine
> whether this suit concerns one firm-wide policy or a congeries of supervisor-level
> practices.  There is no obstacle to examining issues that affect class certification as
> well as the merits.

*Vang v. Kohler Co.*, 2012 WL 3689501, at *1 (7th Cir. Aug. 28, 2012).  In short, the Seventh Circuit's

reasoning is nearly identical to the position advocated by defendants on the instant motion for class

certification.

Plaintiffs likewise selectively omit crucial law and facts from *Pryor v. Aerotek Scientific LLC*,

278 F.R.D. 516, 525 (C.D. Cal. 2011).  First, the fact that the court in *Pryor* concluded that constructive

knowledge of time worked was a common question was a direct result of the nature of the claims, as

plaintiffs—call center employees—alleged that the employer had a policy of requiring them to log onto

their computers prior to beginning their shift and did not pay for such compensable time.  *Id.* at 520.

Here, there is no allegation of a discrete compensable activity that defendants uniformly suffered or

permitted plaintiffs to perform without compensation.  Second, plaintiffs fail to note that the court in

*Pryor* ultimately denied the motion for class certification, concluding that "while the policies about

which Pryor complains are common, how those policies affect members of the class depends on the

individual circumstances of each Aerotek employee…This is not merely a question of damages, it is a

question of liability." *Id.* at 532.  Once again, the court's reasoning only serves to bolster defendants' arguments in opposition to the instant motion.

Finally, plaintiffs also selectively edit the holding of *Burch v. Qwest Commc'ns Int'l, Inc.*, 677 F. Supp. 2d 1101 (D. Minn. 2009).  The court in *Burch* held that an employer's knowledge of call center employees' booting up and shut down activities was susceptible to classwide treatment.  *Id.* at 1118, 1121.  However, the Court also decertified the collective action with respect to the plaintiffs' meal period claims, holding that, much like the meal period claims in this case, employer knowledge would necessarily vary from manager to manager.  *Id.* at 1118.  ("Given the widely varying evidence of how often these practices occurred and to what extent, establishing individual manager knowledge may be necessary.").

### iii.  Whether meal breaks were spent predominantly for the benefit of the employer

The fact that an employee performed some "work" during his or her meal period does not necessarily mean that the entire meal period is compensable.  The Second Circuit has held that a meal break is compensable only where "a worker performs activities predominantly for the benefit of the employer." *Reich v. S. New Eng. Telecomms. Corp.*, 121 F.3d 58, 64 (2d Cir. 1997).  The determination of "whether an employee's time is spent 'predominantly for the benefit of the employer' is 'highly individualized and fact-based.'" *Beasley v. Hillcrest Med. Ctr.*, 78 Fed. Appx. 67, 70 (10th Cir. 2003) (quoting *Pabst v. Okla. Gas. & Elec. Co.*, 228 F.3d 1128, 1132 (10th Cir. 2000)); *see also Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944) ("Whether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case.").  Where an employee's meal period is allegedly interrupted by work, each meal period must be analyzed to determine whether the time was spent predominantly for the benefit of the employer.

Those who responded to defendants' interrogatories testified to a variety of experiences—some claimed to have missed meal periods completely, while others claimed to only have been briefly interrupted from time to time. (Dk. No. 410-6: *Clarke* – alleged that approximately 50 percent of her meal breaks were interrupted; *id.*, *Curry* – alleged that she worked through about 40 percent of her meal breaks and worked through part of about 30 percent of her meal breaks; Dk. No. 410-11, *Pfentner* – alleged that she worked through part of about 80 percent of her meal breaks; *id.*, *Reynolds* – claimed that interruptions typically lasted 5 to 20 minutes). For each claimed interruption by each plaintiff and putative class member, a determination will be needed as to whether that particular meal period was spent predominantly for the benefit of the employer. *See Beasley*, 78 Fed. Appx. at 70. This case cannot, therefore, be decided without an individualized consideration of each instance where a plaintiff or putative class member contends that a meal break was spent for the benefit of his or her employer.

iv.  The *De Minimis* Defense

To the extent that plaintiffs claim that they are owed wages attributable to having worked for short periods of time during their meal period that did not result in the entire meal period becoming compensable, defendants will have a plausible defense based upon the *de minimis* rule. *See De Asencio v. Tyson Foods, Inc.*, 500 F. 3d 361, 373-74 (3d Cir. 2007); *Lindow v. United States*, 738 F. 2d 1057, 1062 (9th Cir. 1984). The Supreme Court has explained that

> [t]he workweek contemplated . . . must be computed in light of the realities of the industrial world. When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded. Split-second absurdities are not justified by the actualities of working conditions or by the policy of the Fair Labor Standards Act. It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved.

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692 (1946); *see also* 29 C.F.R. § 785.47.

An assessment of this defense will necessarily require individualized consideration of each sliver of time allegedly worked by each plaintiff and putative class member. *See Camesi*, 2011 U.S. Dist. LEXIS 146067, at *32 (noting that plaintiffs' theory of small amounts of time worked during meal periods "would essentially reduce Plaintiffs and their counsel to seeking '*slivers of slices*' of FLSA recovery. Given the needles that would need to be thread, and the limited nature of recovery, it would seem that retaining class treatment for these claims would be an end for the sake of itself . . . the individualized nature of Plaintiffs' claims, and the attendant problems with manageability, would increase exponentially under this theory." (emphasis added)); *Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 468 (S.D.N.Y. 2011) (an employer "can defend against some of plaintiffs' claims by demonstrating that certain off-duty work was de minimis. The extent to which work was de minimis, however, will necessarily vary widely according to the particular situation of each individual plaintiff.").

Moreover, even if this Court were to rule that there is a standard for how many minutes qualify as *de minimis*, such a standard could not be applied on a classwide basis to resolve these claims. The reason is that this issue relates to liability and not simply damages. To apply a *de minimis* standard, the Court would need to first determine whether class members' meal periods were in fact interrupted and if so, for how long. Without a doubt, this would be an individualized inquiry that would yield disparate results.

v.   <u>LMRA preemption is an individualized defense</u>

Section 301 of the LMRA preempts NYLL claims like plaintiffs' if adjudication of the claims is substantially dependent upon the terms of a collective bargaining agreement. (*See* Dk. No. 91). While this Court has not yet determined that plaintiffs' NYLL claims are preempted on this ground, it stated in a 2009 order that "[i]t may well be that Plaintiffs' NYLL claim is preempted [pursuant to the

LMRA], in whole or in part." (Dk. No. 232, p. 10). Kaleida has asserted the LMRA preemption

defense against putative class members represented by unions based upon the unique provisions of the

various collective bargaining agreements. The assertion of this defense will require the Court to review

and analyze each applicable collective bargaining agreement to determine whether and to what extent

those agreements must be interpreted in order to determine plaintiffs' claim.

vi.   The application of the professional exemption under the NYLL is an
individualized, week-by-week inquiry

Finally, plaintiffs' proposed class is not suitable for adjudication on a classwide basis because

defendants contend that many of the RNs who are encompassed within this class are exempt from the

wage payment and overtime requirements of the NYLL. Indeed, defendants intend to make a motion

for summary judgment to this effect with respect to named plaintiffs Gordon, Mika, and Thomson. As

the motion will detail, both the NYLL and the New York Minimum Wage Orders exempt bona fide

"professional" employees from their definition. N.Y. Lab. Law § 190(7) (McKinney 2012); 12

N.Y.C.R.R. § 142-3.12(c)(2) (2012). While it is generally accepted that RNs perform professional

duties within the meaning of both of these exemptions, the NYLL requires that such professionals must

earn more than $900 per week in order to meet the exemption during the time that plaintiffs were

employed.[13] N.Y. Lab. Law § 190(7). Accordingly, an analysis of whether each RN in the putative

class meets this exemption would require an examination of both their duties and their weekly earnings

on an employee-by-employee and week-by-week basis. Such an analysis is the antithesis of a class

action. *White v. Western Beef Props., Inc.*, 2011 U.S. Dist. LEXIS 141696, at *8 (E.D.N.Y. Dec. 9,

2011) (denying class certification of overtime claims of class of employees allegedly misclassified as

exempt where "plaintiffs cannot show how a factfinder would resolve that crucial liability question

---

[13] From 1992 to January 14, 2008, the income threshold was $600 per week.

other than on an employee-by-employee basis"); *see also Myers*, 624 F.3d at 548 (affirming district

court's denial of class certification and noting that determining whether a proposed class of employees

was exempt would be "a complex, disputed issue…which in turn will require the district court to

decide a number of subsidiary questions involving whether plaintiffs fall within the Labor

Department's criteria for 'employee[s] employed in a bona fide executive… capacity.'").  In short, the

panoply of factual and legal issues at issue in this case, each of which demanding employee-by-

employee inquiries and evaluations, demonstrates the fundamental lack of commonality and typicality

across the claims, if any, of the putative class.

For all these reasons, plaintiffs' motion for certification of their Meal Break Class must be

denied with prejudice.

### 2.   Plaintiffs Have Failed to Establish Commonality and Typicality With Respect to the Proposed Rounding Class

Plaintiffs also seek certification of a putative Rounding Class of "all current and former hourly

employees of Kaleida from May 22, 2002 to the present whose pay was subject to Kaleida's rounding

policy resulting in systemic under-compensation of employees."  (Pl. Br. 5).  Notably, plaintiffs have

abandoned their original generalized class claims for "preliminary and postliminary work" contained in

the First Amended Complaint at Paragraph 73(b) (Dk. No. 235), which alleged unpaid work performed

before and after shifts.  After over four years of litigating this case, plaintiffs' instant motion is the first

mention they have made of any claim arising from allegedly unlawful rounding.  None of the various

versions of their Complaint contains any allegation related to rounding, and none of the affidavits of the

Named Plaintiffs makes any such allegation.  Even assuming *arguendo* that plaintiffs' rounding

allegations had been properly pled in this case, which they have not, plaintiffs have utterly failed to

meet the commonality and typicality requirements of Rule 23(a) with respect to the proposed Rounding

Class, just as with their Meal Break Class.

Plaintiffs for the first time allege that defendants employed a rounding practice "whereby employees' time is rounded up or down to their scheduled time if they clock in or out within 7 minutes of their scheduled shift times." (Pl. Br. 17). Plaintiffs concede that this practice was facially neutral and lawful according to the Department of Labor's regulations. *See* 29 C.F.R. § 785.48(b) (endorsing the practice of rounding so long as the practice "averages out"). Nonetheless, plaintiffs contend that defendants' rounding practice "systematically undercompensated" employees because defendants' disciplined employees who clocked in late or clocked out early. (Pl. Br. 18). In support of this theory, plaintiffs submit calculations of timekeeping data produced in discovery for a mere 11 individuals out of sample population of 49. (Cressman Aff., Exh. G).

First, plaintiffs' data are highly misleading, statistically insignificant, and inadmissible as a matter of law. This Court has the obligation to act as a "gatekeeper" to exclude invalid and unreliable statistical evidence. *Hollander v. American Cyanamid Co.*, 172 F.3d 192, 202 (2d Cir. 1999), *cert. denied*, 528 U.S. 965 (1999). The statistical evidence upon which plaintiffs rely on a motion for class certification is properly subjected to rigorous analysis. *Sheehan v. Purolator, Inc.*, 839 F.2d 99, 103 (2d Cir. 1988), *cert. denied*, 488 U.S. 891 (1988) ("[B]y finding fault and infirmities in the statistical evidence presented, the district judge was neither evading her responsibility to examine the evidence, nor placing impossible burdens on the plaintiffs. The judge was simply unpersuaded.") (quoting *Penk v. Or. St. Bd. of Higher Educ.*, 816 F.2d 458, 465 (9th Cir. 1987), *cert. denied*, 484 U.S. 853 (1987)). It is the role of the district court to ensure that the basis of the statistical evidence is "not so flawed that it would be inadmissible as a matter of law." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 135 (2d Cir. 2001), *cert. denied sub nom.*, *Visa U.S.A., Inc. v. Wal-Mart Stores, Inc.*, 536 U.S. 917 (2002); *see also In re Initial Pub. Offering Sec. Litig.*, 471 F.3d at 26.

Here, plaintiff's raw statistical data is worthless and cannot provide the basis to certify the proposed Rounding Class.  Although plaintiffs analyzed the impact of rounding on only 11 individuals, they assert, incredibly, that they "expect that an analysis of the records of all 49 plaintiffs will yield a similar result."  (Dk. No. 410-3, Ferris Decl. ¶ 29 n.5).  It is axiomatic that purported results from only 11 people would not and do not dictate the results for 38 other people in different positions in different departments at different facilities, let alone for over 18,000 putative class members working in over 448 different departments in over 27 separate locations, and holding over 388 currently active job titles. Indeed, plaintiffs ignore the fact that the rounding process by its very nature and as acknowledged by the Department of Labor does not affect every employee the same way.  Accordingly, plaintiffs' data should be excluded by the district court.

Defendants performed a thorough analysis of the rounding effect for all 49 sample putative class members.  Headley Decl.[14] ¶¶5-7.  This analysis defeats plaintiffs' contention that defendants' rounding practice was unlawful because it benefitted the employer significantly more than the employee is untrue.  In fact, when broken down per employee per shift, the net rounding effect was 0.84 minutes in favor of the employer.  This average—a mere fraction of a minute in favor of the employer per person per shift—shows there was no meaningful rounding effect in favor of Kaleida. Therefore, plaintiffs' argument that defendants' rounding practice was unlawful is meritless.

Taking this data analysis a step further, when *de minimis* amounts of time are eliminated (*i.e.*, time four minutes or less and when employees were paid minute to minute pursuant to their recorded time), rounding had a positive or neutral effect on this group of employees 82 percent of the time. Headley Decl. ¶ 6, Exh. A; *see also* U.S. Department of Labor Opinion Letter, 2008 DOLWH LEXIS

---

[14] References to "Headley Decl." are to the Declaration of Joshua A. Headley, Senior Litigation Technology Specialist, signed on December 7, 2012.

12, at *8 (May 15, 2008) (in context of employer inquiry with respect to rounding, advising that "insubstantial or insignificant periods of time outside the scheduled working hours that cannot practically be precisely recorded may be disregarded.  The courts have held that such periods of time are de minimis.  This rule applies only where a few seconds or minutes of work are involved and where the failure to count such time is due to considerations justified by industrial realities.").  So, defendants' rounding practice is lawful based on the Department of Labor's regulations because employees are disadvantaged by it only a small (18 percent) percentage of the time.

However, even assuming *arguendo* that the calculations offered by plaintiffs are presumably admissible and correct, which they are not, then the presumption of the lawfulness of the rounding practice merely falls away.  The analysis does not end there.  Rather, in order to determine whether the putative class has cognizable claims for uncompensated work arising from such a practice, this Court would have to engage in highly individualized, fact intensive inquiries that undercut a finding of commonality and typicality.  Plaintiffs have utterly failed to demonstrate how adjudication of the claims of their proposed Rounding Class would provide the necessary "glue" to hold these claims together.

First, it should be noted that defendants' employees utilize different methods of recording their time in the Kronos system, depending on which department and/or facility they work in.  In 2007, employees recorded their time in Kronos by telephone, badge swipe, and/or exception logs.  (Foster Decl. ¶ 31).  Before the implementation of Kronos in 2003 and 2004, employees recorded their time using manual timesheets, time clocks, telephones, and badges, depending on the timekeeping system used in their respective departments and facilities. (*Id.*)  How and where employees record their time necessarily impacts when they might, if at all, begin performing compensable activities prior to their scheduled shift.

- 49 -

Second, much like the proposed Meal Break Class, the putative members of the Rounding

Class would have performed any alleged off-the-clock work in highly different working environments,

at the request of different supervisors, recording their time in different ways and working different

schedules and differing amounts of time.  All of these vastly different factors eviscerate any semblance

of commonality and typicality across the putative class.

Third, to the extent that plaintiffs contend that there is a "common legal question" as to whether

this practice "violates the law by resulting in off-the-clock work," this simply begs the question.

Plaintiffs utterly fail to demonstrate how this supposedly "common legal question" might be resolved

through common answers.  With respect to rounding, the U.S. Department of Labor regulations state

that "[p]resumably, this arrangement averages out so that the employees are fully compensated for all

the time they actually work.  For enforcement purposes this practice of computing working time will be

accepted, provided that it is used in such a manner that it will not result, over a period of time, in failure

to compensate the employees properly for all the time they have actually worked." 29 C.F.R. §

785.48(b).  Accordingly, such a practice is presumably lawful if it meets this criterion.  The exhibits

submitted by plaintiffs' counsel indicate the individualized nature of the analysis necessary to make this

determination.  (*See* Cressman Aff., Exh. G).  These exhibits indicate that some employees were

overcompensated as a result of this practice, some were not affected at all, and still others were

undercompensated.

A more thorough analysis of the data also demonstrates that the effect of rounding varied

significantly across facilities and departments, and even among individuals.  Indeed, defendants'

analysis indicates that the 2 East Nursing Unit at Millard Fillmore Suburban Hospital had a

comparatively large percentage of neutral rounding.  (Headley Decl. ¶ 7, Exh. C).  Meanwhile, Buffalo

General Hospital's Rehab Unit also had a large percentage of neutral rounding, but with more negative

values in favor of the employee. (*Id.*) Similarly, Buffalo General Hospital's Medical ICU had a large percentage of neutral rounding, but with more positive values in favor of the employer. (*Id.*) Going one step further, an observation of as few as three different job titles shows very different experiences among them with respect to rounding. (*Id.*, Exh. D)

Fourth, in order to adjudicate such claims arising from a rounding practice, this Court would need to engage in an employee-by-employee, supervisor-by-supervisor, and shift-by-shift inquiry to determine whether each employee was actually working during the time that he or she allegedly "lost" due to rounding. Even if defendants' rounding practice is not presumed lawful, an individualized inquiry is required to determine whether each employee performed uncompensated work. It cannot be assumed that simply because an employee was clocked in, he or she was performing compensable work. The rounding practice was well-communicated. Employees who clocked in a few minutes early (or a few minutes late) knew that their punch time would be rounded and that they would not be paid for such time. The declarations of supervisors and managers demonstrate that this well-publicized practice affected employee behavior and—knowing full well that they would not be paid—employees clocked in early and in the interim socialized, retrieved coffee, food, beverages, put their belongings away, or otherwise performed non-compensable tasks until the start of their shift. (Roney Decl., Exh. B – Leaderstorf Decl. ¶ 4; Murcko Decl. ¶ 4; Puccio Decl. ¶ 4; Hardy Decl. ¶ 4; Taylor Decl. ¶ 4; Pompeo Decl. ¶ 4; Myers Decl. ¶ 4; Dychtiar Decl. ¶ 4; Drake Decl. ¶ 4; Holtz Decl. ¶ 4). These declarants also observed employees in their departments or units also not performing work after clocking in for the day. (*Id.*) Accordingly, a determination of whether each employee was actually working during the short periods that his or her clock in or out time was rounded to their detriment would necessarily require individualized inquiries into whether or not each employee was performing compensable work during that period of time.

Fifth, plaintiffs must also show that in order for the time before and after shifts that was "rounded" to be compensable, defendants must have had actual or constructive knowledge of the work performed. For the reasons set forth above, the issue of employer knowledge is a highly-individualized analysis that does not lend itself to adjudication on a classwide basis. Likewise, given the miniscule amounts of time at issue with respect to rounding, defendants will raise the *de minimis* defense, which, as stated above, also militates against class certification.

Finally, defendants take the position that the RNs in the putative class meet the professional exemption to the NYLL and the New York Minimum Wage Orders, and determination of whether this exemption applies requires an individualized, week-by-week inquiry.

For all these reasons, plaintiffs' motion for certification of their Rounding Class must be denied with prejudice.

## II.   CLASS CERTIFICATION SHOULD BE DENIED BECAUSE THE NAMED PLAINTIFFS HAVE FAILED TO MEET THE REQUIREMENTS OF RULE 23(b)

### A.   CLASS CERTIFICATION UNDER RULE 23(b)(3) SHOULD BE DENIED

Even if the named plaintiffs could satisfy the commonality, typicality, and adequacy of representation elements of Rule 23(a), they cannot satisfy the "far more demanding" burden under Rule 23(b)(3) to show that: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) class litigation "is superior to other available methods for fairly and efficiently adjudicating the controversy."

#### 1.   Individualized Damages and Evidentiary Issues Predominate

A class action may only be maintained under Rule 23(b)(3) if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members…." Fed. R. Civ. P. 23(b)(3). The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation" and assesses whether a

"class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated . . . ." *Amchem,* 521 U.S. at 615, 623; *see also Myers*, 624 F.3d at 547.  General questions predominate "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).

The predominance requirement is "far more demanding" than the commonality requirement under Rule 23(a).  *Amchem*, 521 U.S. at 623-24; *Dorman v. DHL Express (USA), Inc.*, 2010 WL 446071, at *3 (W.D. Wisc. Feb. 3, 2010).  Importantly, merely seeking the same relief is not sufficient to establish predominance, particularly when there are significant individualized damages or evidentiary issues.  See *Altier v. Worley Catastrophe Response, LLC*, 2011 WL 3205229, at *16 (E.D. La. July 26, 2011) (finding that plaintiffs failed to show that common issues predominated over individualized issues when damages calculations and individual circumstances would need to be analyzed for each putative class member); 5 James Wm. Moore et al., *Moore's Federal Practice*, § 23.46[2][e][i] (3d ed. 2012) ("If each class member's individual damages claim must be resolved, and if each damages calculation is relatively complex, the class is probably unmanageable").

Although an employee's challenge of an employer's uniform policy may satisfy the predominance requirement under certain circumstances, when manager-specific practices only apply to certain individual employees, the individualized inquiry into the facts surrounding each proposed class member precludes class certification.  *Dorman*, 2010 WL 446071, at *3, *5.  "Predominance is not satisfied where liability determinations are individual and fact intensive." *Hawkins v. Securitas Sec. Servs. USA, Inc.*, 280 F.R.D. 388, 396 (N.D. Ill. 2011).  Here, for all of the same reasons that plaintiffs have failed to demonstrate commonality and typicality set forth in Point I above, plaintiffs have

likewise failed to meet the higher standard of predominance required by Rule 23(b)(3). This is particularly true with respect to the myriad defenses defendants intend to raise. *Myers*, 624 F.3d at 551 (observing that it is "well established that courts must consider potential defenses in assessing the predominance requirement").

a.  Meal Break Class

The recent *Camilotes* decision—a case on all fours with the case at bar—confirms that individual issues in automatic meal period deduction cases predominate over any common issues. In *Camilotes*, where plaintiffs challenged a hospital system's automatic deduction policy, the court found that the predominance requirement was not met because "Plaintiffs will not be able to prove their claims using evidence that is common to the class—rather, individualized inquiries into the facts surrounding each Plaintiffs meal period experiences will be required." 2012 U.S. Dist. LEXIS 143583, at *49. The facts here mirror those in *Camilotes* and a host of other decisions, and certification should be denied for the same reasons. See also:

- *Mateo v. V.F. Corp.*, 2009 U.S. Dist. LEXIS 105921, at *16-17 (N.D. Cal. Oct. 27, 2009) ("Here, individual issues, not common ones, predominate the class's claims. For example, one of Plaintiff's claims is that, due to lack of minimum staffing for her store, employees had to continue working after clocking out for meal periods. To prove her claim, Plaintiff will need to demonstrate that: [] she did in fact work off-the-clock . . . [] the instructions were based on a corporate practice and were not made by the supervisor in opposition to corporate policy, [] the store was in fact under-staffed when she missed her break, [] she requested compensation for the missed break, and [] V.F. refused to compensate her despite her requests. Each putative class member will need to go through a similar factual inquiry with similar individualize proof in order to prove V.F.'s liability for the claims in all three subclasses.");

- *England v. Advance Stores Co.*, 263 F.R.D. 423, 456 (W.D. Ky. 2009) ("[D]ifferent managers and assistant managers within the same store may well have had different practices and internal policies regarding when that particular store's employees were required to clock out during the daily closing procedure. If this matter is certified as a class action, the very real prospect exists that the district court may be forced to endure dozens, perhaps hundreds, of mini-trials on such issues. Several other courts faced with the prospect of employee class actions involving claims of off-the-clock work and denied lunch and rest breaks have reached exactly the same conclusion that the Court reaches in this opinion – that common issues do not predominate and that a class action would not be a superior vehicle by which to adjudicate the interest of the potential plaintiff employee class.");

- *Helm v. Alderwoods Group, Inc.*, 2009 U.S. Dist. LEXIS 123527, at *32 (N.D. Cal. Dec. 29, 2009) (denying class certification because "individualized inquiry is required to determine whether a given manager was aware that a given employee worked during his or her meal break, whether any managers altered time cards to exclude time spent working during meal breaks, and whether particular staff meetings included instructions not to seek payment for work done during a break.");

- *Blackwell v. SkyWest Airlines*, 245 F.R.D. 453, 468 (S.D. Cal. 2007) (denying class certification where "[d]efendant submitted evidence that supervisors were responsible for scheduling meal periods, directing agents to take their meal periods on time, relieving agents for meal periods, and recording missed and short meal periods so that Agents were properly compensated.");

- *Basco v. Wal-Mart Stores, Inc.*, 216 F. Supp. 2d 592, 603 (E.D. La. 2002) (denying class certification where "individualized issues will arise from the myriad of possibilities that could be offered to explain why any one of plaintiffs worked off-the-clock.").

        b.      Rounding Class

Similarly, a recent case confirms the failure of plaintiffs to establish predominance with respect to their rounding claims. In *Pryor*, the court concluded that plaintiffs' proposed rounding class failed Rule 23(b)(3)'s predominance requirement. In reaching this conclusion, the court aptly noted that:

> [Plaintiff] argued that common questions predominate because the policies about which she complains, in the aggregate, were more likely to result in under-compensation of employees than overcompensation. Even assuming this is true, concluding that Aerotek's policies probably caused some workers to be underpaid would not resolve the court's concerns, as it would still be required to determine, on an individualized basis, which employees were underpaid and by how much… [Plaintiff] has given the court no confidence that these latter questions can be resolved on a classwide basis, such that it is appropriate to find that common questions predominate over individualized ones.

*Pryor*, 278 F.R.D. at 533 n.60. The court further observed that—much like the case at bar—an individualized inquiry would be required to determine whether each employee actually worked during the times that he or she allegedly was undercompensated: "This is particularly problematic because some putative class members have stated that they logged into their computers upon arriving at work but then spent time eating breakfast or socializing with friends before logging onto VCC and accepting calls. This testimony suggests that the computer logins time may differ significantly from the time an

employee actually began work for which he or she was entitled to be compensated." *Id.* at 535; *see also Cornn v. UPS*, 2005 U.S. Dist. LEXIS 30419, at *17-18 (N.D. Cal. Aug. 26, 2005) (declining to certify a class in a suit involving allegations of uncompensated pre-shift work "[b]ecause the Court cannot determine whether a driver performed work during the interval in question without undertaking individualized inquiries that predominate over any common questions" and aptly observing that "there is no common practice among package-car drivers as to when they punch in to work.  Some drivers may punch in immediately after arriving at the building, while others may punch in just before their scheduled start times.  In addition, drivers perform a variety of non-work-related tasks, such as socializing, reading the newspaper, and drinking coffee or tea, after punching in but before their scheduled start times.  If a driver punched in thirty minutes prior to his or her scheduled start time but actually did no work during that time, then UPS's practice of calculating hours worked based on the scheduled start time would not be unlawful.") (citations omitted).

Indeed, the declarations of several employees indicate that not all employees perform work immediately upon clocking in, and therefore an individualized determination must be made with respect to whether each employee actually performed work during this short period of time that was allegedly rounded to their detriment.  (Roney Decl., Exh. B – Leaderstorf Decl. ¶ 4; Murcko Decl. ¶ 4; Dulski Decl. ¶ 4; Puccio Decl. ¶ 4).  Accordingly, with respect to both of their proposed classes, plaintiffs have failed to demonstrate that questions of law or fact common to class members predominate over any questions affecting only individual members.

## 2.    Manageability/Superiority

Plaintiffs seeking to certify a class under Rule 23(b)(3) must demonstrate that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  In making

this determination, courts consider four factors, including "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D). This factor also dooms plaintiffs' certification bid.

The customized meal period practices and work settings across defendants' 448 departments and varying accounts between named plaintiffs, opt-ins, and putative class members and their managers concerning their meal period and work experiences would pose overwhelming manageability problems and result in thousands of mini-trials. Plaintiffs simply ignore the issue and have made no effort to explain how they can account for the varying meal period practices and work experiences of employees in the 448 departments and, especially, for the hundreds of departments in which they did not work. Plaintiffs only provided evidence relating to just a fraction of defendants' departments, and that evidence is based primarily on boilerplate, vague, and unsupported declarations and interrogatory responses. (*See* Cressman Decl., Exhs. J, K).

Some of those declarants claim knowledge about the meal period practices in departments other than their primary department. In that regard, those declarations mimic the cookie-cutter declarations submitted by the named plaintiffs in support of their motion for conditional certification. (*See* Dk. Nos. 12-17, averring that each "observed that other employees…rarely were able to take a full uninterrupted 30 minute meal period"). These boilerplate assertions are insufficient.

Finally, the court must at this stage consider how this case, if certified, would be tried. Plaintiffs offer no trial plan to help the court with this inquiry. Absent a coherent plan to try class claims efficiently, certification of a class action is not superior and poses "an unnecessarily high risk of introducing needless and avoidable complexity into an already complex case." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1279 (11th Cir. 2009); *see also Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996); *Sweet v. Pfizer*, 232 F.R.D. 360, 369 (C.D. Cal. 2005) (denying class certification where trial plan was not submitted until plaintiffs' reply brief).

- 57 -

To the extent that plaintiffs cite to Judge Hurd's decisions in *Myers v. Crouse Health Sys., Inc.*, 274 F.R.D. 404 (N.D.N.Y 2011), *Hamelin v. St. Luke's Healthcare*, 274 F.R.D. 385 (N.D.N.Y 2011), and *Colozzi v. St. Joseph's Hosp. Health Ctr.*, 275 F.R.D. 75 (N.D.N.Y 2011) for the proposition that "courts have routinely rejected arguments concerning the unmanageability of 'individualized' defenses in the context of 'off-the-clock' claims citing the use of representative testimony," (Pl. Br. 36), plaintiffs offer no plan as to how representative testimony would suffice in the instant action. Written discovery alone demonstrates the widely divergent experiences across the putative class. The necessity of a trial plan is demonstrated by *Cruz v. Dollar Tree Stores, Inc.*, 2011 WL 2682967 (N.D. Cal. July 8, 2011). In *Cruz*, the court initially certified a class of store managers under Rule 23. As the case approached trial, however, it became clear that plaintiffs intended to rely primarily on the testimony of individual class members about their day-to-day job duties. *Id.* at *8. The court reversed itself and decertified the class, holding that such evidence lacks the "glue" necessary to provide a "reliable means of extrapolating from the testimony of a few exemplar class members to the class as a whole." *Id.* at *5-6, *8. The court recognized that a case cannot be certified as a class action unless the results of a trial as to one class member's claims can fairly and reliably be extrapolated to the claims of other class members. *Id.* at *8. Here, they cannot.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court deny plaintiffs' Motion for Class Certification in its entirety with prejudice.

DATED:       Buffalo, New York
             December 7, 2012

**NIXON PEABODY LLP**

By:   /s/ Susan C. Roney
             Susan C. Roney, Esq.
*Attorneys for Kaleida Health*
40 Fountain Plaza, Suite 500
Buffalo, New York 14202
Tel:  (716) 853-8100
Email:  sroney@nixonpeabody.com

- 59 -