UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CATHERINE GORDON, *et al.,*

                Plaintiffs,

     v.

KALEIDA HEALTH, *et al.,*

                Defendants.

_____

**DECISION
and
ORDER**[1]

**08-CV-378S(F)**

APPEARANCES:      THOMAS & SOLOMON, LLP
                      Attorneys for Plaintiffs
                      MICHAEL J. LINGLE,
                      SARAH E. CRESSMAN, of Counsel
                      693 East Avenue
                      Rochester, New York   14607

                      NIXON PEABODY, LLP
                      Attorneys for Defendants
                      SUSAN C. RONEY, of Counsel
                      40 Fountain Plaza, Suite 500
                      Buffalo, New York   14202

                      COBURN & COFFMAN, PLLC
                      Attorneys for Defendants
                      JONATHAN W. GREENBAUM, of Counsel
                      1244 19 th Street, NW
                      Washington, D.C.   20036

## JURISDICTION

By order of Hon. William M. Skretny, dated January 6, 2010 (Doc. No. 252), this

matter was referred to the undersigned for all non-dispositive pretrial matters pursuant

---

[1] A motion to disqualify an expert is non-dispositive. *See Nikkal Industries, LTD. v. Salton*, 689 F.Supp. 187, 189 (S.D.N.Y. 1988) (motion to disqualify considered within non-dispositive referral authority pursuant to 28 U.S.C. § 636(b)(1)(B)). *But see United States ex rel. Grimm Constr. Co., Inc. v. SAE Civil Constr., Inc.*, 1996 WL 148521, *1 (D.Neb. Jan. 29, 1996) (applying *de novo* review where magistrate judge's order denying disqualification of attorney lacked findings or a discussion of applicable law).

28 U.S.C. § 636(b)(1)(A).  The matter is presently before the court on Defendants'

Motion To Disqualify Consulting Expert filed September 25, 2012 (Doc. No. 377)

("Defendants' motion").


## BACKGROUND

This action, pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 218,

and New York State Wage and Hour Laws, N.Y. Labor Law § § 190, 650 (McKinney's

2002) ("Plaintiffs' state claims"), filed May 22, 2008, seeks unpaid regular wages and

overtime pay for work during Plaintiffs' meal breaks, shift preparation time and required

training.  Defendant Kaleida Health is a major regional hospital system and provider of

related health care services.  Plaintiffs are a group of Defendants' hourly employees,

primarily nurses, other health care personnel, clerical, and maintenance workers.

Conditional certification of a collective action under Plaintiffs' FLSA claim pursuant to 28

U.S.C. § 218(b), limited to Plaintiffs who provide direct patient care, was granted on

October 14, 2009 (Doc. No. 228).  On October 29, 2012, Plaintiffs filed a motion,

pursuant to Fed.R.Civ.P. 23, for class certification of Plaintiffs' state claims (Doc. No.

408).  Discovery has been stayed as of February 5, 2013, pending disposition of

Defendants' recently filed motions to dismiss (Doc. No. 371) and for summary judgment

on Plaintiffs' state law claims (Doc. No. 431).

Defendants' motion was filed together with Attorney Declaration In Support of

Defendants' Motion To Disqualify Consulting Expert (Doc. No. 377-1) ("Roney

Declaration") attaching exhibits A - E (Doc. Nos. 377-2 – 377-6) ("Roney Declaration

Exh.(s) ___") and a Memorandum Of Law In Support Of Motion To Disqualify Consulting

Expert (Doc. No. 377-7) ("Defendants' Memorandum"). In opposition, Plaintiffs filed, on October 12, 2012, a Memorandum of Law In Opposition To Defendants' Motion To Disqualify Consulting Expert (Doc. No. 391) ("Plaintiffs' Memorandum"), the Affirmation Of Sarah E. Cressman In Opposition To Defendants' Motion To Disqualify Consulting Expert (Doc. No. 392) ("Cressman Affirmation") attaching exhibits A & B (Doc. No. 392-1) ("Cressman Affirmation Exh(s). ___"), and the Affirmation Of Amir Karahasanovic (Doc. No. 393) ("Karahasanovic Affirmation"). On October 19, 2012, Defendants filed the Reply Attorney Declaration In Support Of Motion To Disqualify Consulting Expert (Doc. No. 402) ("Roney Reply Declaration") attaching Exhibit A (Doc. No. 402-1) ("Roney Reply Declaration Exh. A"), and a Reply Memorandum Of Law In Further Support Of Motion To Disqualify Plaintiffs' ESI Expert Consultant (Doc. No. 403) ("Defendants' Reply Memorandum").[2] Oral argument was deemed unnecessary. Based on the following, Defendants' motion should be DENIED.

## FACTS[3]

D4 ("D4"), located in Rochester, New York, provides litigation support services to

---

[2] Defendants also contend that based on Plaintiffs' counsel's contact with Amir Karahasanovic ("Karahasanovic"), employed by D4, LLC ("D4") a litigation support firm that had provided document scanning and coding services for Defendants, to assist Plaintiffs in opposing Defendants' motion, Plaintiffs' counsel should be disqualified. Roney Reply Declaration ¶ ¶ 19, 26; Defendants' Reply Memorandum at 1, 6. Because this request first appeared in Defendants' reply papers, Roney Reply Declaration ¶ 26; Defendants' Reply Memorandum at 1, 4-7, the court's briefing schedule for Defendants' motion did not direct Plaintiffs file a sur-reply; however, Plaintiffs have not requested leave to do so. The court therefore considers Defendants' motion to also request disqualification of D4 as Plaintiffs' counsel as well as disqualification of Plaintiffs' expert or consultants.

[3] Taken from the pleadings and papers filed in connection with Defendants' motion.

law firms and corporations including E-Discovery[4] services such as computer forensics, consulting, paper document scanning,[5] coding,[6] and storage or hosting[7] of documents in digital form on "web-based platforms" allowing computerized access to a database, and processing of electronically stored information ("ESI").  Roney Declaration ¶ 3; Karahasanovic Affirmation ¶ ¶ 3-4.  On February 12, 2010, D4 and Nixon Peabody, LLP ("Nixon"), Defendants' attorneys, entered into a Master Services Agreement ("the Master Services Agreement" or "Agreement") under which D4 would perform services to Nixon in connection with the instant case.  Roney Declaration ¶ 4 (D4 to provide "e-discovery services" to Nixon's "clients"); Roney Declaration Exh. A;[8] Karahasanovic Affirmation ¶ 4 (D4 provides "litigation support services").  As relevant, the Agreement required D4 to

---

[4] E-Discovery is the "process of identifying, preserving, collecting, preparing, and producing electronically stored information ("ESI") in the context of the legal process."  The Sedona Conference Glossary E-Discovery & Digital Information Management (Third Edition) ("Sedona Conference Glossary") at 18.  *See also* Maura R. Grossman and Gordon V. Cormack, *The Grossman-Cormack Glossary of Technology-Assisted Review*, Vol. 7 FEDERAL COURTS LAW REVIEW 2013 1, 15 (2013) (E-Discovery is the "process of identifying, preserving, collecting, processing, searching, reviewing, and producing Electronically Stored Information that may be relevant to a civil, criminal, or regulatory matter.") ("The Grossman-Cormack Glossary").  ESI includes electronic mail, or e-mail messages, word processing files, web pages, and databases created and stored on computers, magnetic disks (such as computer hard drives, optical disks (such as DVDs and CDs, and flash memory (such as "thumb" or "flash" drives) and "cloud" based services hosted by third parties via the internet)).  MANAGING DISCOVERY OF ELECTRONIC INFORMATION : A POCKET GUIDE FOR JUDGES, Second Edition, Federal Judicial Center (2012) at 2.

[5] Scanning is a process by which, using an optical character reader (OCR), the contents of paper documents are converted into digital images in standard formats to facilitate the viewing and coding of the resulting images using a computer. Sedona Conference Glossary at 46 (defining software for scanning); Lexbe Scanning Services Definition http://www.lexbe.com/hp/define-scanning-services-software.htm, at 2 of 2 ("Lexbe") (defining scanning services as "[s]ervices that create an electronic image or electronic document version of a paper-based document").

[6] Coding is defined herein, Facts, *infra*, at 7; Discussion, *infra*, at 18-19.

[7] Hosting involves holding databases or digital information in a central computer that controls and permits access by remote computers in a network.  Sedona Conference Glossary at 26.

[8] The redacted copy of the Master Agreement filed with the court, Roney Declaration Exh. A, does not state the exact nature of any services to be performed by D4 thereunder.

hold in confidence "all matters relating to Client's [Nixon's] business and those of [Nixon's] client's business," and information designated as confidential by Nixon. Roney Declaration ¶ 5; Roney Declaration Exh. A Section 3 ("Section 3").

As D4's director of sales, Karahasanovic ("Karahasanovic") assists D4's clients in "obtaining the best solution for their litigation needs," Karahasanovic Affirmation ¶ 5, however, Karahasanovic is "not a member of D4's consulting group," *id.*, known as "D4's Advisory and Consulting group," Karahasanovic Affirmation ¶ 22 ("the D4 Advisory and Consulting Group" or "the Advisory and Consulting Group"), and does "not provide consulting or expert services," particularly "e-discovery expert guidance," as does the Advisory and Consulting Group, nor does Karahasanovic provide "expert witness services to [D4's] clients." Karahasanovic Affirmation ¶ 5. In July 2010, D4 informed Nixon that similar agreements between D4 and its outside vendors, such as Infovision21, Inc. ("Infovision21"), which assist D4 in providing services such as document coding to D4's clients, also protected Nixon's confidential business and client information. Roney Declaration ¶ 8; Roney Declaration Exh. B; Roney Declaration Exh. C (Confidentiality Agreement, dated March 7, 2011, between D4 and Infovision21). D4 was not engaged in 2010 to perform any E-Discovery consulting services for Nixon covering "identification, collection, processing, review and production" of Defendants' ESI or related consulting services in this case, Karahasanovic Affirmation ¶ ¶ 7-8, nor was Karahasanovic retained by Nixon to serve as a consultant or potential expert witness for Defendant. Karahasanovic Affirmation ¶ 5.

Nixon maintains in-house staff, its Legal Technology Services department, with the capability of providing E-Discovery and ESI consulting services to Nixon in

connection with this and other cases.  Cressman Affirmation ¶ ¶ 3-5, 7; Cressman

Affirmation Exhs. A & B.   Decision and Order, *Gordon v. Kaleida Health*, 08-CV-

378S(F), July 20, 2012 (Doc. No. 365) ("the July 20, 2012 D&O") at 3.  Nixon recently

engaged the Ricoh Company, an E-Discovery services provider, to assist it in using

predictive coding, a specialized software product Defendants recently decided to use to

facilitate a computer-based review of Defendants' voluminous e-mails – 300,000 to

400,000 – responsive to Plaintiffs' production demands.  Cressman Affirmation ¶ 5, 7;

Plaintiffs' Memorandum at 11; Roney Declaration ¶ 16; Roney Declaration Exh. D at 44,

47. Nixon has also engaged Pangea3, a leading provider of E-Discovery and ESI review

services.  Cressman Affirmation ¶ 4; Cressman Affirmation Exh. B. Plaintiffs' counsel

does not have an in-house litigation support capability to provide ESI consulting

assistance, including assistance on Defendants' use of predictive coding. Cressman

Affirmation  ¶ ¶ 3, 5, 7.

Beginning in March 2011, Nixon requested D4 to provide scanning and coding

services for 50-80 boxes containing Defendants' paper documents relating to this case.[9]

Roney Declaration ¶ ¶ 9, 11; Karahasanovic Affirmation ¶ ¶ 7, 11-12.  D4 prepared the

documents for scanning, Karahasanovic Affirmation ¶ 7, 9, which was performed by D4

in Rochester.  Karahasanovic Affirmation ¶ 9.  Nixon requested that Defendants'

documents were to be "coded for objective information ('objective coding')."

Karahasanovic Affirmation ¶ 10.  Objective coding is a process by which "a coder"

---

[9]  Although the record does not specifically identify the owner of the documents, the court
presumes the documents are business records belonging to Defendants.

6

examines a document and enters "certain categorical information [about the document][10] into a form or database," Karahasanovic Affirmation ¶ 11, based on examples of "document categories" and instructions to the coder for coding the document by "filling in fields in a database." Karahasanovic Affirmation ¶ 12. As an example, the Karahasanovic Affirmation would be coded objectively as an "affirmation," and "Karahasanovic" as its author. Karahasanovic Affirmation ¶ 11. Based on Defendants' documents, which represented Defendants' "forms,"[11] Karahasanovic Affirmation ¶ 13, objective information concerning the documents to be coded was entered into "assigned fields" established by Nixon, including the beginning and end of the document, box sources (referring, presumably, to the storage boxes in which the documents were contained and delivered to D4 for scanning and coding), cost center, and employee number. Karahasanovic Affirmation ¶ ¶ 13, 15. In coding Defendants' documents, the coders "were not asked to identify substantive case issues or make subjective decisions," concerning the relevance or import of the documents or their contents to the issues in the case. Karahasanovic Affirmation ¶ 12. Because the extensive number of Defendants' documents to be coded exceeded D4's capacity, D4 subcontracted the coding work to Infovision21, located in Ohio. Roney Declaration ¶ 9; Karahasanovic Affirmation ¶ ¶ 10, 14. As D4's representative, Karahasanovic discussed with Nixon representatives, including Defendants' lead attorney Susan C. Roney ("Roney"), the scanning and coding work to be performed by D4 and Infovision21. Roney Declaration ¶

---

[10] Unless otherwise indicated, bracketed material is added.

[11] The record does not further describe the nature of such "forms," but, presumably, the forms are used for recording Defendants' hourly employee work time or other information related to Plaintiffs' claims for unpaid wages and overtime in this case.

11; Karahasanovic Affirmation ¶ ¶ 15, 17.  Karahasanovic's discussions with Nixon regarding the coding of Defendants' documents included Roney, Josh Headley, Nixon's Senior Legal Technology Specialist ("Headley"), and Nixon staff members Colleen Durawa and Julie Letgers.[12]  Karahasanovic Affirmation ¶ 15; Cressman Affirmation ¶ 6.

Karahasanovic's discussions with Nixon covered how the documents were to be coded including the number of fields to be used for entry of information about the documents into a "form or database" indicating, for example, the various types of Defendants' documents, *i.e.*, Defendants' record-keeping forms, memoranda, or letters, their authors and dates.  Karahasanovic Affirmation ¶ ¶ 11, 15, 17.  Karahasanovic's review of the documents was limited to determining how the documents would be coded according to the "field categories" established by Nixon, and resolving potential coding problems such as for illegible documents.  Karahasanovic Affirmation ¶ ¶ 15 – 16.  The purpose of the coding work for Nixon performed by D4 and Infovision21 at a cost of $50,000 was to "facilitate [Nixon's] internal handling of data in preparation for depositions and continuing litigation" in this case.  Roney Declaration ¶ ¶ 12-13.

The communications between Nixon's representatives and Karahasanovic preparatory to the scanning and coding of Defendants' documents "revealed the type of information they [Defendants] were interested in highlighting based on Defendants' theory of the case."  Roney Declaration ¶ ¶ 9-10 (asserting Defendants provided Karahasanovic with attorney mental impressions in the context of "ESI search" and "issues relating to Custodians.").  In numerous discussions with Karahasanovic

---

[12]  While the record does not specify which Nixon representative Karahasanovic discussed the scanning of Defendants' documents with, the court presumes they were the same persons with whom Karahasanovic discussed the coding work.

regarding the coding work Nixon explained the significance of the documents to be coded including, for example, "what was important [to Defendants] . . . and . . . why." Roney Reply Declaration ¶ 4. Nixon also revealed to Karahasanovic attorney "mental impressions . . . directly relevant to issues relating to [the] Custodians" of Defendants' documents and e-mail. *Id.* ¶ 10.

In May 2011, Plaintiffs' counsel requested D4 provide ESI consulting services to Plaintiffs in connection with this case. Karahasanovic Affirmation ¶ 18. Such services by D4 are provided by the Advisory and Consulting Group, a separate group within the D4 organization. Karahasanovic Affirmation ¶ ¶ 5, 7, 19, 21, 22. The D4 Advisory and Consulting Group has also provided Plaintiffs with ESI consulting services in *Hinterberger v. Catholic Health Systems, Inc.*, 08-CV-380S(F) ("*Hinterberger*"), an action in this court asserting claims similar to this case against the region's other major hospital and related health care system, Cressman Affirmation ¶ 22, for "at least a year" prior to October 2012, "without objection by Nixon." *Id.* ¶ 6. Nixon was initially advised of Plaintiffs' request to D4 for ESI assistance in May 2011. Karahasanovic Affirmation ¶ ¶ 18-19. Nixon objected to the request based on D4's scanning and coding work for Nixon, not because D4 had provided expert or consulting services to Nixon. Karahasanovic Affirmation ¶ 20. Despite D4's assurances, in response to an e-mail request from Roney on August 5, 2011, that the proposed consulting services D4 would provide for Plaintiffs would not involve the Defendants' documents that were the subject of the scanning and coding work performed by D4 and Infovision21 and that no D4 employees involved in that work would be involved in the future ESI consulting work by D4's Advisory and Consulting Group for Plaintiffs, Roney again objected to the proposed

consulting work based on D4's performance of the document scanning and coding work for Nixon.  Karahasanovic Affirmation ¶ 21; Roney Declaration ¶ 14.  Principal members of the Advisory and Consulting Group including Peter Coons ("Coons"), a D4 senior vice-president and Cynthia Courtney ("Courtney"), who joined the Advisory and Consulting Group as a vice-president in February 2012, did not work with Karahasanovic on Nixon's scanning or coding project.  Karahasanovic Affirmation ¶ ¶ 22, 23, 25.  After considering Nixon's objection to D4 providing litigation consulting services to Plaintiffs, D4 determined it would, notwithstanding Nixon's objection, provide ESI consulting services to Plaintiffs and, eventually informed another Nixon partner, Mark A. Molloy ("Molloy"), who is a lead counsel for defendants in the *Hinterberger* case, of D4's decision to provide E-Discovery consulting services to Plaintiffs.  Karahasanovic Affirmation ¶ 21 ("Eventually, [D4 decided] . . . that the consulting team would work with Plaintiffs [and] I later informed [Molloy] at [Nixon] of that decision").[13]  Roney was not made aware of D4's decision until Plaintiffs attempted to discuss, with Courtney's assistance, during a scheduled telephone conference call, the terms of a protocol regarding use of predictive coding in this case with Defendants' counsel, Cressman Affirmation ¶ 7, on September 6, 2012.  Roney Reply Declaration ¶ ¶ 21, 23.

Nixon attorneys, Molloy, Todd R. Shinaman ("Shinaman") and Joseph A. Carello ("Carello""), counsel to defendants in *Hinterberger*, along with Headley, participated in several phone calls in 2011 with Plaintiffs' counsel and Coons and, after February 2012, Courtney, regarding various ESI matters in *Hinterberger* without objection by Nixon to

---

[13]  The precise date as to when this communication occurred does not appear in the record.

the D4 consultants' participation. Cressman Affirmation ¶ 6. Roney also participated, along with Shinaman, in conference calls with Plaintiffs' counsel and Courtney, which occurred in February 2012, to resolve ESI issues in connection with enforcement of a subpoena served on a third-party in the District of Maryland, "in this case and in the *Hinterberger* matter," *id*., without any objection to Courtney's participation and assistance to Plaintiffs being voiced by the participating Nixon attorneys. *Id.* ("Nixon attorneys, including Susan Roney and Todd Shinaman, were aware that Ms. Courtney was acting as plaintiffs' ESI consultant in *Hinterberger* and they participated in numerous telephone conferences and conferrals with Ms. Courtney acting as plaintiffs' ESI consultant without objection."); Plaintiffs' Memorandum at 11-12 ("Susan Roney has participated in telephone conferences in a third-party subpoena enforcement action in this [*Gordon*] case in the District of Maryland with Ms. Courtney acting as plaintiffs' ESI consultant . . . without objection"). Acknowledging that while the conference calls described by Plaintiffs among counsel in *Gordon* and *Hinterberger* occurred, Roney denies any awareness that, when the conference calls took place, Courtney also participated in such calls. Roney Reply Affirmation ¶ 21.

Plaintiffs' engagement of the D4 Advisory and Consulting Group and Defendants' objection to D4's assistance to Plaintiffs in this case was discussed with the court during a discovery status conference, related to resolution of ESI issues concerning production of Defendants' e-mails, on January 11, 2012. Roney Declaration ¶ 17; Roney Declaration Exh. D (a partial transcript of the conference). At the conference, Plaintiffs advised the court that D4 had been retained by Plaintiffs to operate a "hosting program" to enable Plaintiffs to access and review the ESI data produced in the case using

Relativity software, as the parties had discussed at that time, and an "internet based interface" ("interface") which had been previously developed by Plaintiffs' law firm and D4 to facilitate ease of access and review of Defendants' ESI by Plaintiffs' counsel in this case and other cases litigated by Plaintiffs' attorneys. *Id.* at 40, 42-44, 46-47. Plaintiffs represented to the court that only D4 provides this capability as an E-Discovery services vendor to Plaintiffs because of the interface customized for use by Plaintiffs' counsel. *Id.* at 42-43, 46-47. Plaintiffs could have retained other vendors to provide hosting services using Relativity software, Roney Declaration ¶ 16. Recognizing the possibility that Defendants' "potentially privileged," Roney Declaration Exh. D at 43, information could be misused as a result of D4 providing ESI consulting services to Plaintiffs through its Advisory and Consulting Group, having also provided the scanning and coding services for Defendants' documents, the court suggested, but did not direct, Plaintiffs make arrangements with another vendor to assist Plaintiffs in order to avoid potential disputes with Defendants and related motion practice which could disrupt the progress of production of Defendants' e-mails, *id.* at 46, and delay completion of discovery in this case. *Id.* at 43-45, 46, 48. In response to Defendants' objection to D4 providing ESI consulting assistance to Plaintiffs, Plaintiffs denied the existence of a disqualifying conflict in Plaintiffs' use of D4 as explained by Plaintiffs' attorneys, and that Plaintiffs would benefit from using the interface Plaintiffs counsel had developed with D4 for this case and D4's familiarity with Plaintiffs' counsel's ESI discovery needs in this case, *id.* at 42-43. Notwithstanding the court's admonition, because of Plaintiffs' counsels' "established relationship with D4," and the time spent acquainting D4 with the background of the case, as well as the additional time required to develop a non-

standard internet-based interface with another vendor to facilitate review of Defendants'

ESI by Plaintiffs' counsel, *id.* at 46-47, Plaintiffs continued to use D4 as its ESI

consultant for this case.  Cressman Affirmation ¶ 7.  On September 6, 2012, in e-mails

regarding the subject of the predictive coding protocols the parties were then attempting

to negotiate, Plaintiffs informed Defendants of D4's ESI consulting assistance to

Plaintiffs, Roney Declaration Exh. E.  Based on D4's prior scanning and coding work for

Nixon, Roney again objected to D4 providing any such assistance to Plaintiffs, *id.*, and

Defendants' motion, which seeks to disqualify both D4 and Plaintiffs' counsel, followed.

**DISCUSSION**

A.    <u>Disqualification of D4</u>.

The court's authority to disqualify a party's expert or consultant is based on "'its

inherent power to preserve the integrity of the adversary process.'" *Eastman Kodak*

*Company v. Kyocera Corporation*, 2012 WL 4103811, at *7 (W.D.N.Y. Sept. 17, 2012)

(quoting *1210 Colvin Avenue, Inc. v. Tops Markets, L.L.C.*, ("*1210 Colvin Avenue, Inc.*)

2006 WL 3827429, at *4 (W.D.N.Y. Dec. 28, 2006) (disqualification of trial consultants

providing litigation services to adversary (citing *Hempstead Video, Inc. v. Village of*

*Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) and *Eastman Kodak Company v. Agfa-*

*Gevaert N.V.*, 2003 WL 23101783 (W.D.N.Y. Dec. 4, 2003) (citing *Popular, Inc. v.*

*Popular Staffing Servs. Corp.,* 239 F.Supp.2d 150, 152 (D.P.R. 2003)))).  Disqualification

of a party's expert is "designed to protect the integrity of the judicial process by ensuring

that experts do not use, even unwittingly, confidential information that they learned from

a party in the course of an earlier engagement against that party in a later lawsuit."

*Kyocera Corporation*, 2012 WL 4103811, at *8 (expert cannot separate confidential information learned from first party during course of later litigation because "'the human brain does not compartmentalize information in that manner.'"). *Id.* (quoting *Pellerin v. Honeywell Int'l Inc.*, 2012 WL 112539, at *3 (S.D. Cal. Jan. 12, 2012)). *See also Grioli v. Delta Int'l Machining Corp.*, 395 F.Supp.2d 11, 14-15 (E.D.N.Y. 2005) (noting that courts also recognize public interest in maintaining integrity and fairness of judicial process but that disqualification of experts is "rare"). However, against the public interest in preserving judicial integrity and fairness, courts must also balance the parties' right to the assistance of experts "'who possess specialized knowledge'" and the right of such experts to "'pursue their professional calling.'" *Mays v. Reassure America Life Ins. Co.,* 293 F.Supp.2d 954, 957 (E.D.Ark. 2003) (quoting *English Feedlot, Inc. v. Norden Laboratories, Inc.*, 833 F.Supp. 1498, 1504-05 (D.Colo. 1993) (citations omitted)). Disqualification of an expert or consultant generally requires counsel hold an objectively reasonable belief in the existence of a confidential relationship with the challenged expert or consultant to avoid waiver, *Wang Laboratories, Inc. v. Toshiba Corporation*, 762 F.Supp. 1246, 1249-50 (E.D.Va. 1991) (citing caselaw), and that during the relationship there was a disclosure of "confidential or privileged information to the expert that is relevant to the current litigation." *Agfa-Gevaert N.V.*, 2003 WL 23101783, at *1 (citing *Greene, Tweed of Delaware v. DuPont Dow Elastomers, LLC*, 202 F.R.D. 426, 428 (E.D. Pa. 2001)). Where circumstances indicate disclosure of confidential information to an expert or consultant is "highly unlikely," *Mays,* 293 F.Supp.2d at 957, disqualification will be denied.

The burden is on the party seeking disqualification to show the party's counsel's

"objectively reasonable" belief that a confidential relationship existed with the expert or consultant and that a party's confidential information was "actually disclosed" to the expert or consultant. *The Topps Company, Inc. v. Productors Stani Sociedad Anomina Industrial y Commercial*, 2001 WL 406193, at *1 (S.D.N.Y. Apr. 20, 2001) (burden on party seeking disqualification)*; Wang Laboratories, Inc.,* 762 F.Supp. at 1249 (courts may disqualify consultants where there is "persuasive evidence that a lawyer was objectively reasonable in assuming the existence of a confidential relationship and that confidential information was disclosed."). "[T]he party seeking disqualification may not meet its burden with 'mere conclusory or ipse dixit assertions,'" *Kyocera Corporation*, 2012 WL 4103811, at *8 (quoting *Greene, Tweed of Delaware, Inc.*, 202 F.R.D. at 429), *see also In re Orthopedic Bone Screw Prods. Liab. Litig.,* 1995 WL 925673, at *6 (E.D.Pa. May 5, 1995) (disqualification of plaintiff's expert denied where "concrete evidence" failed to show defendant's confidential information was disclosed during meeting with expert); quoting *Nikkal Indus., Ltd. v. Salton, Inc.,* 689 F.Supp. 187, 191 (S.D.N.Y. 1988)("meaningful inquiry into the existence of the relationship" required). "'[S]pecific and unambiguous disclosures that if revealed would prejudice the party,'" are required. *Kyocera Corporation*, 2012 WL 4103811, at *8 (quoting *Hewlett-Packard Company v. EMC Corp.*, 330 F.Supp.2d 1087, 1094 (N.D. Cal. 2004)).

Defendants first contend that because D4 previously served as Defendants' "expert consultant" in connection with the scanning and coding project for Nixon, and D4 "switched sides" by subsequently serving as Plaintiffs' expert consultant on ESI matters in this case, Defendants' Memorandum at 1, 3, D4 must be disqualified regardless of whether Defendants held a reasonably objective belief that D4 provided the scanning

and coding services to Defendants during a confidential relationship and that in reliance on such confidential relationship Defendants provided confidential information to D4. Defendants' Memorandum at 4 ("In cases like the present . .  where an expert has switched sides in litigation satisfying the test [for disqualification of an expert] is not necessary, and an expert must be disqualified." (citing *Koch Refining Company v. Jennifer C. Boudreau M/V* ("*Koch*"), 85 F.3d 1178, 1881 (5th Cir. 1996))).  Defendants' initial contention is in error for several reasons.

Disqualification of an expert or consultant is justified by the need to avoid the "risk of prejudice from possible disclosure and use of confidential client communications" and the fundamental unfairness that would arise if "an expert hired by a party, who at that party's expense obtains specific knowledge and expertise in the issues involved in the litigation, [were permitted] to then be hired by the opposing party and allow the opposing party to reap the benefits of that work."  *Great Lakes Dredge & Dock Company v. Harnischfeger Corp.* ("*Great Lakes*"), 734 F.Supp. 334, 336 (N.D. Ill. 1990) (citing *Paul v. Rawlings Sporting Goods Company*, 123 F.R.D. 271, 277 (S.D. Ohio 1988)).  *See also Kyocera Corporation*, 2012 WL 4103811, at *8 (purpose of disqualification of experts is to avoid misuse "even unwittingly" of confidential information obtained from prior party to engagement with challenged expert).  Implicit in this rationale is that in an expert or consultant-client relationship such confidential information may be obtained as necessary to the effective delivery of the expert's or consultant's services, typically opinions or specialized knowledge, helpful to the party's conduct of the litigation.  For example, where a former employee through his employment garners detailed knowledge of the development of an employer's patent such intimate knowledge of the employer's

technical information enables the employee to serve an adversary as an expert in a later infringement action based on the patent, and gives the alleged infringer an unfair advantage warranting disqualification of the expert. *See Agfa-Gevaert*, 2003 WL 23101783, at *5 (allowing former employee who helped develop plaintiff's patented process to serve as defense expert would give defendants an "unfair advantage" requiring disqualification); *Cordy v. Sherwin-Williams Co.*, 156 F.R.D. 575, 582-83 (D.N.J. 1994) (where plaintiff's accident reconstruction expert formed opinion as to causal factors of railroad crossing accident based in part on plaintiff's attorney's impressions and investigation provided to expert, expert was disqualified from later serving and providing contrary opinion as defendant's trial expert on same issue). Here, in opposition to Defendants' motion, Plaintiffs argue, Plaintiffs' Memorandum at 1, that Nixon "never retained D4 as any type of expert or consultant in this case" and that, based on the record, Defendants have failed, in meeting Defendants' burden, to establish that in providing the scanning and coding services, D4 functioned as an expert or consultant for Defendants. Plaintiffs' Memorandum at 3. Thus, if the work performed for Defendants by D4 and Infovision21 did not constitute expert or consulting services potentially warranting disqualification under applicable caselaw even assuming D4 "switched sides," Defendants' motion fails at the outset.

Experts "are sources of information and opinions in technical, scientific, medical or other fields of knowledge." *Wang Laboratories, Inc.*, 762 F.Supp. at 1250. A consultant is "one who gives professional advice or services regarding matters in the field of his special knowledge or training" like an expert. Websters Third New International Dictionary at 490. In this case, the record does not demonstrate, as is

Defendants' burden, that the scanning of Defendants' paper documents by D4 or the objective type of coding of the scanned documents provided by D4 and Infovision21 to Defendants involved services requiring specialized knowledge, skill, training or education establishing D4's or its representative, Karahasanovic's, status as an expert or consultant in regard to the delivery of these services. *See also* Fed.R.Evid. 702 (expert witness qualifies by "knowledge, skill, experience, training, or education" of subject matter of testimony). Scanning, in the context of E-Discovery, of paper documents involves the use of an "[i]nput device" such as an optical character reader or OCR to electronically convert papers documents into images using "[s]oftware that enables a scanner to deliver industry standard formats for images in a collection" and "the coding of the images." Sedona Conference Glossary at 46 (defining Scanner and Scanning Software); Lexbe Scanning Services, [http://www.lexbe.com/hp/define-scanningservices-software.htm](http://www.lexbe.com/hp/define-scanningservices-software.htm) at 2 of 2 ("Lexbe") (defining scanning as "[s]ervices that create an electronic image or electronic document version of a paper-based document").

Coding is an "[a]utomated or human process by which documents are examined and evaluated using predetermined codes," such as "names, dates, and relevant terms and phrases." Sedona Conference Glossary at 9. "Coding may be objective, i.e., the name of the sender or the date [of a document], or subjective, i.e., evaluation as to the relevancy or probative value of the document." Sedona Conference Glossary at 9 ("Coding may be structured (limited to the selection of one of a finite number of choices), or unstructured (a narrative comment about a document)). *Id.* "Objective coding" involves the manual recording of "objective information from documents such as date, authors/recipients/carbon copies, blind copies, and associating the information with

specific documents." Sedona Conference Glossary at 6. Defendants do not dispute that at Nixon's request Defendants' documents scanned by D4 were to be objectively coded by Infovision21 as stated by Karahasanovic. *See* Karahasanovic Affirmation ¶ 10 ("along with the scanning of the documents, [Nixon] wanted to have [Defendants'] documents coded for objective information ("objective coding"); Roney Declaration ¶ 12 (D4 scanning and coding "project [for Nixon was] . . . done <u>solely</u> to facilitate [Nixon's] <u>internal</u> <u>handling</u> of <u>data</u> in preparation for depositions and continuing litigation").[14] In objective coding, the Karahasanovic Affirmation would be coded as an affirmation and the author as Karahasanovic. Karahasanovic Affirmation ¶ 11. To accomplish the objective coding of Defendants' documents in accordance with Nixon's request, the Infovision21 coders working on Defendants' scanned documents were "shown examples of the document categories and instructed to code the documents by filling in fields in a database; they were not asked to identify substantive case issues or make subjective decisions." Karahasanovic Affirmation ¶ 12. Defendants also do not contest D4's description of how the coding work on Defendants' documents was to be done, nor that the coding was performed in accordance with "fields" and "document types" established by Nixon representatives, including Headley, and communicated to Karahasanovic, Karahasanovic Affirmation ¶ 15; Cressman Affirmation ¶ 5, by "filling in [the] fields," with "categorical information into a form or database." Karahasanovic Affirmation ¶ 11. That Defendants have not rebutted Plaintiffs' representations regarding the nature of the scanning and objective coding services provided to Defendants by D4 and Infovision21,

---

[14] Unless otherwise indicated, all underlining has been added.

supports a finding that Defendants have acquiesced in D4's representations.  *See Felske v. Hirschmann,* 2012 WL 716632, at *3 (S.D.N.Y. Mar. 1, 2012) (by failing to respond to defendant's argument regarding personal jurisdiction, plaintiff effectively conceded point); *Goodwin v. Burge*, 2011 WL 2117595, at *12 (W.D.N.Y. Mar. 7, 2011) (holding plaintiff, by failing to argue in opposition to summary judgment on a claim for relief, effectively conceded to defendant's argument that there was no factual basis for such claim); *Gonzalez v. City of Schenectady*, 2001 WL 1217224, at *11 (N.D.N.Y. Sept. 17, 2011) (deeming defendant's failure to present a position on one plaintiff's motion to sever his claim from those of other plaintiffs showed acquiescence in the relief sought).

Defendants contend that by having several meetings with Nixon representatives in connection with the scanning of Defendants' documents during which Nixon discussed Defendants' "claims and defenses," Karahasanovic served as Defendants' consultant.  Defendants' Reply Memorandum at 3 (D4's consulting work for Defendants was not "ministerial").  However, Defendants provide no details of such discussions from persons present, *see Kyocera Corporation*, 2012 WL 4103811, at *10 (noting, in denying disqualification of expert, plaintiff's failure to provide affidavits from employees present during conversations between plaintiff's attorney and expert to support attorney's "conclusory" assertion that confidential information was conveyed to expert), and, based on accepted definitions of document scanning, the court fails to see, and Defendants do not explain, how passing paper documents through an OCR involves special, technical or scientific knowledge, *Wang Laboratories, Inc.*, 762 F.Supp. at 1250, or that other specialized skills, experience, training or education, *see* Fed.R.Evid. 702, are necessary to enable a person to successfully perform such activity.  Except for some

minimal training on how to operate an OCR, a device used to scan a document into a digital form for storage and retrieval in a computerized database, Sedona Conference Glossary at 46, Discussion, *supra*, at 4, n. 6, the activity involved in scanning, as performed for Defendants in this case, is more akin to a routine clerical function, such as photocopying paper documents, well outside the scope of any activity that would be reasonably considered as requiring expert knowledge or skills, as Plaintiffs contend, Plaintiffs' Memorandum at 2 ("The type of clerical document scanning work D4 performed for Nixon does not establish an expert or consultant relationship."), and Defendants do not demonstrate otherwise. Moreover, given the non-technical nature of the scanning function, Defendants' assertion that a discussion of Defendants' "claims and defenses" with Karahasanovic was needed to enable D4 to scan Defendants' documents, Defendants' Reply Memorandum at 3, appears to the court to be highly implausible. Additionally, as the "claims and defenses" in this case are reflected in the pleadings, which are public record, a discussion by Nixon to with Karahasanovic regarding such claims and defenses would not, without disclosure of specific related attorney work product, constitute a disclosure of confidential information. *See Stencel v. Fairchild Corporation*, 174 F.Supp.2d 1080, 1084 (C.D. Cal. 2001) (pleadings provided to expert are "public record" and not a party's "confidential information"). Thus, discussion by Nixon with Karahasanovic of the "claims and defenses" as pleaded, even assuming it occurred, does not establish that Defendants' confidential information was disclosed to D4 or Karahasanovic in connection with the scanning work. Defendants also do not attempt to explain how Karahasanovic's involvement with the scanning work should be considered as rendering expert or consultant services. Plaintiffs'

Memorandum at 1 ("The document scanning project for Nixon was facilitated by [Karahasanovic].").  Defendants therefore have failed to meet their burden to establish that Karahasanovic or D4 served as an expert or consultant in providing scanning services to Nixon and Defendants.

Defendants do not dispute that the coding services, facilitated by Karahasanovic, Plaintiffs' Memorandum at 1, actually performed by Infovision21, were to be provided using the objective method of coding which, by definition, does not require the coder to review or evaluate the content of the document to assess its potential probative value or relevance to particular issues in the case, Sedona Conference Glossary at 9.  Instead, objective coding requires merely a judgment by a coder regarding straightforward, objective questions as to the type of document, the document's nature, date, and author, and other indicia of interest, Sedona Conference Glossary at 6, facts readily discernible by the coder from a general inspection of the face of the document, rather than its content, to make the digital form of the scanned document more readily available to those having access to the resulting database the parameters of which, in this case, were established by Nixon and communicated to Karahasanovic, Karahasanovic Affirmation ¶ ¶ 15-16, who in turn facilitated the actual coding by Infovision21.  As with D4's scanning services, the coding of Defendants' documents performed by D4 and Infovision21 did not involve specialized training, knowledge, education or skills, and Defendants have not, as is their burden, provided any evidence to the contrary.  As such, the court finds on this record, these services were also of a more clerical nature, such as routine data entry activity and did not constitute expert or consulting services to Nixon by Karahasanovic.  Nor have Defendants demonstrated that Karahasanovic's

coordination or facilitating of such coding work, Plaintiffs' Memorandum at 1, performed by Inforvision21, involved specialized technical skill or knowledge constituting the rendition of services that can be considered as expert in nature. Defendants argue that in connection with the coding of Defendants' documents Karahasanovic represented he was serving as a consultant to Nixon, Roney Reply Declaration ¶ 5 (referring to Karahasanovic Affirmation ¶ 16), however, a careful reading of paragraph 16 of Karahasanovic's Affirmation finds no support for this assertion. Indeed, nowhere in his affirmation does Karahasanovic describe his services to Nixon in connection with the scanning and coding of Defendants' documents as that of a consultant or, for that matter, an expert; to the contrary, Karahasanovic denies he did so. Karahasanovic Affirmation ¶ 5 ("It is not part of my job responsibilities to provide consulting or expert witness services to clients," and "I have never been asked to provide such services . . . by [Nixon]."); *see* Karahasanovic Affirmation (*passim*). Defendants do not contest Karahasanovic's averments in this regard, and are therefore deemed to have acquiesced in them. *Felske,* 2012 WL 716632, at *3; *Goodwin*, 2011 WL 2117595, at *12; *Gonzalez*, 2001 WL 1217224, at *11. Similar to Defendants' assertions to support a finding that, in providing the scanning services of Defendants' documents, D4's services were more than "ministerial," Defendants' Reply Memorandum at 2, and that Karahasanovic provided expert services to Nixon because Nixon representatives engaged Karahasanovic in several conversations regarding Defendants' "claims and defenses," Defendants' Reply Memorandum at 3, Defendants' contention that the documents could not have been coded "in a vacuum" as Nixon's "litigation insight" was required, *id.*, ignores that the objective coding process did not require knowledge of the

claims and defenses in the case or what information Defendants deemed relevant to their defense, *i.e.*, Defendants' "litigation insight."  *See* Sedona Conference Glossary at 9 (distinguishing objective coding which does not entail an evaluation of the relevance of probative value of a document from subjective coding which does involve such a subjective evaluation).  Defendants fail to provide any explanation of why such "insights" were relevant or necessary to the coding work of Defendants' documents or why even if such information was conveyed to Karahasanovic, such disclosure transforms what otherwise appear to be services not involving any particular expertise into services requiring use of such expertise.  Defendants' contention also overlooks that the parameters of the resulting database, Roney Declaration ¶ 12 (object was to "facilitate [Nixon's] internal handling of data"), such as document types and the other coding fields, expected from the coding process were established by Nixon representatives including Headley, Karahasanovic Affirmation ¶ 15, who as the head of Nixon's in-house E-Discovery staff, presumably was familiar with database design and implementation.  At best, even if facilitating the objective coding of Defendants' documents involved some technical knowledge on Karahasanovic's part of how Nixon's computer database was to be created, nothing in the record shows it required Karahasanovic's access to Defendants' confidential or privileged information regarding Defendants' documents or attorney work product sufficient to show Karahasanovic functioned as an expert or consultant in the design and implementation of the database which resulted from the objective coding process.  Plaintiffs' Memorandum at 1-2.  *See Nikkal Industries, LTD.,* 689 F.Supp. at 191-92 ("[c]ommunication based on technical information as opposed to legal advice is not considered privileged." (internal citations omitted)).  Defendants do

not contend the coding fields selected by Nixon represent attorney work product. In sum, the record fails to support a finding that in providing the scanning and objective coding of Defendants' documents for Nixon, Karahasanovic or D4 acted as Defendants' experts or consultants so as to make either subject to disqualification based on Defendants' contention that D4 (and Karahasanovic in particular) has "switched sides."

As discussed, Discussion, *supra*, at 13-17, potential disqualification of an expert or consultant is based on the policy that because the expert or consultant may acquire access to a party's confidential information, the expert or consultant should not as a matter of fairness, necessary to preserve confidence in the judicial process, be permitted to provide that information to the party's adversary and thus bestow on the adversary the benefit of expert opinion or knowledge based on such information. Here, neither the scanning nor objective coding services for Nixon provided by D4 and Infovision21 constituted expert or consultative services that required or involved access to Defendants' confidential information, specifically, litigation strategies constituting attorney work product or other privileged information, access more typically incident to rendering expert witness or expert consulting services relating to the merits of particular claims or defenses in the context of litigation. *See, e.g., Cordy*, 156 F.R.D. at 582-83. Defendants do not demonstrate any direct connection between the scanning and coding work performed by D4 and Infovision21 and Defendants' production of Defendants' ESI, particularly Defendants' e-mails relevant to the ESI issues in this case. Accordingly, there is no need to protect Defendants from the risk of possible prejudicial disclosure of Defendants' confidential information as a result of D4's providing ESI consulting services to Plaintiffs through its Advisory and Consulting Group in connection with ESI issues in

this case.  Moreover, Defendants present no evidence that such confidential information has been actually conveyed to Plaintiffs under the circumstances of this case or that the D4 Advisory and Consulting Group gained some unfair advantage in advising Plaintiffs on ESI matters as a result of the scanning and coding work.  Although Defendants have failed to establish this threshold ground for disqualification, *i.e.*, that Karahasanovic provided an expert or consulting service to Defendants, thereby justifying denial of Defendants' motion for that reason alone, in the interest of completeness, the court addresses the remaining issues raised by Defendants' motion, specifically, whether assuming D4 served as Defendants' expert or consultant, D4 has "switched sides" requiring its disqualification precluding the ESI services to Plaintiffs by D4's Advisory and Consulting Group.

Defendants' contention that as an expert or consultant D4 "switched sides" by subsequently providing ESI consulting services to Plaintiffs also fails because it erroneously assumes that the same rule upon which a law firm is disqualified based on a prior representation of a client by one of its attorneys also applies where two experts or consultants employed by the same firm provide services to adversaries in the same case.  "An attorney's conflicts are ordinarily imputed to his firm based on the presumption that 'associated attorneys' share client confidences." *Hempstead Video, Inc.,* 409 F.3d at 133.  However, as the presumptions and standards relevant to disqualification of attorneys do not apply to experts, *Stencel*, 174 F.Supp.2d at 1085; *Cordy,* 156 F.R.D. at 580; *In re Ambassador Group, Inc., Litig.*, 879 F.Supp. 237, 243-44 (E.D.N.Y. 1994), there is no presumption that Defendants' or Nixon's confidential communications were provided to D4, specifically Karahasanovic, as a D4 employee

and a non-attorney, *see Hewlett-Packard Company*, 330 F.Supp.2d at 1094 ("'Unlike attorney-client communications, discussions between parties or counsel and experts do not carry the presumption that confidential information was exchanged.'" (quoting *Stencel*, 174 F.Supp.2d at 1083)), by Nixon during the scanning and coding project and, even assuming such information was disclosed to Karahasanovic, there is no basis to find that the information was in fact communicated by Karahasanovic to Coons and Courtney, either actually or impliedly, as Defendants contend, Roney Declaration ¶ 21 ("D4 cannot work both sides of the same litigation"), simply because Karahasanovic, Coons and Courtney are employed by D4. *Stencel*, 174 F.Supp.2d at 1085 (expert witness not disqualified by fact that another expert employed by same firm who had previously agreed to serve as expert to plaintiff but had withdrawn based on unrelated conflict – court refused to apply vicarious disqualification principle applicable to attorneys and their respective law firms, despite fact that first expert had received some work product from plaintiff's counsel, absent a showing that such information actually was disclosed to second expert working for defendant). Here, the record supports that Karahasanovic had no contact with the Advisory and Consulting Group and neither received nor disclosed Defendants' confidential information to Coons and Courtney, Karahasanovic Affirmation ¶ ¶ 23, 24 (Karahasanovic had no contact with the Advisory and Consulting Group about scanning and coding project), a fact seemingly acknowledged by Defendants, *see* Roney Reply Declaration ¶ 16 (Karahasanovic "skipped the middle-man [*viz.* Coons and Courtney] and [has] spoken directly with Plaintiffs' counsel.") and negates any basis to disqualify D4 because it allegedly has "switched sides." For example, in *Great Lakes,* the court refused to disqualify an expert

and the expert's engineering firm on the ground that the expert and another expert for an adverse party were employed by the same engineering firm but did not work in same department. *Great Lakes,* 734 F.Supp. at 339. Finding attorney disqualification rules to be inapplicable to questions of expert disqualification, the court denied disqualification of both defendant's expert and the common employer engineering firm at which experts were employed absent evidence that "there had been a disclosure of confidential or privileged information to the prejudice of a party due to the relationship of the experts, or that such a relationship between the experts poses a significant risk of such disclosure and resulting prejudice." *Great Lakes,* 734 F.Supp. at 339; *see also E.E.O.C. v. Locals 14 and 15, Int'l Union of Operating Engineers*, 1981 WL 163, at \*\*4-6 (S.D.N.Y. Feb. 11, 1981) (refusing to disqualify plaintiff's expert as member of consulting firm of which defendant's former expert was member absent showing that defendant's confidential information received by former expert was disclosed to plaintiff's expert or a serious risk of an "inadvertent disclosure" of such information to plaintiff's expert). As in *Great Lakes*, in this case neither Plaintiffs nor Defendants have "retained an expert that has worked or been associated with the opposing side." *Id.* at 338. In particular, Defendants do not contend that Defendants have used Coons or Courtney as ESI consultants or that Plaintiffs have used Karahasanovic for any litigation support or other expert or consulting services in this case.

Because rules of presumed confidential communications between client and attorney, imputation of shared confidences, and vicarious disqualification applicable to attorneys and their law firms, necessary to assure protection of client confidences, do not apply to client-expert relationships, that Karahasanovic, Coons and Courtney share

a common employer, D4, does not therefore create a basis for disqualification of D4 or, for that reason, Coons and Courtney. *See Great Lakes*, 734 F.Supp. at 339 (fact that experts for opposing parties worked for same engineering firm did not warrant vicarious disqualification). Thus, because there is no presumption that a party has disclosed confidential information to an expert, *Hewlett-Packard Company,* 330 F.Supp.2d at 1094, there is, contrary to Defendants' unsupported supposition, no vicarious disqualification of the asserted expert's firm (*i.e.*, D4) or of a second expert (*i.e.*, Coons and Courtney) employed by the same firm who is later retained by the party's adversary. *See Stencel*, 174 F.Supp.2d at 1087 (refusing to disqualify defendant's expert employed by same firm as plaintiff's expert because "concerns of loyalty that in large part drive imputed disqualification [in case of law firm] are absent [in case of experts]"); *Great Lakes*, 734 F.Supp. at 339 (disqualification protects against adversary's use of expert's opinion based on client's confidential information). As noted, in this case, "[n]either party alleges it has disclosed confidential or privileged information to the opposing side's expert." *Id.* Although Defendants assert confidential information was conveyed to Karahasanovic, Defendants do not contend they provided such information to either Coons or Courtney who are assisting Plaintiffs. Conversely, Plaintiffs do not allege providing such information to Karahasanovic. That these individuals have a common employer, D4, is, as discussed, Discussion, *supra*, at 26-29, irrelevant. Therefore, contrary to Defendants' predicate contention, neither Karahasanovic nor D4, assuming they served as Defendants' experts or consultants, have "switched sides" in this case.

Moreover, Defendants have not disputed, and accordingly have acquiesced in, *see Felske,* 2012 WL 716632, at *3; *Goodwin*, 2011 WL 2117595, at *12; *Gonzalez*,

2001 WL 1217224, at *11, Karahasanovic's averments that he had no communication with Coons and Courtney regarding the scanning and coding services provided for Nixon and that until he was informed of the fact that the Advisory and Consulting Group had been providing ESI consulting services to Plaintiffs when Molloy advised Karahasanovic of this fact in early 2012, Karahasanovic had no prior knowledge of it. Karahasanovic Affirmation (*Gordon* Doc. No. 375) ¶ 19. While such lack of interaction does not establish the existence of a formal policy of screening between Karahasanovic, as head of D4's scanning and coding services, and the Advisory and Consulting Group in order to prevent inadvertent disclosures, such a *de facto* operational separation in the functioning of the two D4 units provides reasonable assurance against the risk of potential "leakage," *Great Lakes,* 734 F.Supp. at 338, of any confidential information Karahasanovic may have acquired from Nixon between Karahasanovic and the D4 Advisory and Consulting Group of which Coons and Courtney are members. *See Stencel*, 174 F.Supp.2d at 1087. The record therefore supports that D4's scanning and coding department headed by Karahasanovic, functions separately and independently of the D4 Advisory and Consulting Group sufficient to obviate any risk that Defendants' confidential information, even if disclosed to Karahasanovic during the scanning and coding project as Defendants maintain, was in fact disclosed to Coons and Courtney or is likely to be disclosed and, as a result, potentially disclosed to Plaintiffs' counsel. Defendants have failed to submit any evidence to establish facts to the contrary as is Defendants' burden. *See Kyocera Corporation,* 2012 WL 4103811, at *8 ("party seeking disqualification may not meet its burden with 'mere conclusory or ipse dixit assertions' but must identify 'specific and unambiguous disclosures that if revealed would prejudice

the party.'") (internal citations omitted). In *Kyocera Corporation,* the court refused to disqualify defendant's expert, who had served as plaintiff's expert in prior litigation involving the same patents as in the present case, where plaintiff's attorney's affidavit "alleged in conclusory terms only that [plaintiff's] employees shared with [the expert] information about [plaintiff's] digital camera technology" and related features. *Kyocera Corporation*, 2012 WL 4103811, at *9. Accordingly, Defendants have failed to demonstrate Karahasanovic or D4 has, as Defendants' asserted experts or consultants, "switched sides" in this litigation requiring disqualification irrespective of whether Defendants held a reasonable expectation that a confidential relationship between Defendants and D4, in particular Karahasanovic, existed covering the scanning and coding work D4 performed for Nixon, and that, in the course of this work, Defendants' confidential information was disclosed to Karahasanovic and has been, or is likely to have been, communicated to Plaintiffs resulting in prejudice to Defendants.

Defendants' reliance of *Koch* is undermined be a second reason. As the court in *Koch* found the challenged expert had in fact received confidential information from his prior client, *Koch Refining Co.*, 85 F.3d at 1182, thereby satisfying the general requirement that to support disqualification the challenged expert must be shown to have acquired confidential information, *id.* at 1181 (citing *Wang Laboratories, Inc.,* 762 F.Supp. at 1248 ("*Wang*"); *Mayer v. Dell*, 139 F.R.D. 1, 3 (D.D.C. 1991) ("*Mayer*")), the court's statement in *Koch*, that "[i]n disqualification cases other than those in which the expert clearly switched sides, lower courts have rejected a 'bright-line' rule and have adopted the following test," 85 F.3d at 1181, upon which Defendants' rely, is *dicta*. Additionally, the cases cited by the court in support of this statement, *Wang* and *Mayer*,

do not support the Defendants' reading of *Koch*. For instance, in *Wang,* the court stated that "where it is <u>undisputed</u> that the consultant had been previously retained as an expert . . . by the adverse party in the same litigation <u>and</u> <u>had</u> <u>received</u> <u>confidential</u> <u>information</u> <u>from</u> <u>the</u> <u>adverse</u> <u>party</u> <u>pursuant</u> <u>to</u> <u>the</u> <u>earlier</u> <u>retention</u>," such facts would constitute "a <u>clear</u> case for disqualification." *Wang Laboratories, Inc.*, 762 F.Supp. at 1248. Similarly, in *Mayer*, the court required that both elements – a prior confidential relationship and a disclosure of confidential information to the challenged expert – be shown to warrant disqualification. *Mayer*, 139 F.R.D. at 4. Defendants cite to no caselaw holding that an expert or consultant having previously been retained to assist a party will be disqualified from later serving as an expert or consultant to an adverse party in the same litigation in the absence of a confidential relationship with the first party to retain the expert or consultant as well as the expert or consultant's receipt of confidential information from such party, and the court's own research reveals none. Thus, any suggestion in *Koch* that in considering disqualification of experts or consultants, courts may dispense with finding a prior confidential relationship and disclosure of a party's confidential information as prerequisites "[i]n disqualification cases . . . <u>in</u> <u>which</u> <u>the</u> <u>expert</u> <u>clearly</u> <u>switched</u> <u>sides</u>," *Koch*, 85 F. 3d at 1181, refers to cases, in contrast to the present case, Plaintiffs' Memorandum at 6 ("There <u>Was</u> <u>No</u> <u>Confidential</u> <u>Relationship</u> [between Defendants and D4] and <u>No</u> <u>Confidential</u> <u>Information</u> <u>Was</u> <u>Disclosed</u>."), where the existence of these prerequisites is not disputed. *See Wang*, 762 F.Supp. at 1248 ("<u>Less</u> <u>clear</u> are those cases where, as here, the parties <u>dispute</u> whether <u>the</u> <u>earlier</u> [confidential] <u>retention</u> <u>and</u> <u>passage</u> <u>of</u> <u>confidential</u> <u>information</u> <u>occurred</u>.").

Even where, in making reference to an expert's switching sides during litigation as

a ground for disqualification, courts cite *Koch*, the courts nevertheless required a showing of both a prior confidential relationship between a party and the expert, as well as a disclosure to the expert of the party's confidential information relevant to the instant litigation if either factor is disputed. *See, e.g., Kyocera Corporation,* 2012 WL 4103811, at *7 ("disqualification may be appropriate . . . where an expert switches sides during the course of litigation" – expert's receipt of confidential information disputed (citing *Koch*)); *Lacroix v. BIC Corporation*, 339 F.Supp.2d 196, 199 (D.Mass. 2004) ("Disqualification of an expert is appropriate when a party retains an expert who previously worked for an adversary <u>and received confidential information from the first client</u>" – expert's confidential relationship and exposure to confidential information disputed (citing *Erickson v. Newmar Corporation*, 87 F.3d 298, 300 (9th Cir. 1996) (in a "switching sides" case, the court may grant the original hiring party's motion to disqualify the expert when it is determined that the expert is in possession of confidential information received from the first client."), and *Koch* ("there is a 'clear case for disqualification' when an expert switches sides in the same litigation <u>after receiving confidential information from the adverse party</u> pursuant to its earlier retention."))).  Thus, Defendants' reading of *Koch*, as permitting courts to forgo with finding grounds for disqualification where an expert has switched sides, is not supported by apposite caselaw applying *Koch*.

Further, as Plaintiffs point out, Defendants' argument, in reliance on *Koch*, that because D4 provided scanning and coding services to Nixon, D4, including the Advisory and Consulting Group, for that reason alone, must be disqualified from providing ESI consulting services to Plaintiffs because in doing so D4, as an expert, has switched sides in this litigation, ignores the difference, recognized by the relevant caselaw,

between experts as "sources of information and opinions" and attorneys as "advocates in litigation," and that experts are accordingly not properly "held to the stringent attorney-client conflict standards." Plaintiffs' Memorandum at 5-6 (citing *In re Ambassador Group, Inc. Litig.*, 879 F.Supp. at 242; *Grioli*, 395 F.Supp.2d at 13; and *Paul*, 123 F.R.D. at 281). *See also Cordy*, 156 F.R.D. at 580 ("Because experts and attorneys perform different functions in litigation, the standards and presumptions applicable to the attorney-client relationship have little bearing on an expert's disqualification"); *In re Ambassador Group Litig.,* 879 F.Supp. at 242 (refusing to apply the "stringent attorney-client conflict standards in determining whether [expert] should be disqualified" (citing *English Feedlot, Inc.,* 833 F.Supp. at 1505, (citing *Paul*, 123 F.R.D. at 281-82)). Specifically, "'[u]nlike attorney-client communications, discussions between parties or counsel and experts do not carry the presumption that confidential information was exchanged.'" *Hewlett-Packard Company*, 330 F.Supp.2d at 1094 (quoting *Stencel,* 174 F.Supp at 1083, and citing *Paul*, 123 F.R.D. at 281). Thus, courts do not apply the standard for disqualification of an attorney barring subsequent representation of a party presently adverse to the attorney's previous client, to questions of expert disqualification as necessary to fully protect against a loss of privilege communications and, instead, require "[a] predicate showing that confidential information has been divulged." *In re Ambassador Group, Inc., Litig.*, 879 F.Supp. at 243-44. Accordingly, *Koch* does not support Defendants' contention that D4 should be disqualified based solely on the ground that it has "switched sides" in this litigation without a showing of a prior confidential relationship between Defendants and Karahasanovic and an actual or highly likely, *Mays*, 293 F.Supp.2d at 957, disclosure of Defendants' confidential information to

Karahasanovic relevant to this case and prejudicial to Defendants.

To the extent that the statement in *Koch*, relied on by Defendants, represents, as Defendants maintain, a holding that expert disqualification is required where an expert has "switches sides" in the course of the same litigation regardless of whether the confidential nature of the expert's prior relationship with a party and receipt of confidential information from that party is disputed, this court respectfully declines to follow it. *See Anita Foundations, Inc. v. ILGWU National Retirement* Fund, 902 F.2d 185, 190 (2d Cir. 1990) (holding district court in this circuit not bound by Ninth Circuit decision (citing cases); *see also Board of Trustees of Aftra Retirement Fund v. JPMorgan Chase Bank, N.A.*, 806 F.Supp.2d 662, 687-88 (S.D.N.Y. 2011) (refusing to apply caselaw on which plaintiff relied because the circumstances of the cited case were sufficiently different from the case before the court that the legal theory on which the referenced case relied was inapplicable).

The court thus turns to whether the record supports a finding that Defendants and Nixon held an objectively reasonable belief that a confidential relationship existed with Karahasanovic, *Lacroix*, 339 F.Supp.2d at 200 (citing *Hewlett-Packard Company*, 330 F.Supp.2d at 1093), and "'whether the relationship developed into a matter sufficiently substantial to make disqualification or some other judicial remedy appropriate.'" *Id.* (quoting *Paul*, 123 F.R.D. at 278).  In determining this prerequisite to disqualification, courts consider several relevant factors including the existence of a confidentiality agreement between the party and the expert or consultant, *Hewlett-Packard Company*, 330 F.Supp.2d at 1093; the extent to which the expert or consultant received a party's confidential information such as attorney work product, *Grioli*, 395 F.Supp.2d at 14-15;

the length of the relationship, *Marvin Lumber & Cedar Company v. Norton Company*, 113 F.R.D. 588, 591 (D.Minn. 1986); whether the expert or consultant had access to the party's confidential information, *Agfa-Gevaert N.V.,* 2003 WL 23101783, at *1; contemporaneous documentation that confidential information had been provided to the expert or consultant, *Wang*, 762 F.Supp. at 1249; and the payment of a fee, *Hewlett-Packard Company*, 330 F.Supp.2d at 1093 (citing cases).

Here, although the Master Agreement, Section 3, required D4 not to disclose any of Nixon's or Defendants' confidential information, it did not prohibit D4 from accepting consulting work from Plaintiffs, and Defendants provide no evidence that Karahasanovic or any employees of D4 have disclosed to Plaintiffs any of Nixon's or Defendants' confidential information Karahasanovic may have obtained as a result of the scanning and coding work in violation of Section 3. Moreover, while the Master Agreement was executed in February 2010, the scanning and coding work Nixon requested did not commence until March 2011, over a year later. As demonstrated, Discussion, *supra*, at 22-24, the scanning and objective coding did not involve expert or consulting services that required Karahasanovic's access to Defendants' confidential information, including any work product such as Nixon's assessments of the strengths and weaknesses of Plaintiffs' claims or Defendants' defenses. Further, Defendants do not contest that the coding work was to be performed on an objective rather than subjective basis, which, had it been selected as the coding method for Defendants' documents, could have required assessments by Karahasanovic, and the Infovision21 coders he coordinated with, of the relevance or probative value of the information recorded in the coded documents, Sedona Conference Glossary at 9, conceivably involving a degree of

attorney guidance qualifying as work product. Thus, regardless of Nixon's statements asserting Karahasanovic was given work product preparatory to the coding work, because such information was superfluous to the objective coding of Defendants' documents being performed by Infovision21, facilitated by Karahasanovic, it is unlikely such information was in fact disclosed to Karahasanovic, thereby substantially reducing any risk that Karahasanovic would have retained and divulged such information in violation of his obligation under Section 3, even assuming he actually had received such information from Nixon. Significantly, Defendants do not assert that the documents to be coded contained any privileged material or other confidential matter and, as the documents were primarily Defendants' business records relating to Defendants' hourly employees' work schedules, it is highly unlikely that they did; Defendants' failure to state otherwise supports this conclusion. That the nature of the scanning and coding services performed by D4 and Infovision21 did not require access to Nixon's work product is therefore consistent with Karahasanovic's averment that no such information was provided to him in connection with the services. Karahasanovic Affirmation ¶ 17 ("My only discussions with [Nixon] . . . regarding the documents . . . concerned the configuration of the field categories that would be coded . . . as opposed to case strategy or the content of the documents in relation to the claims in the case."). Defendants provide no contemporaneous documentation that attorney work product was communicated to Karahasanovic or from other persons who were parties to such discussions. *See Wang,* 762 F.Supp. at 1249. Nor do Defendants' contend that any work product was disclosed to D4, or Infovision21, through Nixon's request to have Defendants' documents scanned and coded, based on the organization of the

documents or selection of the coding fields and categories established by Roney and Nixon's litigation support staff including Headley, for the Inforvision21 coders' use as communicated to Karahasanovic and Infovision21.  *See, e.g., Cordy*, 156 F.R.D. at 579 (recognizing that attorney's selection and grouping of photos provided to expert represented protected work product as one factor in support of disqualification based on expert's access to work product (citing *Sporck v. Peil*, 759 F.2d 312, 315 (3d Cir.), *cert. denied*, 474 U.S. 903 (1985))).

Additionally, the period of D4's scanning and coding services, over a period of several months in 2011, was relatively short.  *Cf. Marvin Lumber & Cedar Company*, 113 F.R.D. at 591 ("long-term access to [plaintiff's] sensitive product design information and plaintiff's manufacturing and research facilities" supported finding that testing company acted as plaintiff's "consulting engineer" on "matters relevant to this litigation" warranting testing company's disqualification as defendants' consulting expert).  The relative brevity of the scanning and coding period in the instant case thus militates against a likelihood that Karahasanovic was actually exposed to significant work product through his interactions with Nixon representatives during the project.  Although Nixon paid D4 a substantial fee, $50,000, for these services, the services were, as explained, Discussion, *supra*, at 22-24, not of expert nature and, so far as the record indicates, involved little in the way of discernible advice from D4 of a consultive character regarding the selection of the fields to be used for the coding process or the design of the resulting database as determined exclusively by Nixon. Accordingly, the substantial expense paid to D4 was therefore more likely attributable to the volume of Defendants' documents – 50-80 boxes of documents – to be scanned and coded requiring a substantial number of hours of

work over several months by D4 scanners and Infovision21 coders, and is not reflective of higher value expert services, like attorneys or testifying or consulting experts, of those involved in performing the scanning and coding work.

Finally, while Nixon maintains its work product was provided to Karahasanovic and D4 in connection with the scanning and coding work, the record does not support a finding that such work product was in fact communicated to Karahasanovic.  Thus, in this case, the reasonableness of Defendants' belief in the existence of a confidential relationship with Karahasanovic and D4 depends more on whether Defendants' attorneys actually conveyed confidential information to Karahasanovic incident to the scanning and coding work then on the presence of the Master Agreement's confidentiality provision, Section 3.  *See Agfa-Gevaert N.V.,* 2003 WL 23101783 at *1 (former employee's undisputed access to employer's confidential information important factor, along with continuing agreement to retain confidential character of such information, in determining existence of a required confidential relationship).  For example, Defendants assert that the discussions with Karahasanovic were "based on Defendants' theory of the case," Roney Declaration ¶ 10, and related to "areas that we [Nixon] wanted coded as important to our litigation strategy and defense . . . [and] the contents of the documents in relation to the claims of the case."  Roney Reply Declaration ¶ 4.  While the Nixon's choice of fields used in the coding process, Karahasanovic Affirmation ¶ 15, may well have been a result of such attorney analysis of the issues in the case, *i.e.*, constituting the "information they [counsel] were interested in highlighting based on Defendants' theory of the case," Roney Declaration ¶ 10, these averments do not indicate that such underlying attorney's analysis or Nixon's "theory of

the case" were in fact communicated to Karahasanovic in the process of selecting the coding fields. Defendants were required to demonstrate that such work-product was actually communicated by specific unambiguous examples, *Kyocera Corporation*, 2012 WL 4103811, at *8 (citing cases), and Defendants have not done so. Moreover, any disclosures to Karahasanovic by Nixon relating to the "claims of the case," Roney Reply Declaration ¶ 14, would not necessarily involve disclosure of Defendants' confidential information as the claims of the case are alleged in the pleadings which are, of course, public. *See Stencel*, 174 F.Supp.2d at 1084 (pleadings provided to expert are "public record" and not a party's "confidential information"). As discussed, Discussion, *supra*, at 38, Defendants do not contend that Nixon's work product, *e.g.*, litigation strategies such as defense theories, was readily discernable by a non-lawyer such as Karahasanovic from the coding fields selected by Nixon in connection with the objective coding of Defendants' documents by D4 and Infovision21.

Defendants' reliance on the 2010 Master Agreement and the Confidentiality Agreement between D4 and Infovision21 executed in March 2011 nearly one-year prior to commencement of the coding project, Roney Declaration Exh. C, to establish the confidential information was provided to Karahasanovic, Defendants' Memorandum at 4-6, is further undermined for two other reasons. First, Defendants do not dispute that, contrary to Defendants' assertion that in connection with the Master Agreement D4 was asked to submit a proposal to work with Nixon on E-Discovery issues in the case, Roney Declaration ¶ 6, there is no documentary evidence that such proposal was ever made or that D4 was given a contract for such work. Karahasanovic Affirmation ¶ 8. The absence of a separate contract with D4 to provide E-Discovery to Nixon services, other

than the scanning and coding work D4 later performed, is significant as potential access

to Nixon's work product by D4 could conceivably have been required in order for D4 to

provide such a broader scope of E-Discovery, particularly ESI consulting services, to

Nixon in connection with the case, whereas the D4 services actually provided to Nixon

and Defendants were limited to the scanning and objective coding of Defendants'

documents requiring non-expert consulting, *i.e.*, semi-clerical, services, not dependent

on any access to Defendants' confidential information.  The equally undisputed fact that

Nixon maintains its own in-house E-Discovery staff to provide it with presumably expert

E-Discovery assistance, making any retention of D4 for such services unnecessary,

further supports that Nixon had no need for such expert or consulting services by D4, an

outside contractor, which may have required access to Nixon's confidential information,

consistent with the fact that no contract for such services was extended to D4 by Nixon.

Thus, neither the Master Agreement nor the Confidentiality Agreement between D4 and

Infovision21 satisfies Defendants' burden to demonstrate a reasonably objective basis to

believe that a confidential relationship existed between Defendants and D4 in

connection with the scanning and coding work services rendered by D4 and

Infovision21.  As the court in *Paul* stated "there may be situations where, despite the

existence of a formal contractual relationship, so little of substance occurs during the

course of the relationship that neither the integrity of the trial process, nor the interests of

the party who retained the expert, would be served by blanket disqualification."  *Paul*,

123 F.R.D. at 278.  Defendants' failure to establish that D4 had any need for or access

to Defendants' confidential information in connection with the routine scanning and

objective coding services provided by D4 and Infovision21, as well as the non-expert or

41

non-consultative nature of those services, demonstrates that, despite the existence of the two confidentiality agreements, in this case, "so little of substance occur[red] during [Nixon's] relationship [with Karahasanovic]," *id.*, thereby negating any reasonably objective basis for Defendants' belief that a confidential relationship between Defendants and D4 existed. Moreover, "a confidential relationship is not necessarily established just because some information concerning the litigation is shared." *Hewlett-Packard Company*, 330 F.Supp.2d at 1094. Neither does the presence of a confidentiality agreement require a finding that confidential information was provided. *See Paul*, 123 F.R.D. at 278. As the court in *Kyocera Corporation* recently stated, "[t]he existence of a confidentiality provision does not transform non-confidential information into confidential information." *Kyocera Corporation*, 2012 WL 4103811, at *10. Thus, the fact of the existence of the confidentiality agreements is not a substitute for showing by Defendants that confidential information was in fact disclosed to D4 in order to demonstrate a reasonable objective belief that a confidential relationship with D4 existed with respect to the scanning and coding work. Nixon's ambiguous and unspecific assertions to the contrary are therefore insufficient to establish, as is Defendants' burden, that Defendants had an objectively reasonable belief that the scanning and coding work performed by D4 occurred in a confidential relationship.

Inasmuch as the court has found Defendants have, on this record, failed to establish Defendants' objectively reasonable belief that a confidential relationship between Defendants and D4 existed, a threshold requirement for disqualification of an expert or consultant, disqualification of D4 should be denied on that basis alone making it unnecessary for the court to consider whether Defendants "had disclosed to the expert

confidential or privileged information." *Kyocera Corporation,* 2012 WL 4103811, at *8 (citing *1210 Colvin Ave., Inc.*, 2006 WL 3827429, at *5, and *Hewlett-Packard Company*, 330 F.Supp.2d at 1093 ("if only one of the two factors [for disqualification] is present, disqualification likely is inappropriate.")). Notwithstanding Defendants' failure to satisfy the first prong of the test for disqualification, *viz.*, that there existed the requisite objective reasonable belief that a confidential relationship existed between Defendants and D4, because of Defendants' insistence that Roney disclosed confidential information, *i.e.*, work product to Karahasanovic, Roney Reply Declaration ¶ 4, the court addresses whether Defendants have established that confidential information was in fact provided to Karahasanovic and D4. Here, again, Defendants have failed to meet their burden. Other than Nixon's "'ipse dixit assertions,'" *Kyocera Corporation,* 2012 WL 4103811, at *8 (quoting *Greene, Tweed of Delaware, Inc.*, 202 F.R.D. at 429 (internal citations omitted)), *e.g.*, Roney Declaration ¶ 10; Roney Reply Declaration ¶ 4 (Roney discussed with Karahasanovic documents' "significance" to Defendants' defense), Defendants proffer no specifics to demonstrate that confidential information was disclosed to Karahasanovic as D4's representative during the scanning and coding project. *See Kyocera Corporation*, 2012 WL 4103811, at *10 (conclusory allegations in attorney's affidavit insufficient to establish confidential information obtained by expert in prior work for plaintiff). More specifically, Defendants, as previously noted, Discussion, *supra*, at 37-38, do not dispute that nothing in Defendants' documents which were to be scanned and coded by D4, or the selected coding fields, and Infovision21 contained confidential or privileged information. Roney's averments fairly read do not directly state, or necessarily imply, that the litigation strategies alluded to therein were actually

conveyed to Karahasanovic given the undisputed fact that, because the coding work was to be done on an objective basis, knowledge of such strategies by Karahasanovic or Infovision21 was completely irrelevant to the design of the coding fields used by the Infovision21 coders, which were created by Nixon, not D4, Karahasanovic Affirmation ¶ 15 ("Nixon . . . had chosen to have a certain number of field codes."), for "the database the coders were creating." Karahasanovic Affirmation ¶ 13. Further, any discussion with Karahasanovic concerning Defendants' "forms," Karahasanovic Affirmation ¶ 13, pertained to Defendants' business records relating to Defendants' hourly employees' work information, and Defendants do not assert these records were either privileged or otherwise exempt from Plaintiffs' discovery. In an attempt to demonstrate that work product was communicated to Karahasanovic, Defendants submit that Nixon's interaction with Karahasanovic pertained to the "content of the documents and the claims of the case." Roney Reply Declaration ¶ 4. However, as discussed, Discussion, *supra*, at 39, the claims of the case are set forth in the pleadings which, as public documents, are not of a confidential nature. *See Stencel*, 174 F.Supp.2d at 1084 (showing expert pleadings in case insufficient to demonstrate expert was provided with confidential information by attorney as pleadings are matters of "public record."). Nor, as discussed, Discussion, *supra*, at 37-38, is there any basis to conclude that the documents contained work product or privileged information. Thus, lacking more details, this broad assertion does not establish any of Defendants' confidential information was in fact disclosed to Karahasanovic.

In a further effort to meet their burden to show confidential information was communicated to Karahasanovic, Defendants also maintain that Nixon "provided D4 with

attorney mental impressions from which he [Karahasanovic] could glean information . . .

directly related to the issues relating to [Defendants'] Custodians." Roney Reply

Declaration ¶ 10. However, Defendants fail to explain how the subject matter of

Defendants' "Custodians" of Defendants' scanned and coded documents, or

Defendants' e-mails, demonstrates disclosure of confidential information to

Karahasanovic, and caselaw indicates that, as material subject to discovery, it is not.

*See Heller v. City of New York*, 2009 WL 2944663, at *2 (E.D.N.Y. July 31, 2008)

(custodian of relevant records including storage and maintaining evidence subject to

deposition); *Philan Insurance LTD. v. Frank B. Hall & Co., Inc.*, 1992 WL 183553, at *2

(S.D.N.Y. July 21, 1992) (deposition of custodian of records permitted where deposition

"may lead" to evidence probative of plaintiff's claim and damages).

Moreover, prior to Defendants' motion, Defendants had communicated with

Plaintiffs regarding the identity of Defendants' e-mail custodians and reported such

communications to the court in connection with attempts to resolve ESI production

issues regarding Defendants' voluminous e-mails. Doc. Nos. 338, 355, 357, and 361.

Additionally, 10 days after filing the instant motion, Roney stated to Plaintiffs' counsel

that Nixon was prepared to discuss with Plaintiffs Defendants' "Custodians" in

connection with Defendants' use of the predictive coding software. Roney Reply

Declaration ¶ 9 ("please let me [Roney] know if we can at least confer without experts as

to the [Defendants'] Custodians.") (e-mail from Susan Roney to Sarah Cressman dated

October 5, 2012) (Roney Reply Declaration Exh. A at 2). How discussing Defendants'

"Custodians" directly with Plaintiffs' counsel would not destroy any supposed

confidentiality as to this subject matter, assuming it was even discussed by Nixon with

Karahasanovic, as being confidential in nature, during the scanning and coding work, is not explained by Defendants. Indeed, the effective use of predictive coding software anticipates the parties' cooperation including on this subject. *See Moore v. Publicis Groupe*, 287 F.R.D. 182, 189 (S.D.N.Y. 2012) (referring to need for counsel to be knowledgeable as to parties' document/e-mail custodian's identities as part of protocol for use of predictive coding software), *adopted by* 2012 WL 1446534 (S.D.N.Y. Apr. 26, 2012). Defendants do not assert that any of Defendants' scanned and coded documents contained custodian information. Moreover, there is no indication in the record that Karahasanovic, in connection with the scanning and coding work for Defendants' business records, had any involvement with the issue of Defendants' production of e-mails particularly the identity of the e-mails' custodians. Thus, whether Defendants' reliance on this example to show Karahasanovic had access to Defendants' confidential information refers to custodians of Defendants' paper documents or, more likely, Defendants' e-mails, Defendants' assertion that Nixon's communications with Karahasanovic regarding the subject of Defendants' "Custodians," even if it occurred, represents any disclosure of Defendants' confidential information to D4 during the scanning and coding work appears to be, on this record, baseless. Other than the supposed improper disclosure of confidential information by D4 relating to Defendants' "Custodians," Defendants' submissions are devoid of any credible examples to support Defendants' contention that D4, particularly Karahasanovic, received Defendants' confidential information creating a serious risk of improper disclosure to Plaintiffs.

Defendants also point to the discovery status conference conducted by the court on January 11, 2012 (Doc. No. 338), Roney Declaration Exh. D, during which Plaintiffs'

counsel informed the court that Defendants objected to D4 providing Plaintiffs' with ESI-consulting services.  Roney Declaration ¶ 16.  In response to the discussion, the court urged, but did not require, Plaintiffs to engage a different ESI consultant in order to avoid discovery disputes based on the possibility Defendants' "potentially privileged" information could be misused.  Roney Declaration Exh. D at 43; Facts, *supra*, at 11-13. Plaintiffs' counsel nevertheless apparently determined that Plaintiffs' continued use of D4s' Advisory and Consulting Group was necessary to facilitate Plaintiffs' access and review of Defendants' ESI through D4's hosting service and customized interface, and because Plaintiffs' counsel lacks an in-house ESI consulting staff to assist in such review.  Cressman Affirmation ¶ 7.  Defendants argue that the court's admonition placed Plaintiffs' counsel on notice regarding the potential for further dispute and delay arising from the impropriety of D4 providing ESI consulting assistance to Plaintiffs having also performed the scanning and coding services for Defendants.  Defendants' Memorandum at 5.  Defendants therefore assert D4's disqualification is justified regardless of any delay in concluding discovery resulting from D4's disqualification.  *Id.*  However, based on the court's conclusion that D4's disqualification is not, on this record, warranted, it is not necessary to further address the merits of Defendants' contention that any delay resulting from D4's disqualification does not contravene the public interest in a prompt and orderly disposition of the case supporting disqualification.

As there is, on the record, no reasonable basis to believe that further proceedings involving D4's Advisory and Consulting Group – Coons and Courtney – as Plaintiffs' ESI consultants will taint the integrity of future proceedings in this case, D4's disqualification is not required on this ground.  Further, Defendants do not dispute Plaintiffs' lack such

expertise on an in-house basis, in contrast with Nixon which has an extensive in-house E-Discovery and ESI advisory group. Cressman Affirmation ¶ 7 ("Unlike Nixon, plaintiffs' counsel does not have e-discovery experts."); Cressman Affirmation Exh. A (describing Nixon's "team of legal technology experts . . . for assisting [Nixon's] attorneys and clients with all aspects of electronic discovery"). Thus, given Defendants' recent decision to use predictive coding, Cressman Affirmation ¶ 7, to facilitate review of Defendants' voluminous and potentially probative ESI, requiring Plaintiffs to obtain different competent ESI consultants at this stage would unduly disadvantage Plaintiffs without promoting judicial integrity. D4's disqualification, as Defendants request, would, therefore, not serve the public interest in a fair and prompt adjudication in this court. *See Grioli*, 395 F.Supp.2d at 14 (courts consider "public interest" in whether to disqualify an expert) (citing cases).

The court also notes and addresses Defendants' offer, ostensibly in support of Defendants' burden, to provide "[f]urther details on the [D4] project" for *ex parte* review. Roney Declaration ¶ 10 n. 1. However, Defendants were well-aware of their burden of proof to establish both an objectively reasonable belief that a confidential relationship between D4 and Defendants existed and that confidential information was provided to D4 given that Defendants alternatively argued that if the court declined to order D4's disqualification based on Defendants' 'switching-sides theory,' disqualification was required under the general test, Defendants' Memorandum at 4-5 (contending, alternatively, that, in satisfaction of the prevailing test for expert disqualification, based on the Master Agreement and the Confidentiality Agreement between D4 and Infovision21, a confidential relationship existed between D4 and Nixon, and that Nixon

provided Defendants' confidential information to D4 in connection with the scanning and coding work). The court declines Defendants' offer as, given the Defendants' burden to establish the merits of Defendants' motion, for the court to request that, after Defendants' motion was fully briefed and submitted, Defendants provide such supplemental material to satisfy Defendants' burden on this motion is equivalent to advising Defendants that the materials submitted by Defendants in support of Defendants' motion may be, or are, upon the court's review of Defendants' submissions, insufficient, thereby indicating to Defendants the need to strengthen Defendants' submissions on this important requirement. The court also notes that Defendants did not request discovery in connection with the motion such as depositions, *see, e.g., Grioli*, 395 F.Supp.2d at 14 (deposition testimony of expert admitting access to client's confidential information), nor did either side request an evidentiary hearing, *see, e.g., Agfa-Gevaert N.V.,* 2003 WL 23101783, at *1 (parties requested evidentiary hearing on disqualification motion). Nor upon careful review of the record does the court find "stark factual disputes" based on the parties' conflicting averments which require the court conduct, *sua sponte*, an evidentiary hearing as to such issues. *See Cordy,* 156 F.R.D. at 576. Moreover, Defendants failed to provide any indication as to the nature of the proposed supplemental material other than that it pertained to the "project." Such ambiguity makes it difficult to know whether Defendants' proffered information would even be relevant to the specific issues raised on the instant motion. If upon reviewing Plaintiffs' response which directly and unambiguously attacked Defendants' asserted grounds for disqualification, Defendants believed Defendants' submissions supporting Defendants' motion were insufficient, Defendants should have filed the supplemental

material for *ex parte* review as part of Defendants' reply, or requested an *ex parte* hearing. Defendants did neither, relying instead on their papers, including the Roney Reply Declaration and Defendants' Reply Memorandum as submitted. Acquiescing in Defendants' proposal that the court invite Defendants to supplement the record to assist Defendants in meeting Defendants' burden of proof after issue was joined by the parties, and the matter was under judicial consideration, would therefore amount to improper judicial guidance in violation of the court's neutral decision-making duty and, accordingly, the court declines to do so. *See Bektic-Marrero v. Goldberg*, 850 F.Supp.2d 418, 429 (S.D.N.Y. 2012) (declining to address defendant's argument asserted in "one throwaway line at the end of its brief" because to address such argument would force the court to make the argument and become an advocate for one side).

## B.    Disqualification of Plaintiffs' Counsel.

Disqualification of an adversary's counsel based on an attorney's alleged access to an opponent's confidential information from a disqualified expert requires a "high standard of proof" and is viewed with disfavor.[15] *See 1210 Colvin Avenue, Inc.*, 2006 WL 3827429, at *6. Such a heightened burden is necessary to protect a party's right to choose counsel requiring the court to balance this right against the need to maintain

---

[15]  While Defendants' request appears only in Defendants' Reply Memorandum papers, (manifesting a degree of uncertainty regarding the merits of Defendants' request), because a charge of disqualifying attorney misconduct invokes the court's responsibility to enforce applicable professional standards, the court addresses the merits of Defendants' request. *See Dunton v. Suffolk County, State of New York*, 729 F.2d 903, 908-09 (2d Cir. 1984) ("'[w]hen a potential or actual conflict of interest situation arises, it is the court's duty to ensure that the attorney's client, so involved, is fully aware of the nature of the conflict and understands the potential threat to the protection of his interests'" (quoting *In re Taylor*, 567 F.2d 1183, 1191 (2d Cir. 1977))). *See also Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562, 565 (2d Cir. 1973) ("even an appearance of impropriety requires prompt remedial action by the court" with regard to attorney conflict of interest).

high professional standards. *Id.* (citing *Evans v. Artek Systems Corp.*, 715 F.2d 788, 791 (2d Cir. 1983); and *Marshall v. State of New York Div. of State Police*, 952 F.Supp. 103, 106 (N.D.N.Y. 1997)).  Courts must also consider the risk that asserted disqualification of an adversary's attorney is motivated by "'tactical reasons.'" *1210 Colvin Avenue, Inc.*, 2006 WL 3827429, at *6 (quoting *Bd. of Education v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979)).  In the context of the contentions presented by Defendants' motion, attorney disqualification turns on whether a movant's expert or consultant wrongly disclosed confidential information to the adversary's attorney or whether a cognizable conflict of interest is established.  *1210 Colvin Avenue, Inc.*, 2006 WL 3827429, at *6 (citing caselaw).  Absent evidence indicating a former testifying expert or consultant obtained and provided the client's confidential litigation-related information to the opposing attorney, there is no presumption that such information was obtained by opposing counsel requiring disqualification of counsel.  *See 1210 Colvin Avenue, Inc.*, 2006 WL 3827429, at *9 (evidence demonstrated consultants obtained confidential information from former employer but did not disclose such information to plaintiff's attorneys – court denied disqualification of plaintiff's attorneys). Courts "hesitate to impose [the] drastic . . . measure [of] disqualification [of a party's attorney] except when absolutely necessary." *MMR/Wallace Power & Industrial, Inc. v. Thames Associates* ("*MMR/Wallace*"), 764 F.Supp. 712, 718 (D.Conn. 1991) (citing *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 721 (7th Cir. 1982)).

The court has found Defendants' motion to disqualify D4 from serving as Plaintiffs' ESI consultant to be without merit; Defendants' request to disqualify Plaintiffs' counsel, Roney Reply Declaration ¶ ¶ 19 ("Plaintiffs' counsel . . . elicited confidences

[from D4] supports disqualification), 26-27 (same); Defendants' Reply Memorandum at 2 ("the court should also <u>consider</u> whether to also disqualify Plaintiffs' counsel from proceeding with this litigation") therefore fails for similar reasons. As noted, Discussion, *supra*, at 50, disqualification motions of an adversary's attorney based on the attorney's alleged access to an opponent's confidential information from a challenged expert or consultant are viewed with disfavor and require a "high standard of proof" (citing and quoting *1210 Colvin Avenue, Inc.*, 2006 WL 3827429, at *6 (citing caselaw)). Courts also consider the risk that a disqualification request is motivated by tactical reasons. *Id.* (quoting *Nyquist*, 590 F.2d at 1246). As Defendants argue, Defendants' Reply Memorandum at 5 (citing *1210 Colvin Avenue, Inc.*, 2006 WL 3827429, at *7), a requested disqualification of an opponent's attorney depends on whether a party's expert wrongly disclosed confidential information to the adversary's attorney, which the expert or consultant acquired from a party, having the capacity to effect significant prejudice to the party, or whether some other cognizable conflict of interest exists. *Id.* Here, Defendants for the reasons discussed, Discussion, *supra*, at 36-46, have failed to meet their burden that D4 received any confidential information from Defendants or Nixon incident to its engagement to provide scanning and objective coding of Defendants' documents during 2011. Accordingly, as the record fails to support that either Karahasanovic or D4, by imputation, obtained Nixon's work product or any other form of Defendants' confidential information, concerning this case, it follows that Defendants have also failed to meet Defendants' heavy burden to establish that Plaintiffs' attorneys obtained any such information through counsel's contact with Karahasanovic and Coons or Courtney which could be used to Defendants' prejudice.

*See 1210 Colvin Avenue, Inc.*, 2006 WL 3827429, at *9 ("'nagging suspicion'" that plaintiffs "have been unfairly advantaged" by asserted disclosures to plaintiffs' counsel insufficient to warrant disqualification of counsel (quoting *MMR/Wallace,* 764 F.Supp. at 718)). On this record, therefore, Plaintiffs' counsel's "continued representation [of Plaintiffs] does not threaten to taint the integrity of these proceedings and disqualification is not required." *1210 Colvin Avenue,* Inc., 2006 WL 3827429, at *9. Defendants do not point to any basis to find Plaintiffs' counsel function under a disqualifying conflict of interest.

Defendants also contend that by obtaining from Karahasanovic information as stated in Karahasanovic's Affirmation, concerning D4's engagement with Nixon to provide scanning and coding services, in order to oppose Defendants' motion, Roney Reply Declaration ¶ 26, Plaintiffs' counsel violated certain ethical requirements applicable to attorneys which requires counsel's disqualification, *viz.*, the duty not to cause others to reveal a client's confidences, Defendants' Reply Memorandum at 4-5 (citing *MMR/Wallace,* 764 F.Supp. at 718, and former New York Rules of Professional Conduct 1.6 (duty to protect client confidences), 4.2 (prohibition against communication with represented party) and 8.4 (prohibiting conduct prejudicial to administration of justice supporting that counsel be disqualified)). Defendants further assert an ethical violation based on Plaintiffs' attorneys contact with Karahasanovic to aid Plaintiffs in opposing Defendants' motion, in violation of Fed.R.Civ.P. 26(b)(4)(D)(ii) (permitting adverse party to obtain "facts or opinions" from an opponent's non-testifying expert where party unable to obtain facts or opinions by other means) ("Rule 26(b)(4)(D)(ii)") also warrants disqualification of Plaintiffs' counsel. Defendants' Reply Memorandum at

4 (referencing ABA Comm. on Ethics & Prof'l Responsibility Formal Op. 378 (1993) ("ABA Op. 93-378").  Particularly, Defendants claim that D4 was given Defendants' confidential information and that Plaintiffs' counsel violated ethical standards prohibiting counsel from soliciting witnesses in violation of the rules of this court, specifically Rule 26(b)(4)(D)(ii), to divulge an adversary's confidences by interviewing Karahasanovic and obtaining from Karahasanovic the information in his affirmation, Doc. no. 393, describing the scanning and coding work performed by D4 and Infovision21 for Nixon and Karahasanovic's interactions with Nixon, filed as part of Plaintiffs' opposition to Defendants' motion.  Defendants' Memorandum at 5; Defendants' Reply Memorandum at 4.  However, the court has found the record does not support that Karahasanovic or D4 actually received such confidential information in connection with the scanning and coding work which could have been transmitted by Karahasanovic to Plaintiffs' counsel. Discussion, *supra*, at 17-26, 36-46.  Moreover, Defendants fail to point to any "fact" or "opinion" Plaintiffs' counsel have sought or obtained from D4 or Karahasanovic as a non-testifying expert, within the meaning of Rule 26(b)(4)(D)(ii).  Although D4 was retained to provide scanning of Defendants' documents, and, with Infovision21's assistance, objective coding of Defendants' documents for Nixon, services insufficient to support a finding that D4 and Infovision21 served as Defendants' experts or consultants in providing such services, Discussion, *supra*, at 15-25, there is no indication that D4 also served, contrary to Defendants' assertion, Defendants' Reply Memorandum at 3, as Defendants' "consultants" for the purposes of this litigation by providing to Defendants any expert investigation or evaluation of Plaintiffs' claims or Defendants' defenses regarding the merits of such claims or defenses so as to qualify Karahasanovic as a

non-testifying expert within the scope of Rule 26(b)(4)(D)(ii).  By its terms, the rule limits

access to an opponent's non-testifying expert's knowledge of "facts" or "opinions"

relevant to the merits of the claims or defenses in the case.  *See* Fed.R.Civ.P. 26(b)(1)

(discovery limited to matters "relevant to any party's claim or defense").  Defendants

failed to provide any support for Defendants' contention that the scanning and objective

coding in this case involved expert services relevant to any claims or defenses in the

case.  Rather, Karahasanovic assisted Nixon in establishing the fields or categories to

be used by Infovision21 coders in objectively coding the numerous documents –

Defendants' forms – D4 had scanned preliminary to the coding process, and creation of

the resultant database, to Nixon's desired requirements.  Karahasanovic Affirmation ¶ ¶

13, 15-17.  Defendants do not contest Karahasanovic's description of D4 and

Infovision21's work performed for Nixon.  ABA Op. 93-378, upon which Defendants rely,

Defendants' Reply Memorandum at 4, holding that *ex parte* contact with an adversary's

"expert witness may violate Model Rule of Professional Conduct 3.4(c) ("Rule 3.4(c)"),

ABA Op. 93-378 at 2, is also inapposite given that the opinion and Rule 3.4(c) are

directed to a party's "expert witness," subject to Fed.R.Civ.P. 26(b)(4)(A) (permitting

deposition of "expert whose opinions may be presented at trial") and Defendants do not

assert Karahasanovic was retained to serve, nor served, as Defendants "expert

witness."  Defendants therefore fail to establish that the services rendered by D4 or

Karahasanovic qualify as expert services, or that Karahasanovic's description of the

scanning and coding work in his affirmation constitutes a disclosure of "facts" or

"opinion" "known" or "held" by Karahasanovic as an expert within the ambit of Rule

26(b)(4)(D)(ii), or that Plaintiffs' counsel violated any applicable ethical standards based

on violation of Rule 26(b)(4)(D)(ii) or any other ethical rule, requiring disqualification.

In contrast to the work performed for plaintiff by the disqualified experts in *1210 Colvin Avenue, Inc.*, 2006 WL 3827429, at *4, relied on by Defendants, Defendants' Reply Memorandum at 3, in attempting to establish Plaintiffs' counsel improperly obtained from Karahasanovic "facts" relevant to Defendants' defense, (quoting *1210 Colvin Avenue, Inc.*, at *4), D4 did not develop "a strategy for . . . combing through documents," *id.* (quoting *1210 Colvin Avenue, Inc.*, 2006 WL 3827429 at *4), to locate those most helpful to Defendants' case.  By definition, D4's work allowed Nixon to have all of the scanned documents coded into a database to enable Nixon, not D4, to "comb," *i.e.*, review, the scanned documents by computer using the coding system established, not by D4, but by Nixon, during later phases of the instant litigation.  Roney Declaration ¶ 12 (goal of project was to "facilitate [Nixon's] handling of data [*i.e.,* the objectively coded information concerning Defendants documents]" to assist Nixon in further litigation in this case).  This fact distinguishes the instant case from the facts in *1210 Colvin Avenue, Inc.*, and other cases cited by the court in that case, in which disqualification was granted as the challenged consultants in that case intended to use, as the court found, the confidential knowledge concerning defendant's business operations and decision-making procedures relevant to plaintiff's price discrimination allegations, obtained by plaintiff's consultants while employed by defendant, to assist plaintiff in reviewing defendant's documents and to more effectively support plaintiff's claims.  *1210 Colvin Avenue, Inc.*, 2006 WL 3827429, at *7.  Here, the coding system for Defendants' documents did not entail any review of the documents' contents and was established by Nixon for Defendants' benefit to facilitate Nixon's computerized access to

and use of the scanned and coded documents in later phases of the instant litigation, not to facilitate any access by Plaintiffs in developing evidence supporting Plaintiffs' claims. Unlike the "facts" obtained from defendant's records by the disqualified consultants in *1210 Colvin Avenue, Inc.*, the information – descriptive elements of the Defendants' documents – facts regarding the scanning and coding work performed by D4 are therefore not facts relevant, *i.e.*, probative, to the claims or defenses in this case. Nor, in contrast to the instant matter, were the former employees of defendant in *1210 Colvin Avenue, Inc.* disputed to be experts or consultants for any purpose. *See 1210 Colvin Avenue, Inc.*, 2006 WL 3827429, at *1 (plaintiff "retained Bridgeport Partners LLC . . . to assist [plaintiff] in this litigation . . . Bridgeport is a consulting firm owned [by defendant's former employees]"). Therefore, Karahasanovic did not provide any "fact or opinion" improperly obtained by Plaintiffs' counsel relevant to defending Defendants' motion in violation of Rule 26(b)(4)(D)(ii), and disqualification of Plaintiffs' counsel is not warranted on that ground asserted by Defendants.

Defendants' contention that Plaintiffs' counsel obtained "confidential information" from Karahasanovic, Defendants' Reply at 3, in violation of Section 3 of the Master Agreement as a ground for disqualification of Plaintiffs' counsel, is also insufficient to warrant counsel's disqualification. Roney Reply Declaration ¶ 8 (In assisting Plaintiffs in opposing Defendants' motion, Karahasanovic "broke Kaleida's confidence."). As stated, whether Plaintiffs' counsel should be disqualified turns on whether counsel received Defendants' confidential or privileged information from Karahasanovic, who served as Defendants' expert or consultant, *1210 Colvin Avenue, Inc.*, 2006 WL 3827429, at *7, pertaining to Defendants' "trial preparation and strategy." *MMR/Wallace,* 764 F.Supp. at

724. Here, the court has found that in facilitating the scanning and coding work, Karahasanovic did not serve as Nixon's expert or consultant with respect to such services nor was Karahasanovic or D4 retained to provide expert or consulting services to Nixon regarding the merits of the case. Discussion, *supra*, at 15-25.

Further, Defendants failed to establish that in connection with such scanning and coding services, Nixon actually disclosed attorney work product to Karahasanovic, particularly given that the scanning of Defendants' documents and the nature of the objective coding did not require such information. Other than revealing that the coding work was to be done on an objective, as opposed to a subjective, basis and that Karahasanovic was assisted by several members of Nixon's staff identified by Karahasanovic in establishing parameters for the coding, Karahasanovic's Affirmation ¶ 15, provides no information regarding Karahasanovic's communications with Defendants, except examples of the coding fields selected for coding of Defendants' business forms, such as document type, cost center, or employee number, Karahasanovic Affirmation ¶ ¶ 13, 15, relating to Defendants' hourly employees work schedules as recorded on the documents to be coded. Significantly, Defendants do not contend that this information is confidential as Defendants' business records relating such facts are, given Plaintiffs' claims for unpaid wages and overtime, in all likelihood subject to discovery in any event, and Defendants fail to establish or argue, otherwise. Additionally, as discussed, Discussion, *supra*, at 37-38, Defendants do not contend that such information disclosed was privileged or attorney work product. Because Defendants have not demonstrated that the information regarding the scanning and coding work for Nixon provided by Karahasanovic in support of Plaintiffs' opposition to

Defendants' motion constituted confidential information that could be prejudicial to Defendants' case, that such information was disclosed by Karahasanovic to Plaintiffs' counsel is insufficient to require counsel's disqualification. In sum, the record does not support Plaintiffs' counsel solicited or obtained Defendants' confidential information creating any prejudice to Defendants warranting counsel's disqualification.

Defendants' reliance, Defendants' Reply Memorandum at 4-6, on *Tyco Healthcare Group L.P. v. Ethicon Endo-Surgery, Inc.*,("*Tyco Healthcare*") No. 10-60, Slip. Op. (D.Conn. Dec. 30, 2011), *United States ex rel. Grimm Construction, Co., Inc. v. SAE Civil Construction, Inc.* (*"Grimm"),* 1996 WL 148521 (D.Neb. Jan. 29, 1996), *Cordy*, 156 F.R.D. 575, and *MMR/Wallace*, 764 F.Supp. 712, to support disqualification of Plaintiffs' counsel is misplaced.

*Tyco Healthcare*, an unreported case, on which Defendants rely for the proposition that D4's failure to assure that Karahasanovic was sufficiently isolated from contact with D4's Advisory and Consulting group so as to avoid Plaintiffs' possible access to any of Defendants' confidential information which may have been gleaned by Karahasanovic incident to the scanning and coding work and thereby support disqualification of Plaintiffs' counsel, Defendants' Reply Memorandum at 6, is, inapposite. A careful reading of the facts in *Tyco Healthcare* reveals significant differences from the facts of the instant dispute which, when contrasted with the instant record, instead of weakening, reinforces the court's conclusion that Defendants' motion is without merit and that this case provides no support for Defendants' request that Plaintiffs' counsel be disqualified. Specifically, in *Tyco Healthcare*, the trial presentation consultant at issue, subsequently hired to perform identical services in the same patent

litigation for defendant's attorneys after previously providing such services for plaintiffs, was "'privy to and received [plaintiff's] confidential information'" and participated in "'numerous confidential and privileged discussions,'" concerning "'[plaintiff's] trial tactics and strategy.'" *Tyco Healthcare*, Slip Op. at 3. The consultant also "acknowledged that he had access to [p]laintiff's attorney trial team's confidential and privileged information." *Tyco Healthcare,* Slip Op. at 4 (based on the expert's deposition). Further, significantly, such an extensive involvement with, and detailed comprehension of, plaintiff's confidential litigation information and strategies was essential to enable the consultant to accomplish his specialized work of assisting plaintiff's trial counsel in achieving an effective trial presentation of plaintiff's case. *Tyco Healthcare*, Slip Op. at 2. In contrast, the facts in the instant case fail to support that either Karahasanovic, Coons, or Courtney, were privy to Defendants' counsel's confidential trial strategies and related knowledge, or that such knowledge was even necessary to the successful execution of D4's scanning and coding work for Nixon. Relevantly, other than in obtaining some non-confidential information concerning the nature of the scanning and coding services provided by D4 to Nixon in order to oppose Defendants' motion, Plaintiffs' counsel has not utilized Karahasanovic to provide expert or consultant services to assist in the litigation of Plaintiffs' claims. In contrast, in *Tyco Healthcare*, plaintiffs' former consultant was assigned to defendant for the same type of trial assistance services the consultant had provided to plaintiffs in that case. *Tyco Healthcare*, Slip Op. at 17. Thus, in the absence of any evidence that Karahasanovic was retained by Plaintiffs to provide expert or consulting services to Plaintiffs, the lack of formal screening rules to avoid potential leakage of Defendants' confidential information, even assuming any such information

was imparted to Karahasanovic, in this case does not require counsel's disqualification, and the holding in *Tyco Healthcare* to disqualify defendant's counsel in that case does not support Defendants' request that Plaintiffs' counsel be disqualified.

In *Grimm*, the court found that the disqualified former employee of defendant, later hired by plaintiff's counsel as a trial consultant for plaintiff, obtained presumably privileged information about defendant's case, creating a palpable risk of disclosure of defendant's confidential information to plaintiff's counsel, potentially prejudicial to the defense. *Grimm*, 1996 WL 148521, at **1, 2. Specifically, the court in *Grimm* found the former employee had been "intimately involved" in the construction project and the underlying dispute giving rise to the litigation before being hired by plaintiff's law firm. *Id.* at *4. In the instant case, although Plaintiffs' attorneys obtained some information from Karahasanovic, not shown by Defendants to be confidential in nature, as described in the Karahasanovic Affirmation, about the general nature of the work performed by D4 and Infovision21 during the scanning and coding project for Defendants, the record does not support, as discussed, Discussion, *supra*, at 17-26, 36-46, that prior to this disclosure Karahasanovic obtained any protected information from Defendants' attorneys in connection with performing this work that could have been disclosed to Plaintiffs' counsel by Karahasanovic. Thus, *Grimm* does not require a disqualification of Plaintiffs' counsel.

In *Cordy*, the court found that an accident reconstruction expert was retained by plaintiff to provide an opinion on the cause of plaintiff's accident and obtained plaintiff's attorney's work product as a basis for that opinion. *Cordy*, 156 F.R.D. at 577-78. Thereafter, the expert was retained by defendant and provided a different opinion on the

same issue.  *Cordy*, 156 F.R.D. at 579.  Because the expert had previously received

plaintiff's confidential information as a basis for the experts' first opinion, including

plaintiff's attorney's work product, the expert's subsequent consultations with

defendant's attorneys required disqualification of defense counsel to avoid the risk that

such protected information would be used against plaintiff in the litigation.  *Cordy*, 156

F.R.D. at 584-85.  In contrast, as with *Tyco Healthcare*, *Grimm,* and *Cordy,*

Karahasanovic has not served Plaintiffs as an expert or consultant for any litigation-

related purpose, and the record does not support a finding that Defendants' confidential

information was disclosed to Karahasanovic.  Accordingly, *Cordy* does not support that

disqualification of Plaintiffs' counsel is required.

In *MMR/Wallace,* plaintiff's former employee, hired as a consultant in the litigation

by defendants' attorneys had, prior to being hired by defendant's attorney, "extensive

contact with plaintiff's counsel," "access to confidential information about plaintiff's

litigation strategy" as well as the facts concerning the underlying dispute, and assisted

plaintiff's counsel in digesting documents, and preparing for depositions and answering

interrogatories in connection with the litigation.  *MMR/Wallace*, 764 F.Supp. at 725-28.

Thus, the court in that case found on the record before it that the former employee had

for 10 months served as plaintiff's "trial consultant and paralegal," *id.* at 725, and that,

given those circumstances, the employee's presumptive disclosure of privileged

information to defendant's attorney required disqualification of the attorney. *Id.* at 726-

27.  In contrast to *MMR/Wallace*, in this case, Karahasanovic served not as an expert or

consultant assisting Defendants' counsel in litigating the merits of Plaintiffs' claims but,

rather, as a scanning and coding services contractor meeting with Defendants' attorneys

and staff to determine the fields, which Defendants do not assert constitute Defendants' confidential information, needed to satisfy Nixon's requirements for the coding of Defendants' documents into a readily useable database to be accomplished over a relatively limited – several months during the spring-summer of 2011 – period of time. Importantly, there also is no evidence in this case to support that, in contrast to the disqualified attorney in *MMR/Wallace*, Plaintiffs' counsel attempted to hire Karahasanovic to assist Plaintiffs in any capacity in connection with litigating the merits of this case. Thus, in contrast to *MMR/Wallace,* disqualification of Plaintiffs' counsel is not required to negate any potential tainting of further proceedings in this case. *See MMR/Wallace*, 764 F.Supp. at 727 (defense counsel's purpose in attempting to hire plaintiff's former employee, to obtain plaintiff's confidential information, helpful to the defenses, to which former employee was privy, a fact known to counsel, provided ground for counsel's disqualification),

Finally, Defendants attempt to demonstrate that such work product was in fact obtained by Karahasanovic and revealed to Coons and Courtney and Plaintiffs' attorneys based on a scheduled telephone conference call discussion by counsel concerning Defendants' "Custodians" of Defendants' e-mails thus requiring Plaintiffs' counsel's disqualification. Roney Reply Declaration ¶ ¶ 10-14, Roney Reply Declaration Exh. A (referring to Defendants' requests that Plaintiffs not include D4 ESI consultants Coons and Courtney in telephonic conferences regarding the issue of Defendants' custodians as one element in a protocol needed to guide the use of predictive coding software to review the e-mails). *See Moore*, 287 F.R.D. at 198 (listing of defendant's e-mail custodians in proposed predictive coding software protocol). Defendants contend

Plaintiffs' "curious insistence" on including Courtney in the scheduled conversations, Roney Reply Declaration ¶ 26, demonstrates Plaintiffs' counsel has received Defendants' confidential information by improperly obtaining from Karahasanovic Defendants' confidential information provided to him by Nixon as a result of D4's previous scanning and coding work for Defendants, specifically, Defendants' attorney's "mental impressions . . . directly relevant to the [ESI] issues relating to [Defendants] Custodians." Roney Reply ¶ 10. According to Defendants, Plaintiffs' "insistence" on using D4's ESI consultants in discussing the subject of Defendants' "Custodians," as a part of the discussions between the parties for the purpose of establishing a protocol to guide the use of the predictive coding software indicates that Plaintiffs expect to "take advantage of [Defendants'] confidences" regarding Defendants' "Custodians" based on D4's previous scanning and coding work, coordinated by Karahasanovic, for Nixon. Defendants' Reply Memorandum at 5. There are two difficulties with this contention.

First, Defendants make no attempt to explain, and the court fails to see, how the identity, or job titles, of such "Custodians" of Defendants' documents or Defendants' e-mails subject to review by the predictive coding or other computerized method, constitutes Defendants' confidential or otherwise protected, such as proprietary or privileged, information. To the contrary, the identity and job descriptions of Defendants' document custodians are subject to discovery, Discussion, *supra*, at 45, and are likely to be required for any workable protocol to guide the predictive coding process Defendants have recently stated they intend to use in order to comply with Plaintiffs' request for production of Defendants' e-mails on a cost-effective basis. Cressman Affirmation ¶ ¶ 5, 7; *see Moore*, 287 F.R.D. at 192-93 (emphasizing attorneys' need to acquire and share

accurate information regarding custodians of subject e-mails in order to facilitate use of predictive coding method). Second, it is undisputed that the D4 scanning and coding work related to 50-80 boxes of Defendants' paper documents consisting of Defendants' internal business "forms." Karahasanovic Affirmation ¶ 7. While it is possible that some of these documents, and their respective "Custodians," may be associated in some way with, or have included information regarding the identity of the "custodians" at issue in connection with the parties' most recent discussions regarding the need for a predictive coding search protocol in order to facilitate a computerized review of Defendants' e-mails, Defendants have failed to provide any explanation as to whether such overlap even exists. It is therefore unlikely that any information Karahasanovic may have obtained regarding the custodians of Defendants' scanned and coded documents is relevant to the parties' scheduled discussions concerning the custodians of Defendants' e-mails. Simply, the record does not indicate, as was Defendants' burden, Karahasanovic had any access to information regarding the identity of Defendants' e-mail custodians prejudicial to Defendants' discussions with Plaintiffs on implementing predictive coding. Thus, Defendants' contention that D4's asserted access to important confidential information regarding Defendants' "Custodians," arising from D4's prior scanning and objective coding work for Defendants (actually performed by Infovision21) represents the same group of "Custodians" that were to be discussed (and as had been scheduled prior to Defendants' motion) with Plaintiffs' ESI consultants, evidences an improper disclosure by Karahasanovic and an improper use of Defendants' confidential information by Plaintiffs' attorneys, is without basis in fact. Any conceivable disclosure of confidential information to Plaintiffs' counsel by Karahasanovic pertaining to

custodians of Defendants' paper documents or e-mails is, on this record, therefore wholly speculative and, as such, insufficient to require disqualification of Plaintiffs' counsel.

In sum, Defendants have failed to meet their burden of establishing that (1) D4 provided expert services to Defendants, (2) Defendants' reasonably believed a confidential relationship between Defendants and D4 relating to the scanning and coding of Defendants' documents existed and (3) any of Defendants' confidential information was in fact, or highly likely to have been, disclosed to Karahasanovic or Plaintiffs' attorneys requiring disqualification of D4, or any of its employees, or Plaintiffs' counsel as Defendants' motion requests.

## C.    <u>Plaintiffs' Request for Costs</u>.

Asserting Defendants' motion to be "frivolous," Plaintiffs request the court award Plaintiffs' costs including attorneys fees incurred by Plaintiffs in connection with opposing Defendants' motion.  Plaintiffs' Memorandum at 13.  Defendants have not responded to this request.  As the court has determined that Defendants failed to satisfy Defendants' burden to establish the grounds necessary to grant Defendants' motion and the parties have not specifically addressed Plaintiffs' request for costs, the court directs Plaintiffs file papers in support of Plaintiffs' request <u>within 20 days</u>; Defendants' response shall be filed <u>within 10 days thereafter</u>; Plaintiffs' reply, if any, shall be filed not later than <u>10 days after filing</u> of Plaintiffs' response.  Oral argument shall be at the discretion of the court.

**CONCLUSION**

Based on the foregoing, Defendants' motion (Doc. No. 377) is DENIED.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

Dated: May 21, 2013
      Buffalo, New York